PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

Nos. 15-2811, 15-2826, 15-2844, 15-2925, 19-1398
_____

UNITED STATES OF AMERICA

v.

NICODEMO S. SCARFO, SALVATORE PELULLO,
WILLIAM MAXWELL, and JOHN MAXWELL,
Appellants
_____

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 1-11-cr-0740-001 thru 004)
District Judge:  Honorable Robert B. Kugler
_____

Argued
July 6, 2021

Before:  AMBRO, JORDAN, and BIBAS, *Circuit Judges*

(Opinion Filed:  July 15, 2022)
_____

Michael E. Riley   [ARGUED]
Law Offices of Riley and Riley
2 Eves Drive – Suite 109
Marlton, NJ   08053
        *Counsel for Nicodemo S. Scarfo*

Troy A. Archie   [ARGUED]
Afonso Archie & Foley
21 Route 130 South
Cinnaminson, NJ   08077
        *Counsel for Salvatore Pelullo*

Michael N. Huff   [ARGUED]
1333 Race Street
Philadelphia, PA   19107
        *Counsel for William Maxwell*

Mark W. Catanzaro
21 Grant Street
Mount Holly, NJ   08060
        *Counsel for John Maxwell*

Rachel A. Honig
Sabrina G. Comizzoli
Mark E. Coyne
Bruce P. Keller   [ARGUED]
Office of United States Attorney
970 Broad Street – Room 700
Newark, NJ   07102

Norman Gross   [ARGUED]
Office of United States Attorney
401 Market Street
Camden, NJ   08101
    *Counsel for Appellee*

_____

OPINION OF THE COURT

_____

# TABLE OF CONTENTS

I.     Overview ....................................................7
II.    Background ..................................................8
       A.    The Organized Crime Origins...........................8
       B.    The FirstPlus Takeover ...............................10
       C.    The FirstPlus Fraud ..................................14
       D.    The Investigation and Takedown.......................19
       E.    The Damage ...........................................20
       F.    Indictment and Pretrial Proceedings ................21
       G.    Trial.................................................23
       H.    Post-Trial Proceedings and Sentencing...........26
       I.    Appeals...............................................26
III.   Investigation Issues .......................................27
       A.    Collection of Pelullo's Cell Site Location
             Information ..........................................28
       B.    Filter Teams .........................................37
             1.    Background......................................38
             2.    Challenges to Filter Team Procedures .41
             3.    Challenges to Ex Parte Proceedings ....44
             4.    Crime-Fraud Exception.........................47
IV.    Pretrial Issues ............................................48
       A.    Speedy Trial Act Claim ...............................49
       B.    Admission of La Cosa Nostra Evidence and
             Denial of the Maxwells' Motion for Severance
             .....................................................54
             1.    Admission of LCN Evidence...............55
             2.    Denial of the Maxwells' Severance
                   Motion..........................................62
V.     Trial Issues ...............................................65
       A.    Scarfo's Joint Trial with Former Counsel
             Donald Manno..........................................65
             1.    Background......................................67

2.     Sixth Amendment ................................ 68

3.     Due Process ......................................... 72

B.     Pellullo's Sixth Amendment Ineffective Assistance of Counsel Claim .......................... 74

1.     Background .......................................... 74

2.     Ineffective Assistance of Counsel Claim .............................................................. 78

C.     Convictions for RICO Conspiracy Under 18 U.S.C. § 1962(d) ............................................ 84

1.     Constructive Amendment of Indictment ............................................................. 85

2.     Jury Instructions and Sufficiency of the Evidence ............................................. 89

D.     Firearm Conspiracy Conviction Following *Rehaif* ............................................................ 90

E.     Sufficiency of Evidence to Support William Maxwell's Convictions .................................. 95

1.     Conviction for Conspiracy to Unlawfully Transfer or Possess a Firearm .............. 95

2.     Convictions for Wire Fraud and Conspiracy to Commit Wire Fraud ...... 98

F.     Juror Issues ................................................. 101

1.     Background ........................................ 101

2.     Disclosure of the District Court's First Conversation with Juror #8 ................ 110

3.     Purported Coercion of the Jury by the District Court ..................................... 113

4.     Purported Coercion of the Substituted Juror by Other Jurors .......................... 117

5.     District Court's Response to Report of Juror Misconduct ............................... 122

VI.     Sentencing Issues ...................................................... 124

A.     Pellullo's Sentencing Challenges ................... 125

|     |     | 1. | Guidelines Sentencing Range Calculation | 126 |
|     |     | 2. | Loss Amount Enhancement | 129 |
|     |     | 3. | Victim Number Enhancement | 133 |
|     |     | 4. | Substantive Reasonableness | 136 |
|     | B. | Joint and Several Forfeiture Liability Following *Honeycutt* | | 136 |
|     |     | 1. | Background | 136 |
|     |     | 2. | *Honeycutt* and Its Progeny | 139 |
|     |     | 3. | Post-*Honeycutt*: John Maxwell | 141 |
|     |     | 4. | Post-*Honeycutt*: Pelullo | 142 |
|     | C. | Delay in Forfeiture of Pelullo's Property | | 144 |
|     |     | 1. | Background | 144 |
|     |     | 2. | CAFRA | 148 |
|     |     | 3. | Due Process | 150 |
| VII. | *Brady* Issues | | | 155 |
|     | A. | Denial of Scarfo's Request to File a Motion for a New Trial Pursuant to Rule 33(b) | | 156 |
|     | B. | Pelullo's Motion for Remand Based on *Giglio* Evidence | | 161 |
| VIII. | Conclusion | | | 169 |

JORDAN, *Circuit Judge.*

## I.    OVERVIEW

*Everybody calls me a racketeer.  I call myself a businessman.*

– Alphonse Gabriel Capone

The four appellants before us – Nicodemo Scarfo, Salvatore Pelullo, William Maxwell, and his brother John Maxwell – were convicted for their roles in the unlawful takeover and looting of FirstPlus Financial Group, a publicly traded mortgage loan company.  Their scheme commenced with the Defendants'[1] and their co-conspirators' extortion of FirstPlus's board of directors and its chairman to gain control of the company.  Once they forced the old leadership out, the Defendants proceeded to drain the company of its value by causing it to enter into expensive consulting and legal-services agreements with themselves, causing it to acquire (at vastly inflated prices) shell companies they personally owned, and using bogus trusts to funnel FirstPlus's assets into their own accounts.   The Defendants and their crew ultimately bankrupted FirstPlus, leaving its shareholders with worthless stock.

Each Defendant was convicted of more than twenty counts of criminal behavior and given a substantial prison

---

[1] We use the capitalized term "Defendants" to refer to the four individuals who were convicted and are now appealing, and "defendants" with a lower case "d" to refer to everyone who was indicted and part of the proceedings before the District Court.

sentence.  Now, in this consolidated appeal, their combined efforts challenge almost every aspect of their prosecutions, including the investigation, the charges and evidence against them, the pretrial process, the government's compliance with its disclosure obligations, the trial, the forfeiture proceedings, and their sentences.  Although they raise a multitude of issues, only one entitles any of them to relief: the government has conceded that the District Court's assessment of John Maxwell's forfeiture obligations was improper under a Supreme Court decision handed down during the pendency of this appeal.  Having jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a), we will affirm all the convictions and sentences, except for the forfeiture portion of John Maxwell's sentence.  We will remand that for the District Court to reassess what share of the forfeiture sum he should pay.

## II.    BACKGROUND[2]

### A.    The Organized Crime Origins

This case has its roots in organized crime, and, like other mob cases, it gets its start with family – both biological and made.  Nicodemo Domenico "Little Nicky" Scarfo Sr. was the "boss" of the Philadelphia branch, or "family," of La Cosa

---

[2] The following factual background is based on the evidence adduced at trial and is cast in the light most favorable to the prosecution.  *See United States v. Pungitore*, 910 F.2d 1084, 1097 (3d Cir. 1990) ("We are bound, after a jury has delivered a guilty verdict, to interpret the evidence in a light most favorable to the government.").

Nostra ("LCN") for most of the 1980s.[3] *See United States v. Pungitore*, 910 F.2d 1084, 1098 (3d Cir. 1990). He oversaw nearly a decade of murders, gambling, and extortion for the benefit of LCN. *Id.* at 1097-1102; *see also United States v. Scarfo*, 850 F.2d 1015, 1016 (3d Cir. 1988).

By the time the Defendants here began their FirstPlus scheme, however, he was out of the game, serving a lengthy federal prison sentence. *Pungitore*, 910 F.2d at 1152. His son, Nicodemo Salvatore "Nicky" Scarfo (the "Scarfo" in this opinion), wanted to fill the power vacuum, but his attempted takeover of the Philadelphia LCN family did not go according to plan. On Halloween in 1989, as he was having dinner at a restaurant, masked assailants ambushed him, shooting him several times but, no doubt to their chagrin, not killing him.

When he recovered, Scarfo sought the help of the Lucchese LCN family, which operated in northern New Jersey. He had an "in" with the Luccheses: their boss was incarcerated in the same prison as his father. According to the government's expert on the structure and operations of LCN, eventually the

---

[3] "La Cosa Nostra" is "an Italian phrase which literally translates as 'our thing' or 'this thing of ours.'" *Pungitore*, 910 F.2d at 1097 n.3. According to an FBI agent who testified at trial, the word "mafia" – despite its ubiquity in discussions of mobsters – refers to Italian organized crime based in Italy, while LCN is based in the United States. (JAC at 8282.) LCN is headed by a commission of "bosses," who in turn direct the illegal activities of regional organized crime "families." *Pungitore*, 910 F.2d at 1097. A family is "a highly structured criminal enterprise with a well defined chain-of-command" comprising multiple layers of operatives. *Id.* at 1098.

Lucchese family integrated Scarfo into their organization as a "made member" – someone who has been "fully inducted" and has "taken an oath of loyalty to the family." (JAC at 8280-81.) Being a made member meant that he had to generate money for the Lucchese family and share with it the profits of any criminal activities he pursued.

Scarfo's longtime friend Salvatore Pelullo, although not a blood relative, had a close relationship not only with Scarfo but with Scarfo's father too. The older Scarfo treated Pelullo as his nephew. Pelullo became an "associate" of the Luccheses – a criminal colleague who hadn't been "formally initiated into [the family's] ranks." *Pungitore*, 910 F.2d. at 1098. The government's expert testified that an associate like Pelullo had to "share … the profits of any of [his] criminal activity" with the family, and he had to answer to a made member, such as Scarfo, who would "supervis[e] and direct[]" his actions. (JAC at 8286-87 (trial testimony of government LCN expert).)

Before the events at issue in this case, Scarfo and Pelullo had each earned criminal convictions. Scarfo was convicted in 1990 of assaulting a woman in a hospital elevator, and then in 1993 for racketeering conduct. In 2002, he was convicted of running an illegal gambling business. Pelullo, meanwhile, was convicted of bank fraud and making false statements to the SEC in 1999. Three years later, he pled guilty to wire fraud.

## B.     The FirstPlus Takeover

In 2007, Scarfo and Pelullo stumbled on "the golden vein of deals" – an opportunity that seemed so lucrative, they thought they could ride it into retirement. (JAC at 1781-82.)

That opportunity was FirstPlus, a Texas-based mortgage company whose main operating subsidiary had recently exited bankruptcy after falling on hard times. Following that restructuring, FirstPlus began receiving periodic, multi-million-dollar "waterfall" payments from its bankruptcy trust.[4] At that point, it was essentially a dormant parent company receiving the waterfall payments but doing no business.

After the payments started coming in, a former FirstPlus employee, Jack Roubinek, had the idea to locate investors and gain control of FirstPlus. In early 2007, he contacted his attorney, William Maxwell, and asked him to research the possibility of investing in FirstPlus. At around the same time, Pelullo learned about FirstPlus from his business acquaintance David Roberts, a mortgage broker from Staten Island. A group including Pelullo, Roberts, Scarfo, Roubinek, and Gary McCarthy (Pelullo's attorney and an eventual codefendant)

---

[4]As part of the subsidiary's bankruptcy, a creditor's trust was set up to pay the subsidiary's creditors, one of which was FirstPlus, which held an unsecured claim against its subsidiary. Income generated by the subsidiary from outstanding mortgages and investments flowed to the trust, which paid it out to creditors in order of priority, creating a "waterfall" of payments. Several years later, a grantor's trust was established as a result of litigation with shareholders. That second trust was interposed between the creditor's trust and the creditors: a portion of the money coming into the creditor's trust was routed to the grantor's trust, and from there it was disbursed to FirstPlus, other creditors of the subsidiary, and FirstPlus shareholders.

11

gathered in Philadelphia to discuss a potential takeover of FirstPlus.

At first, according to Roberts, their thinking was "to try to raise money to buy [FirstPlus's] stock[.]" (JAC at 1791.) That plan, however, fell through: the group realized that none of them had the money needed to buy the stock. Luckily for them, however, FirstPlus had recently fired Jack Draper, a high-ranking employee. Draper had griped about his firing to Roubinek – the two having become acquainted while employed at FirstPlus – and to William Maxwell.[5] Those three were joined by Roberts and Pelullo for a meeting in Dallas, where Draper, bearing a grudge, told the group he was willing to "divulge all" and accuse the FirstPlus board and CEO Daniel Phillips of financial improprieties. (JAC at 1813-16 (trial testimony of Roberts).)

That "completely changed the direction of the plan." (JAC at 1815.) Seeing an opportunity, Pelullo, who was emerging as the leader of the takeover group, worked with William Maxwell to send letters to Phillips and other board members. The letters were purportedly written by Draper and threatened that he would go to "the FBI, the IRS[,] the U.S. Attorney's [O]ffice[,] [FirstPlus's] Bankruptcy's attorney and the SEC" with claims of financial misconduct including bribery, money laundering, and Sarbanes-Oxley violations.[6]

---

[5] William Maxwell's brother, John, is another of the Defendants here. We thus refer to each Maxwell brother using either his full name or just his first name.

[6] The Sarbanes-Oxley Act of 2002 was enacted "[t]o

12

(JAC at 1822.) They also threatened to tell Phillips's wife – who was then divorcing him – that Phillips had raped an assistant and used the company's moneys to pay off the victim when she got pregnant. According to Phillips, all those claims were false, but he was nonetheless concerned that their dissemination would cause grave damage to his and the company's reputations.

The letters had their intended effect. Phillips met with William Maxwell and Pelullo, who indicated the allegations would be dropped if Phillips and the FirstPlus board handed the business over to them. Evidently, it was an offer he couldn't refuse.

Phillips swiftly persuaded the entire board to give up their positions rather than try to engage in what would be a messy and expensive fight with Pelullo's group. Pelullo then selected a new board of directors for FirstPlus: William Handley (a friend of Pelullo's who took over as Chief Financial Officer), John Maxwell (William Maxwell's brother and the titular Chief Executive Officer), Roberts (who became secretary of the company), Harold Garber (Scarfo's father's attorney, who became the new board chairman), and Robert O'Neal (one of William's clients, who later succeeded Garber

---

safeguard investors in public companies and restore trust in the financial markets[,]" *Lawson v. FMR LLC*, 571 U.S. 429, 432 (2014), by mandating that public companies take particular steps to assure the integrity of their audits and financial reports.

as chairman).[7] The necessary corporate formalities were followed and, on June 7, just four days after sending the threatening letters, Pelullo and his cronies had total control of the company.

### C. The FirstPlus Fraud

With FirstPlus in their power, the new officers and directors went to work – making the company work for them. Pelullo, along with William Maxwell, controlled the show. They even obtained stamps of the directors' signatures so they could run the looting scheme without interference.

The board entered into a "legal services agreement" with William, who became FirstPlus's "special counsel." (JAC at 5315-16; JAD at 1653, 1673-75.) The contract formally granted him significant power within the organization. It purported to give him "[a]ll legal authority for any matter involving" FirstPlus; the power to select and retain legal counsel, accountants, and, "in [his] sole discretion," "any and all consulting firms"; and the right to "spend funds, incur legal expenses, and to expend fees in excess of [his] retainer and to seek reimbursement[.]" (JAD at 1673-75.) He could also "restrict disclosure of information … to any person[,]" including the members of the board. (JAD at 1674-75.) For his supposed labors, William made $100,000 a month, plus expenses of up to $30,000.

---

[7] William Handley and John Maxwell became codefendants in this case.

14

With that authority, William hired Pelullo as a consultant to FirstPlus, a role that shielded him from public scrutiny. In practice, though, Pelullo was the "de facto president" of the company, according to FirstPlus's public auditor, Anthony Buczek. (JAC at 7069.) John Maxwell was named as CEO, but he largely functioned under Pelullo's control.

Using his controlling position at FirstPlus, and with William's help, Pelullo set up several channels through which money flowed out of FirstPlus's accounts and into his and Scarfo's coffers. For one, Pelullo set up a bogus trust that ostensibly had his children as its beneficiaries. In practice, however, according to codefendant Cory Leshner, the trust was "created for the purposes of owning" Seven Hills Management, LLC, a company with Pelullo's brother-in-law, Alexander Lyubarskiy, listed as its head.[8] (JAC at 3661.) Lyubarskiy's supposed management of Seven Hills was strictly for show; "[e]verything he did was at the direction of Mr. Pelullo." (JAC at 3665.)

William Maxwell, on FirstPlus's behalf, retained Seven Hills to provide FirstPlus with "consulting services." (JAD at 675.) The agreement entrusted Seven Hills (and, through it, Pelullo) with "a litany of duties" that Leshner summarized as "helping run the entire operation" of FirstPlus. (JAC at 3755.) Seven Hills was compensated $100,000 each month, plus $15,000 in expenses.

---

[8] Leshner served as Pelullo's personal assistant and a vice president of Seven Hills.

Scarfo, meanwhile, profited from FirstPlus as well. Like Pelullo, he set up a trust that was nominally intended to "benefit[] [his] daughter" but in actuality served as a vehicle for his own gain. (JAC at 3673, 4026 (trial testimony of Leshner).) That trust, in turn, owned Learned Associates of North America, LLC ("LANA"); both entities were run "[o]n paper" by Scarfo's cousin and codefendant John Parisi. (JAC at 3675.) That was a ruse to keep Scarfo's name off the books; "[i]n reality," it was Scarfo, not Parisi, who controlled the trust and LANA. (JAC at 3673-75.) LANA enabled Scarfo to get in on the take through a secondary consulting agreement between LANA and Seven Hills. The agreement obliged LANA to perform for FirstPlus "exactly the same" tasks that Seven Hills was already being paid to do, according to an FBI investigator. (JAC at 579.) In practice, LANA performed no work, but the deal entitled LANA (and, through it, Scarfo) to a roughly one-third cut of what Seven Hills was getting from FirstPlus. As the government puts it, those payments were "effectively 'tribute'" to Scarfo. (Answering Br. at 18.)

Those arrangements were all facilitated by William Maxwell, to whose attorney trust account the consulting fees and expenses were wired. William generally passed those on to Seven Hills, which in turn sent $33,000 a month, plus so-called expenses, to LANA. Pelullo was "completely involved with" and oversaw the flow of money from FirstPlus to Maxwell and on to the consulting firms. (JAC at 3933 (trial testimony of Leshner).)

Pelullo and Scarfo also profited from FirstPlus by having it acquire three shell companies they owned. First up was Rutgers Investment Group, LLC, an unsuccessful mortgage loan provider majority owned by LANA and Seven

16

Hills. Rutgers's single source of revenue was receivables it supposedly got from Shore Escapes, a defunct vacation sales company also owned by Seven Hills and LANA. It was make-believe money, but on June 7, the new team's first day in office, Pelullo got approval for the acquisition from the FirstPlus board, and the following month FirstPlus bought Rutgers for approximately $1.8 million and 500,000 FirstPlus shares.

Two more acquisitions of companies owned by Seven Hills and LANA followed soon after. FirstPlus bought Globalnet Enterprises, LLC, a financially struggling cleaning company, for around $4.5 million and more than one million shares of FirstPlus stock. It then paid $725,000 – including $100,000 directly to each of Seven Hills and LANA – to buy The Premier Group, LLC, a company that Pelullo set up in May 2007 to hold the assets of a company at least nominally in the business of representing the interests of insurance policyholders.

Pelullo made sure that FirstPlus bought his and Scarfo's companies on preposterously favorable terms. To conduct valuations of the target businesses, he brought in Kenneth Stein, the head of a business brokerage firm. Stein told Pelullo that he (Stein) was unqualified to perform the valuations, but Pelullo said to "[j]ust go get it done[.]" (JAC at 4743-44.) Though Stein believed that the companies' financials were "horrific" and "atrocious" (JAC at 4841), Pelullo pressured him into preparing nominally "independent" valuation reports that overvalued the businesses. William Maxwell covered up Pelullo's involvement by listing his own name on the engagement letters and handling Stein's payments.

17

Also helping grease the skids were two of Pelullo's attorneys – David Adler and Gary McCarthy. Although FirstPlus's public filings said that the acquisitions were "completed on an arms-length basis" (JAD at 2337), that was not even remotely true. Pelullo had his lawyers on both sides of the negotiating table, with Adler representing FirstPlus and McCarthy representing the shell companies.

In the meantime, Scarfo, Pelullo, and William Maxwell began to take advantage of their ill-gotten gains. Scarfo bought a house and expensive jewelry for his wife; Pelullo purchased a Bentley automobile; Scarfo and Pelullo together bought a yacht; and William and Pelullo had FirstPlus acquire a plane for their personal use. The scheme was working as planned.

Still, the fact that FirstPlus was a public company, with disclosure requirements under federal securities laws, added complications to the looting. To get around those requirements, Pelullo hired Anthony Buczek as FirstPlus's auditor, based on a referral by Howard Drossner, who later became a codefendant. Pelullo pressured Buczek into hiding or obscuring material information about the company – such as the Rutgers and Globalnet acquisitions, the consulting agreements, and Pelullo's prior federal fraud convictions[9] – even though FirstPlus was required to disclose that information in its SEC filings.

---

[9] Pelullo knew that his prior felony convictions posed a problem: he told Leshner that he "didn't want to be on the [FirstPlus] board of directors because of his previous convictions." (JAC at 3650-51.)

18

## D.  The Investigation and Takedown

The party had to come to an end, and eventually the actions of the FirstPlus thieves caught up with them.  While investigating a tip that Scarfo was again trying to gain control of the Philadelphia LCN, the Federal Bureau of Investigation became aware of the mob ties and suspicious circumstances surrounding the resignation and replacement of FirstPlus's former board.  As FBI agents dug deeper, they came to believe – rightly – that Pelullo and Scarfo were behind the FirstPlus takeover and would systematically steal from it.  They obtained court permission to track the defendants' locations through their cellphones and wiretap their calls over the course of several months.  Among the calls that agents picked up were communications between Pelullo and his lawyers (Maxwell, McCarthy, and Donald Manno).  To weed out any discussions protected by Pelullo's attorney-client privilege, the government asked the District Court to review in camera the records of wiretaps assembled by a special "filter team" before they were transmitted to prosecutors [10] – all, of course, unbeknownst to Pelullo.

The conspirators eventually came to suspect that they were under investigation.  For example, while on a long drive from Dallas to deliver a gun to Scarfo's house in New Jersey,

---

[10] The filter team, which comprised both prosecutors and investigators, reviewed the contents of the intercepted calls between Pelullo and his lawyers to protect the attorney-client privilege.  *See infra* Section III.B.1.  The filter team sought court permission to transmit non-privileged communications to the prosecution team.  *Id.*

19

John Maxwell suspected that the government had agents following him in a car and in a helicopter.

The government's investigation escalated on May 8, 2008. That day, the FBI executed search warrants at thirteen locations across the country, including FirstPlus's offices in Texas and the defendants' homes, offices, and law firms in Pennsylvania and New Jersey. They also seized the plane, the Bentley, and the yacht, along with guns they found on board the yacht and more guns and ammunition found at Scarfo's and Pelullo's homes and Pelullo's office. It took another three years for the government to obtain an indictment from a grand jury, but that day did arrive. In unpacking the evidence and building their case, prosecutors set up additional filter teams to review the evidence recovered from McCarthy's and Manno's law offices and to set aside anything that was privileged before turning the rest over to the team handling the prosecution of the defendants.

### E.    The Damage

When Scarfo, Pelullo, and their co-conspirators took over the company in early June 2007, FirstPlus had almost $10 million in its accounts, and it received a $4.4 million waterfall payment later that year. By the following May, when the FBI seized the accounts, there was less than $2,000 left. Between the fraudulent consulting and legal-services agreements channeled through bogus trusts and the acquisitions of virtually worthless companies, the conspirators had bled FirstPlus dry. It soon fell into bankruptcy, leaving its more than 1,200 public stockholders with the company's husk.

### F. Indictment and Pretrial Proceedings

In October 2011, a federal grand jury in New Jersey handed down a twenty-five-count indictment against thirteen defendants, based on the FirstPlus scheme. All four Defendants before us – Scarfo, Pelullo, and the Maxwell brothers – were charged with conspiring to participate in the affairs of an enterprise through a pattern of racketeering activity, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d); conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371; conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349; sixteen substantive counts of wire fraud, in violation of 18 U.S.C. § 1343; conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h); conspiracy to commit bank fraud, in violation of 18 U.S.C. § 1349; conspiracy to make false statements in connection with a loan application, in violation of 18 U.S.C. §§ 371 and 1014; and conspiracy to transfer a firearm to prohibited persons, or to possess a firearm by a convicted felon, in violation of 18 U.S.C. §§ 371 and 922. In the RICO conspiracy count, prosecutors charged all four Defendants with engaging in a pattern of racketeering activity comprising various predicate acts: mail fraud, wire fraud, bank fraud, obstruction of justice, extortion under the federal Hobbs Act, interstate travel in aid of racketeering, money laundering, and fraud in the sale of securities.

In addition, Scarfo, Pelullo, and William Maxwell were charged with conspiracy to obstruct justice, in violation of 18 U.S.C. § 1512(k). Scarfo, alone, was also charged with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). And finally, the indictment sought criminal forfeiture of assets acquired from the proceeds of the

21

defendants' criminal misdeeds, including the vehicles, jewelry, and other assets that had been seized pursuant to the search warrants in 2008.

The other nine defendants, who were less involved in the scheme, were charged with various combinations of those counts, though none faced as many charges as did the four primary Defendants. Five of the lesser players – Leshner, Parisi, Drossner, Lisa Murray-Scarfo,[11] and Todd Stark[12] – took plea deals before the case went to trial. Due to William Handley's poor health, the charges against him were severed and eventually dismissed. That left three other defendants – McCarthy, Adler, and Manno, all of whom were lawyers – alongside the main four heading to trial.

Extensive motions practice, discovery, and pretrial proceedings ensued, lasting more than two years. Given the breadth of evidence and the amount of time it was going to take all parties to get ready for trial, the District Court designated the matter a "complex case" and so tolled the deadlines of the Speedy Trial Act.

The parties also engaged in comprehensive briefing and argument on numerous issues, some of which are relevant here.

---

[11] Lisa Murray-Scarfo is Scarfo's wife, who, along with the four primary Defendants, was indicted for conspiracy to commit bank fraud and conspiracy to make false statements in connection with a loan application.

[12] Stark worked for Seven Hills as Pelullo's driver and was indicted for conspiring to get Pelullo a firearm.

Multiple defendants, including both Maxwells, sought to sever their trials, particularly from Scarfo's and Pelullo's. The District Court denied those motions. In early 2013, Pelullo unsuccessfully tried to have the charges against him dismissed on the basis of the Speedy Trial Act, complaining that the government and the Court were taking too long to bring the case to trial. Later that year, Pelullo asked the Court to order that the yacht and the Bentley, among other assets, be returned to him, which the Court refused to do.

### G. Trial

Trial for the seven remaining defendants kicked off on January 8, 2014. Because the case involved organized crime, the District Court empaneled an anonymous jury. All defendants were represented by counsel, except for Manno, who proceeded pro se. To simplify the proceedings, the District Court allowed any motion by one defendant to count as having been made on behalf of all the defendants.

Still, conducting a joint trial for seven defendants facing twenty-five counts in a complex case proved challenging, and trial stretched through eighty-four days in court over the course of six months. Several participants in the conspiracy, including Roberts, O'Neal, and Leshner, turned on their associates and testified for the prosecution. The defendants did not testify but instead relied on cross-examination, character witnesses, and expert testimony to present the case for the defense.

Scarfo's, Pelullo's, and William Maxwell's defenses hinged on the proposition that they had simply been engaged in standard, run-of-the-mill business practices. John Maxwell, for his part, claimed he had been in the dark as to the others'

malfeasance. The three attorney defendants – McCarthy, Adler, and Manno – blamed their clients and said they had been unaware of the criminal conduct.

The government sought to rebut those narratives, telling jurors: "Is this how legitimate businessmen conduct themselves? The answer to that is overwhelmingly no. Legitimate businessmen don't lie, they don't cheat, they don't steal." (JAC at 12687; *accord* JAC at 12504.) The government also pointed to the mob connections behind the entire operation, explaining to the jury how organized crime works and connecting LCN, and Scarfo's and Pelullo's roles within it, to the FirstPlus scheme. The District Court repeatedly made clear to the jurors, however, that they could consider that evidence only as it may show that Scarfo and Pelullo (and not any of the other defendants) were linked to organized crime, and only for the purpose of determining their motives and the modus operandi of the scheme.

In mid-June 2014, the jury began to deliberate. The Court delivered extensive instructions after hearing objections from the parties. The verdict form asked the jury to reach a unanimous finding of guilty or not guilty beyond a reasonable doubt on each of the charges, as well as to make specific findings as to whether the government had proven each of the RICO predicate acts as to each of the defendants.

Given the length of the trial, perhaps it was inevitable that some juror issues would arise. Even before deliberations started, the Court excused a juror who expressed fears that her and her family's identities would be revealed to the defendants. An alternate was seated in her stead. And after the jury had been deliberating for a week, another juror was excused

because she had prepaid vacation plans. Rather than proceeding with an eleven-member jury, the parties agreed to have the Court substitute an alternate juror and instruct the jurors to start their deliberations anew.

The Court also fielded a complaint from a juror, who said that other members of the jury were being intransigent in discussions, and another complaint from an alternate, who told the Court that he had witnessed jurors discussing the case outside of the jury room, in violation of the Court's instructions. In each case, the Court inquired into the concerns, informed the parties, and gave them an opportunity to suggest how to proceed. Both times, the Court ultimately chose to allow the jurors to continue their deliberations.

The jury reached its verdict on July 3. It convicted Scarfo, Pelullo, and the Maxwell brothers on virtually all charges – though the Maxwells were acquitted of the bank fraud and false statements conspiracies[13] – and found that the government had proven each of the charged racketeering predicate acts that the Court had sent to the jury (which, for some of the defendants, was fewer than the eight predicates listed in the indictment). McCarthy, Adler, and Manno, however, were acquitted. The District Court then held separate forfeiture proceedings, at the end of which the jury found that the proceeds from the fraudulent scheme, including the specific property the government had sought – the airplane, yacht,

---

[13] While the jury verdict form did not list either John or William as defendants under those counts, they were indicted for those offenses and are listed on the District Court docket as "acquitted" of those charges.

Bentley, and jewelry, along with FirstPlus stock certificates, the contents of bank accounts, and several thousand dollars in cash – were all forfeit.

### H.    Post-Trial Proceedings and Sentencing

A blizzard of post-trial motions followed, including several attempts to secure new trials, all of which were rejected. Eventually, the District Court told the Defendants to stop filing motions, and it moved on to the sentencing phase.

It sentenced both Scarfo and Pelullo to 360 months' imprisonment, William Maxwell to 240 months, and John to 120 months.  As relevant here, the Court calculated the sentencing ranges after finding that the Defendants had caused a loss of more than $14 million – the value FirstPlus lost over the course of the scheme – and had harmed more than 1,000 victims – reflecting the number of shareholders whose investments had been rendered worthless.

The District Court also ordered the Defendants to pay more than $14 million in restitution and held them jointly and severally liable for a $12 million forfeiture order for the proceeds of their criminal activities.  The forfeiture ruling also transferred to the United States title to all the items the Defendants had purchased with ill-gotten payments the jury found were forfeitable.

### I.    Appeals

The Defendants each timely appealed, and we

26

consolidated their appeals.[14]  In August 2017, however, we granted Pelullo's request to remand his case for the District Court to address his motion for a new trial based on his claim that one of his attorneys labored under an undisclosed conflict of interest.  Following briefing and an evidentiary hearing, the District Court denied Pelullo's motion in February 2019.  He appealed that ruling, and we consolidated that appeal with the others.

Before us, the parties completed a supplemental round of briefing on Pelullo's claim regarding a federal investigation and indictment of O'Neal for separate and unrelated wrongdoing.  They also submitted letters and briefing addressing the effect of certain Supreme Court decisions that issued while these appeals were pending.

The Defendants' appeals raise some two dozen issues, depending on how you count them, across five phases of the prosecution: (1) the government's investigation, (2) pretrial proceedings, (3) trial, (4) sentencing, and (5) post-trial issues concerning the government's compliance with its disclosure obligations.

## III.  INVESTIGATION ISSUES

Pelullo makes two claims of error arising out of the government's investigation.  First, he says that the government

---

[14] All record citations, except where otherwise indicated, are to the combined District Court docket in No. 1-11-cr-0740.  All citations to the docket in this appeal are to the docket in No. 15-2826.

violated his Fourth Amendment rights by tracking cell site location information from his cellphones without obtaining a warrant. Second, he criticizes the government's procedures for processing communications intercepted from wiretapped phones and for reviewing potentially privileged documents seized from his attorneys' offices. Neither claim entitles him to relief.

## A. Collection of Pelullo's Cell Site Location Information[15]

The Stored Communications Act ("SCA") allows government investigators to collect suspects' cell site location information ("CSLI").[16] 18 U.S.C. § 2703(c). Investigators can obtain a court order to that end by submitting "specific and articulable facts showing that there are reasonable grounds to believe that the [data] are relevant and material to an ongoing criminal investigation." *Id.* § 2703(d). In 2007 and 2008, prosecutors in this case repeatedly sought authorization to gain

---

[15] We review a "denial of a motion to suppress for clear error as to the underlying factual findings and exercise plenary review over its application of the law to those facts." *United States v. Burnett*, 773 F.3d 122, 130 (3d Cir. 2014).

[16] "CSLI is a type of metadata that is generated every time a user's cell phone connects to the nearest antenna. The user's cell phone service provider retains a time-stamped record identifying the particular antenna to which the phone connected." *United States v. Goldstein*, 914 F.3d 200, 202 (3d Cir. 2019). "Because most people constantly carry and frequently use their cell phones, CSLI can provide a detailed log of an individual's movements over a period of time." *Id.*

28

access to CSLI for Pelullo's and Scarfo's phones.[17] The District Court approved the requests, authorizing the collection from Pelullo's cellphone provider of nine months of historical cell site data, going as far back as September 2006, and eleven months of prospective data, through May 2008.[18]

As trial approached, Pelullo moved to suppress that evidence based on the duration of the tracking and the government's failure to show probable cause for obtaining the information. The District Court denied the motion, holding (in reliance on our precedent at the time) that probable cause was not required to obtain the CSLI and that, even if it was, the

---

[17] The investigators also obtained authorization to use two other surveillance methods: pen registers to record outgoing phone numbers dialed on the phones, 18 U.S.C. § 3127(3), and trap-and-trace devices to record incoming phone numbers, *id.* § 3127(4).

[18] "Prospective" CSLI means data collected after the government obtains court permission to acquire it, while "historical" CSLI describes data already in existence at the time of the court order. *In re Application of U.S. for an Order Authorizing Installation & Use of a Pen Register & a Caller Identification Sys.*, 402 F. Supp. 2d 597, 599 (D. Md. 2005).

The District Court similarly approved the collection of prospective and historical CSLI from Scarfo's phone, and Scarfo moved alongside Pelullo in the District Court to suppress that data. But he does not, on appeal, challenge the Court's denial of his suppression motion, so we are only concerned with Pelullo's attack on the government's gathering of CSLI from his phones.

evidence was nonetheless admissible by virtue of the good-faith exception.

Pelullo characterizes the government's applications as "the most egregious and intrusive surveillance request ever filed by a United States Attorney." (SP Opening Br. at 184.) He argues that the District Court erred in refusing to suppress the CSLI evidence obtained during the tracking. [19] His

[19] Invoking Federal Rule of Appellate Procedure 28(i), each Defendant purports to adopt all arguments of his "co-appellants which are applicable to himself." (SP Opening Br. at 223; NS Opening Br. at 183; WM Opening Br. at 36; JM Opening Br. at 49.) Each Defendant then identifies specific arguments advanced by codefendants that he intends to adopt. We will recognize their specific adoptions but not the "blanket request[s]" to adopt, which "fail[] to specify which of the many issues of [their] codefendants [they] believe[] worthy of our consideration." *United States v. Fattah*, 914 F.3d 112, 146 n.9 (3d Cir. 2019) (citing Fed. R. App. P. 28(a)(5)). "[W]e will [not] scour the record and make that determination for [them]." *Id.*; *accord Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993). Each Defendant has thus abandoned and forfeited any argument raised by his codefendants that he did not specifically adopt.

As already noted, Scarfo did not adopt Pelullo's CSLI argument. *Supra* note 18. Both Maxwells, however, did specifically adopt the argument. Their problem is they lack standing to pursue that Fourth Amendment claim, as no CSLI pertaining to them was collected by the government. *See United States v. Cortez-Dutrieville*, 743 F.3d 881, 883 (3d Cir. 2014) (defendant seeking "to invoke the Fourth Amendment's

reasoning centers on *Carpenter v. United States*, in which the Supreme Court held that the collection of historical CSLI is a "search" under the Fourth Amendment and that the SCA's "reasonable grounds" standard for obtaining a court order "falls well short" of the probable cause standard the Fourth Amendment imposes. 138 S. Ct. 2206, 2219-21 (2018).

Nobody disputes that, under *Carpenter*, acquiring a defendant's CSLI without a warrant is an unconstitutional search. *United States v. Goldstein*, 914 F.3d 200, 203 (3d Cir. 2019). The question is whether Pelullo was entitled to a remedy for that violation of his Fourth Amendment rights – specifically, to have the illegally obtained CSLI suppressed at trial.

The exclusionary rule is a "judicially created remedy" by which evidence is suppressed in order to "deter future Fourth Amendment violations." *Davis v. United States*, 564 U.S. 229, 236-38 (2011). We do not reflexively apply it whenever an unconstitutional search takes place. *Goldstein*, 914 F.3d at 203. Instead, it is reserved for those cases where its expected deterrent effect justifies its use. *Id.* at 203-04.

One set of circumstances in which suppression is not justified is when the government has an "objectively reasonable good faith belief in the legality of [its] conduct" at the time of the search. *Id.* at 204 (alteration in original). That good-faith exception to the exclusionary rule is satisfied when

exclusionary rule" must have standing, which is the case when he has a "legitimate expectation of privacy in the invaded place" (citation omitted)).

31

the search in question was undertaken in "reli[ance] on a properly-obtained valid judicial order, a then-valid statute, and then-binding appellate authority[.]" *Id.* Here, prosecutors obtained CSLI pursuant to a court order following the SCA's procedures, and, in 2007 and 2008, no binding precedent required them to do more. On the contrary, that was standard procedure at the time. *See id.*; *United States v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018); *United States v. Joyner*, 899 F.3d 1199, 1205 (11th Cir. 2018). Because we do not expect the government to have anticipated the "new rule" announced a decade later in *Carpenter*, its reliance on the SCA was reasonable, and so the good-faith exception applies to its acquisition of CSLI data without a warrant. *Goldstein*, 914 F.3d at 201, 204-05.

Pellullo argues against that conclusion, saying that the government lacked a good- faith basis for seeking prospective CSLI – particularly over a lengthy time period – without a warrant. He seeks to cabin *Carpenter* and *Goldstein* as announcing a "new rule" only as to *historical* CSLI. [20] Tracking his movements in real time, Pellullo says, involved an "even greater intrusion into [his] privacy, for a far longer period of time[,]" and so the government should have known that it needed a warrant even prior to *Carpenter*. (SP Opening Br. at 189.)

Yet Pellullo cites no pre-*Carpenter* authority from appellate courts that would have put the government on notice that seeking prospective CSLI required doing more than

---

[20] For the distinction between prospective and historical CSLI, see *supra* note 18.

satisfying the SCA's requirements.[21]  He cannot even show a consensus among district courts: at the time the orders at issue here were signed, courts had reached differing conclusions on whether officers seeking CSLI needed to show probable cause and get a warrant, and they were still grappling with the Fourth Amendment's application to both historical and prospective CSLI.  *See, e.g.*, *In re Applications of U.S. for Orders Pursuant to Title 18, U.S. Code Section 2703(d)*, 509 F. Supp. 2d 76, 78-79, 78 n.4 (D. Mass. 2007) (noting a "disagreement among courts" and collecting cases that granted applications under the SCA standard and those that instead required a showing of probable cause).[22]  Neither we nor the Supreme Court had addressed the issue.  We did weigh in a few years after the searches here took place, in *In re Application of the U.S. for an Order Directing a Provider of Electronic Communication*

---

[21] After argument, Pelullo brought to our attention *Leaders of a Beautiful Struggle v. Baltimore Police Department*, 2 F.4th 330 (4th Cir. 2021) (en banc), in which the Fourth Circuit extended *Carpenter* to new aerial surveillance technology and enjoined the City of Baltimore's use of it.  Setting aside that the case does not deal with CSLI, it does not affect our analysis of the state of the law *before* the Supreme Court held in *Carpenter* that collecting historical CSLI constituted a search.

[22] Some of those cases held that prospective CSLI was not authorized by the SCA.  But even if the data collection here violated the SCA, "suppression is not a remedy for a violation of the [SCA]" and is only appropriate if "cell site location data was obtained … in violation of the Fourth Amendment." *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014).

33

*Service to Disclose Records to the Government*, 620 F.3d 304, 312-13 (3d Cir. 2010), but that was only to decide that, for Fourth Amendment purposes, acquiring historical CSLI was not a search, a holding later abrogated by *Carpenter*. In sum, then, the officers lacked clear guidance from any caselaw, much less binding precedent, that would have put them on notice that obtaining prospective CSLI would require compliance with the Fourth Amendment.

Undeterred, Pelullo highlights language in *In re Application* noting that CSLI could "be used to allow the inference of present, or even future, location" and thus resembles a tracking device. *Id.* He also points out that the D.C. Circuit held, prior to *Carpenter*, that GPS tracking requires a warrant. *United States v. Maynard*, 615 F.3d 544, 563-64 (D.C. Cir. 2010). Based on those and other decisions, he says that, even before *Carpenter*, the heightened threat to privacy posed by prospective CSLI should have been evident to the officers.

Setting aside that the GPS data considered by the D.C. Circuit reveals a person's movements more precisely than does CSLI, which logs the suspect's general area, "only *binding* appellate precedent" "at the time of the search" is relevant to the good-faith exception. *Goldstein*, 914 F.3d at 205. While conducting this investigation, prosecutors dealt with an unsettled area of law but relied in good faith on what was available to them – the plain text of the SCA and the court order they obtained in compliance with that Act. Given those circumstances, excluding the CSLI would not have "serve[d] any deterrent purpose[,]" *id.* at 204, and the District Court did not err in refusing to suppress the evidence.

34

Pelullo nonetheless insists that, even under the law as it then existed, the CSLI should have been suppressed because the government, in its applications for the court orders, misrepresented the technological capabilities of the equipment used to collect information from Pelullo's phone and falsely claimed that the phone had a connection to New Jersey.[23]  He cites the principle that evidence must be suppressed "if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." *United States v. Leon*, 468 U.S. 897, 923 (1984).

His claim that the government made misrepresentations in those applications fails, however, because he did not first raise it before the District Court.  Federal Rule of Criminal Procedure 12 requires that a request to suppress evidence "be raised by pretrial motion[.]" Fed. R. Crim. P. 12(b)(3)(C).  As a result, a suppression argument raised for the first time on appeal is forfeited, and we do not consider it even under Rule 52(b)'s plain-error standard. *United States v. Rose*, 538 F.3d 175, 182-84 (3d Cir. 2008).  Pelullo offers no explanation for why he did not object in the District Court to the alleged

---

[23] Specifically, Pelullo argues that the government misrepresented both that it lacked the capability to collect outgoing phone numbers dialed on his cellphones using a pen register without also collecting dialed "content" information, such as bank account numbers and Social Security numbers, and that it was unable to obtain precise "pin-point" location information for his phones using CSLI and could only ascertain the larger "sector" in which the phones were located.  (SP Opening Br. at 195-98.)

misrepresentations, so there is no "good cause" to excuse his failure to do so. [24]  *Id.* at 184-85.

Even if Pelullo had not forfeited that suppression argument, his challenge to the evidence would prove fruitless. The government only introduced a small quantity of CSLI at trial.  And what it did rely on merely served to corroborate other evidence of Pelullo's whereabouts.  For example, multiple witnesses testified that Pelullo was in Dallas during the takeover of FirstPlus, and, as a further example, visitor logs and security footage showed that Pelullo repeatedly visited Scarfo's father in prison in Atlanta.  Any alleged error in the admission of the CSLI was "rendered harmless" "in light of all of the other evidence" at trial.[25]  *United States v. Perez*, 280 F.3d 318, 338 (3d Cir. 2002).

---

[24] It is true that Pelullo joined Scarfo's challenge regarding the duration of the tracking and the lack of probable cause.  But neither defendant raised the misrepresentation issue noted here, and accordingly it is forfeited.  *See United States v. Joseph*, 730 F.3d 336, 342 (3d Cir. 2013) (holding that a suppression argument in the district court must match the argument in the court of appeals to be preserved).

[25] Pelullo also argues that improprieties in the collection of the CSLI led to his conviction because they served as one of the bases for the government's requests to conduct wiretaps.  That, too, is not a basis for relief, since Pelullo makes no effort to show that the wiretap applications would have been devoid of probable cause without the CSLI.  *See Franks v. Delaware*, 438 U.S. 154, 155-56 (1978) (holding that, when a defendant establishes the falsity of a statement in an affidavit used to

## B.     Filter Teams[26]

Because federal agents intercepted and seized materials covered by attorney-client privilege, the government established filter teams to keep that information out of

procure a warrant and when "the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded").

[26] We exercise de novo review over specific legal issues underlying the claim of attorney-client privilege and review factual determinations for clear error. *In re Impounded*, 241 F.3d 308, 312 (3d Cir. 2001). We review for abuse of discretion a district court's judgment that the crime-fraud exception applies. *Id.* at 318. We review pre-indictment procedures used by the District Court for abuse of discretion. *See In re Grand Jury Subpoena*, 223 F.3d 213, 219 (3d Cir. 2000) (finding no abuse of discretion in district court "denying Appellant and/or his attorney access to this information to protect grand jury secrecy").

Preserved Fifth Amendment claims are typically reviewed for harmless error, *United States v. Toliver*, 330 F.3d 607, 613 (3d Cir. 2003), while infringements on the Sixth Amendment right to counsel are generally structural errors that require automatic reversal, *United States v. Gonzalez-Lopez*, 548 U.S. 140, 150 (2006). With regard to Pelullo's challenges to ex parte proceedings, however, we need not grapple with the varying standards of review because those claims fail under any standard, as he identifies no error. We analyze his separation-of-powers claim under the harmless-error standard, as discussed in greater detail herein.

prosecutors' hands. Pelullo challenges the procedures employed by the filter teams and the District Court's attorney-client privilege rulings as deprivations of his Fifth Amendment right to due process and his Sixth Amendment right to counsel, and as violative of the separation of powers.[27] As a remedy for those alleged errors, he claims he is entitled to a new trial. His arguments fail.

### 1. Background

In August 2007, approximately four years before Pelullo was indicted, the District Court entered an order permitting the government to intercept his cellphone communications, having found probable cause that he and others were committing criminal offenses and using communications with counsel to further those offenses. While wiretapping Pelullo's phone, federal agents intercepted calls between Pelullo and his attorneys.

Knowing that some of those communications could be privileged, the government deployed a "Wiretap Filter Team" between federal investigators and the prosecution team, to examine the communications and sort them into three categories before turning them over to the prosecutors: (1) communications protected by the attorney-client privilege; (2) communications that would be privileged but for the crime-fraud exception, which excludes from the scope of the

---

[27] John and William Maxwell say they adopt Pelullo's arguments on these issues. That adoption, however, is ineffective, because Pelullo's briefing focuses specifically on alleged intrusions into his own attorney-client privilege, an issue that has no relevance to the Maxwells.

attorney-client privilege any communications made "in furtherance of a future crime or fraud"; and (3) unprivileged communications. *United States v. Zolin*, 491 U.S. 554, 563 (1989). Once the Wiretap Filter Team sorted the information, it sought court approval to share with the prosecution team unprivileged communications and communications falling under the crime-fraud exception.

The Wiretap Filter Team was headed by Assistant U.S. Attorney ("AUSA") Melissa Jampol. She and her team reviewed wire and text communications between Pelullo and his attorneys, including, among others, David Adler, Gary McCarthy, and Donald Manno. Federal agent Kevin Moyer, who engaged as well in the surveillance of Scarfo and others for a brief period, was also assigned to the Wiretap Filter Team. In connection with his surveillance responsibilities, Moyer interacted with members of the prosecution team.

During the duration of the wiretap, which was from August 2007 through January 2008, Jampol submitted five sealed ex parte motions to the District Court seeking to disclose communications to the prosecution team. The District Court granted each of those motions, authorizing disclosure of selected intercepted communications to the prosecution team. The Wiretap Filter Team's memoranda of law, including supporting affidavits and related papers, remained under seal until after Pelullo's indictment was unsealed. Following the indictment's unsealing, all the intercepted communications, including those not yet disclosed to the prosecution team, were provided to Pelullo's counsel, giving him an opportunity to challenge any of the communications as privileged, prior to their potential use at trial. Pelullo's counsel moved to exclude the intercepted communications en masse, without identifying

any particular communication claimed to be privileged. The District Court denied that motion.

Roughly nine months after the entry of the order, law enforcement officials executed search warrants at the offices of both Manno's solo law practice and McCarthy's law firm. Two more filter teams were established to review and sort out privileged materials seized from those offices: the "Manno Filter Team" and the "McCarthy Filter Team."

AUSA Matthew Smith and federal agent Michael O'Brien formed the Manno Filter Team. O'Brien performed an initial review of materials seized from Manno's law office, trying to make sure those items fell within the scope of the search warrant, and Smith then made the privilege determinations. *Manno v. Christie*, 2008 WL 4058016, at *5 (D.N.J. Aug. 22, 2008). If Smith determined that items were not privileged, he turned them over to the prosecution team, without going through the District Court first. *Id.* In contrast, if he thought that certain items might be privileged, he then determined whether an exception to the privilege, such as the crime-fraud exception, applied. *Id.* When such an exception did apply, Smith would "'meet and confer' with Manno or any … individual who may have a claim of privilege in an attempt to work out a resolution." *Id.* Then, if that was unsuccessful in resolving any concerns, Smith applied to the District Court for a privilege determination before disclosing anything to the prosecution team. *Id.*

The McCarthy Filter Team, led by Department of Justice attorney Cynthia Torg, followed similar procedures. It cataloged the materials seized from McCarthy's law office and substantively evaluated them. Because the materials included

40

multiple parties and transactions, the team worked with McCarthy's counsel to identify items covered by the attorney-client privilege and the names of any of McCarthy's clients who may have held the corresponding privilege as to those items. Any items identified as "potentially privileged" were segregated, and in February 2013, nearly one and a half years after Pelullo's indictment, his counsel in this case was provided copies of those items to confirm if either Pelullo or Seven Hills claimed that privilege. The McCarthy Filter Team then sought to work with Pelullo's counsel to resolve privilege disputes and reduce the volume of contested documents that the District Court needed to review.

## 2. Challenges to Filter Team Procedures

Pelullo first challenges the propriety of the procedures employed by the Wiretap Filter Team and Manno Filter Team, saying they violated his Fifth and Sixth Amendment rights. He asserts it was improper for Agent Moyer to be on both the Wiretap Filter Team and an investigative team that had regular contact with the prosecution. He claims that error necessarily led to privileged information making its way from the Wiretap Filter Team to the prosecution. Additionally, Pelullo contends the Manno Filter Team's attorney-client privilege determinations were improperly made by Agent O'Brien, a non-attorney.

While rare, governmental intrusion into an attorney-client relationship has occasionally risen to the level of "outrageous government conduct" violative of the Fifth

41

Amendment's Due Process Clause.[28] *United States v. Voigt*, 89 F.3d 1050, 1066 (3d Cir. 1996). We have exercised "scrupulous restraint" before declaring government action so "outrageous" as to "shock[] … the universal sense of justice[.]" *Id.* at 1065 (citation omitted). We thus require defendants to show the government knew of and deliberately intruded into the attorney-client relationship, resulting in "actual and substantial prejudice." *Id.* at 1066-67. But nowhere does Pelullo claim the government's conduct "amount[ed] to an abuse of official power that 'shocks the conscience'" or otherwise explain how his due process rights were violated. *Fagan v. City of Vineland*, 22 F.3d 1296, 1303 (3d Cir. 1994) (citing *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992)). He directs us to "no document, no telephone call, nothing that was turned over to the prosecution team that in any way has been used against [him] improperly[.]" (JAB at 2225.) Although Agent Moyer's presence on both a surveillance team

---

[28] Common-law attorney-client privilege, which Pelullo asserts, has been described as overlapping with the Fifth Amendment protection against self-incrimination. *See Fisher v. United States*, 425 U.S. 391, 405 (1976) (noting the overlap between the right against self-incrimination and the attorney client privilege); *In re Foster*, 188 F.3d 1259, 1271 (10th Cir. 1999) ("Under *Fisher*, [the attorney-client] privilege effectively incorporates a client's Fifth Amendment right; it prevents the court from forcing [the attorney] to produce documents given it by [the client] in seeking legal advice if the Amendment would bar the court from forcing [the client] himself to produce those documents."). Pelullo, however, only argues a Fifth Amendment due process violation, and he does not invoke his right against self-incrimination.

and a filter team may have run afoul of Department of Justice procedures, [29] that alone is not enough to establish a constitutional violation.

With respect to the Manno Filter Team, Pelullo is not quite accurate when he says that Agent O'Brien, a non-attorney, performed the initial privilege determinations. O'Brien did screen the materials in the first instance to decide what fell within the scope of the warrant. *Manno*, 2008 WL 4058016, at *5. The initial privilege review, however, was performed by AUSA Smith. *Id.* And even if that were not the case, Pelullo does not present an argument that O'Brien being an initial screener would "shock the conscience."

Finally, in a conclusory fashion, Pelullo also asserts that the errors he alleges are also all in violation of the Sixth Amendment. But the Sixth Amendment does not attach before the indictment. *See McNeil v. Wisconsin*, 501 U.S. 171, 175 (1991); *United States v. Kennedy*, 225 F.3d 1187, 1194 (10th Cir. 2000) ("Government intrusions into pre-indictment attorney-client relationships do not implicate the Sixth Amendment.").

Pelullo fails to identify any constitutional deficiencies in the procedures of the filter teams, and we discern no error.

---

[29] A Department of Justice manual provides that "'privilege team[s]' should … consist[] of agents and lawyers not involved in the underlying investigation." U.S. Dep't of Justice, *Justice Manual* § 9-13.420 (2021).

43

### 3.    Challenges to Ex Parte Proceedings

Next, Pelullo challenges the ex parte proceedings held in conjunction with the filter teams, saying they violated his Fifth Amendment due process rights, his Sixth Amendment right to counsel, and separation of powers principles.  Again, he comes up short.  The use of filter teams is an acceptable method of protecting constitutional privileges.  Moreover, Pelullo has not identified any privileged materials that were improperly shared with the prosecution, nor has he otherwise attempted to demonstrate prejudice.

The use of filter teams in conjunction with ex parte proceedings is widely accepted.  *See, e.g.*, *In re Search of Elec. Commc'ns*, 802 F.3d 516, 530 (3d Cir. 2015) ("[T]he use of a 'taint team' to review for privileged documents [is] a common tool employed by the Government."); *In re Grand Jury Subpoenas*, 454 F.3d 511, 522 (6th Cir. 2006) (explaining that when "potentially-privileged documents are already in the government's possession, … the use of the taint team to sift the wheat from the chaff constitutes an action respectful of, rather than injurious to, the protection of privilege"); *United States v. Avenatti*, 559 F. Supp. 3d 274, 282 (S.D.N.Y. 2021) ("[T]he use of a filter team is a common procedure in this District and has been deemed adequate in numerous cases to protect attorney-client communications." (citation and internal quotation marks omitted)).  Contrary to Pelullo's suggestion, he had no pre-indictment Sixth Amendment rights, nor did he have a Fifth Amendment due process right to notice of the ex parte proceedings.  Indeed, his surveillance was consistent with the Wiretap Act, which requires courts to seal all government applications for wiretaps and any resulting orders.  18 U.S.C. § 2518(8)(a)-(b).  That sealing provision was established "to

protect the confidentiality of the government's investigation[,]" *United States v. Florea*, 541 F.2d 568, 575 (6th Cir. 1976), which the sealing did here until the appropriate time. Although the Act entitles the subject of the wiretap to notice and an inventory of the intercepted communications within a reasonable time, such notice may be postponed pursuant to an ex parte showing of good cause. 18 U.S.C. § 2518(8)(d).

Good cause is not a high bar, and an ongoing criminal investigation will typically justify delayed notice of the wiretap. *E.g.*, *United States v. John*, 508 F.2d 1134, 1139 (8th Cir. 1975); *United States v. Manfredi*, 488 F.2d 588, 602 (2d Cir. 1973). It did so in this case. The undercover investigation here continued until the intercepted communications gave the government probable cause in May 2008 to search the law offices of Manno and McCarthy. By executing those searches pursuant to warrants, the government's investigation could no longer continue undercover. Pelullo was thus notified about the existence of the wiretap shortly thereafter.

Pelullo next challenges the procedures employed by the Manno and McCarthy Filter Teams, arguing they violated separation-of-powers principles. The Manno and McCarthy Filter Teams, as detailed above, instituted procedures to ensure the protection of privileged materials. In challenging those procedures, Pelullo relies predominantly on a Fourth Circuit case, *In re Search Warrant*, 942 F.3d 159 (4th Cir. 2019), which held comparable conduct unconstitutional. That case, however, arose in the context of a motion for a temporary restraining order brought by a law firm to enjoin the use, without adequate process, of materials that had been seized as part of a criminal investigation into one of its clients. *Id.* at

164. The Fourth Circuit reversed the district court's denial of the motion, ordering that the challenged filter team procedures be enjoined. *Id.* at 170.

Pelullo's argument arises in an entirely different procedural posture: on post-conviction appeal. The full applicability of the Fourth Circuit's precedent is thus open to question. More importantly, however, Pelullo has not identified any way in which the process used to screen for attorney-client privileged material caused him harm. We do not believe, nor has Pelullo suggested, that the alleged error – allowing an executive branch employee to make an initial privilege determination – is structural. *See United States v. Colon-Munoz*, 192 F.3d 210, 217 n.9 (1st Cir. 1999) (finding alleged separation-of-powers violation not structural because it "involve[d] the structure of the federal government rather than the structure of the criminal trial process as a reliable means of determining guilt or innocence"); *see also Neder v. United States*, 527 U.S. 1, 8-9 (1999) (structural error is that which would "deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence ... and no criminal punishment may be regarded as fundamentally fair'" (citation omitted)).

Thus, we employ harmless-error review, and the answer to whether there was any error here that caused Pelullo harm is simple. There was not. Despite having had a full and fair opportunity to do so, before both the District Court and us, Pelullo has not pointed to any piece of evidence that was privileged but improperly provided to the prosecution. Without reaching the question of whether a constitutional violation occurred (and without commenting on the

advisability of the particular screening methods employed by the government), it is clear that, even if there were error, there was no prejudice as a consequence. *See United States v. Schneider*, 801 F.3d 186, 200 (3d Cir. 2015) ("An error is harmless when it is highly probable that it did not prejudice the outcome." (citation and internal quotation marks omitted)). Because Pelullo has not shown that injury resulted from the filter teams' review, any error was harmless, and his Fifth and Sixth Amendment claims fail.

### 4. Crime-Fraud Exception

Pelullo's final complaint about the handling of his attorney-client privilege assertions in the District Court is that the Court applied the incorrect standard when determining whether the crime-fraud exception applied to certain intercepted communications. But it is Pelullo who misconstrues that exception.

The crime-fraud exception to the attorney-client privilege limits "the right of a client to assert the privilege … with respect to pertinent [communications] seized by the government, when the client is charged with continuing or planned criminal activity." *In re Impounded Case*, 879 F.2d 1211, 1213 (3d Cir. 1989). To invoke the exception, the party seeking to overcome the privilege must first demonstrate "a factual basis … to support a good faith belief by a reasonable person that the [seized] materials may reveal evidence of a crime or fraud." *Haines v. Liggett Grp. Inc.*, 975 F.2d 81, 96 (3d Cir. 1992). If that threshold is crossed, the district court will conduct an in camera review to determine whether the party advocating the exception has made "a prima facie showing that (1) the client was committing or intending to

commit a fraud or crime, … and (2) the attorney-client communications were in furtherance of that alleged crime or fraud[.]" *In re Grand Jury Subpoena*, 223 F.3d 213, 217 (3d Cir. 2000) (citations omitted).

Contrary to the just-quoted precedent, Pelullo says that the crime-fraud exception requires something beyond a prima facie showing, that some heightened standard governs whether disclosure to the prosecution is permitted. He is wrong. As our precedent makes clear, there is no heightened standard beyond the requisite prima facie showing. Here, the District Court performed the correct analysis when it determined, based on the government's prima facie showing, that Pelullo was committing crimes and that the communications at issue included discussion furthering those crimes. The Court's conclusion was supported by the filter teams' evidence of Pelullo's criminal activities, the connection between his attorneys and the purported fraud, and analysis of how Pelullo's conversations with attorneys furthered that fraud.

In sum, the showing required to apply the crime-fraud exception was met by the evidence provided by the filter teams, and the District Court relied on the appropriate legal standard in making its determinations. Pelullo has not established any error based on the government's use of filter teams.

## IV.   PRETRIAL ISSUES

The Defendants claim to have identified multiple errors arising from what happened – and didn't happen – prior to trial. First, Pelullo asserts that the District Court failed to promptly set a trial date and so deprived him of a speedy trial. Next, Pelullo and both Maxwells complain about the District Court's

grant of the government's request to introduce evidence of Scarfo's and Pelullo's ties to organized crime, and the Maxwells insist that the Court should have severed their trial from that of their codefendants.  None of those arguments is persuasive.

## A.    Speedy Trial Act Claim[30]

Although Pelullo was arrested in November 2011, his trial did not occur until more than two years later.  He objects to the length of that delay, blaming the government for causing the holdup and faulting the District Court for waiting too long to set a trial date.  He asks us to reverse his conviction and order dismissal of the charges with prejudice.  But because the District Court properly ordered a continuance in response to the complex nature of the case, and because it scheduled trial once it made sense to do so, Pelullo's arguments fail.

To "assure a speedy trial" for all defendants, the Speedy Trial Act sets timing deadlines for the stages of a criminal prosecution.  18 U.S.C. § 3161(a).  A defendant must be indicted within thirty days of his arrest, and he must be tried within seventy days of the later of his indictment or initial appearance.  *Id.* § 3161(b), (c)(1).  The Speedy Trial Act generally insists on strict conformity with its deadlines:

---

[30] We exercise plenary review of a district court's interpretation of the Speedy Trial Act and review factual conclusions for clear error.  *United States v. Lattany*, 982 F.2d 866, 870 (3d Cir. 1992).  We review for abuse of discretion a district court's grant of a continuance after a proper application of the Act to established facts.  *Id.*

49

charges "shall be dismissed" if a defendant is not afforded a trial on time. *Id.* § 3162(a)(2). Nonetheless, those deadlines can be tolled for good cause. *Id.* § 3161(h); *accord United States v. Adams*, 36 F.4th 137, 144-45 (3d Cir. 2022). Delay is allowed for the duration of a continuance granted by the district court "on the basis … that the ends of justice [are better] served by taking such action [and that doing so] outweigh[s] the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). If a continuance is improper or the court does not justify its findings on the record, however, the clock continues to run. *Id.*; *Zedner v. United States*, 547 U.S. 489, 508 (2006).

Case complexity is an acceptable reason for tolling Speedy Trial Act deadlines, 18 U.S.C. § 3161(h)(7)(B)(ii), and this case was certainly complex. It involved thirteen codefendants, dozens of charges, "approximately 1,000,000 pages of information[,]" and "voluminous" amounts of discoverable material, including seven months of wire taps, hundreds of phone call recordings, items seized from seventeen locations, and data from sixty computers. (Government's Supplemental Appendix ("GSA") at 407D.) In light of all that, the parties wisely acceded to a Complex Case Order ("CCO"), which the District Court entered in December 2011, just over a month after the defendants were indicted and well before the seventy-day deadline. The District Court found that the defendants would need "considerable time" to look over the documents and craft their defenses and pretrial motions. (GSA at 407E.) Specifically citing "the nature of the prosecution, its complexity[,] and the number of defendants," the Court designated the case as complex, determined that it would be "unreasonable to expect adequate preparation" within the seventy-day window, and found that "the ends of justice served

50

by granting the continuance outweigh[ed] the best interests of the public and the defendants in a speedy trial."[31] (GSA at 407F (citing 18 U.S.C. § 3161(h)(7)(A), (B)(ii)).) It entered an indefinite continuance without a set end date, with trial to take place on a date "to be determined[.]" (GSA at 407F.)

Like all the other parties, Pelullo stipulated to entry of the CCO, and he never advanced a speedy-trial argument or asked the District Court to set a trial date prior to seeking dismissal of the charges on Speedy Trial Act grounds in March 2013 – roughly sixteen months after the CCO was entered. Yet he now takes issue with the open-ended nature of the continuance, saying it failed to incentivize the parties to move quickly toward trial and enabled the government to delay providing discovery.

In *United States v. Lattany*, 982 F.2d 866, 877, 881 (3d Cir. 1992), we authorized district courts to enter open-ended continuances to serve the ends of justice as long as they are "not permitted to continue for an unreasonably long period of time" and are supported by on-the-record factual findings.

---

[31] The District Court also held that the defendants had waived their "rights under the Speedy Trial Act[.]" (GSA at 407F.) That was not correct: while a defendant whose rights have already been violated but who fails to raise the issue prior to pleading guilty or going to trial loses his "right to dismissal[,]" 18 U.S.C. § 3162(a)(2), "a defendant may not prospectively waive the application of the Act." *Zedner v. United States*, 547 U.S. 489, 503 (2006). Because the District Court's decision to grant a continuance was otherwise proper, however, that error does not alter our analysis.

51

While a continuance must be reasonable in length, defendants are not "free to abuse the system by requesting [ends-of-justice] continuances and then argu[ing] that their convictions should be vacated because the continuances they acquiesced in were granted." *Id.* at 883; *accord United States v. Fields*, 39 F.3d 439, 443 (3d Cir. 1994) (Alito, J.) ("The defendant's arguments are disturbing because he would have us order the dismissal of his indictment based on continuances that his own attorney sought.").

The continuance here was appropriate. Pelullo explicitly conceded in the District Court "that the complex designation [was] factually supported" (JAB at 1933), and he does not identify any clear error in the District Court's findings. As the extensive motions practice in which the parties engaged and the duration of the trial both confirm, the number of defendants, factual complexities of the case, and sheer volume of discovery all required difficult and time-consuming pretrial preparation by the parties.[32] Indeed, Pelullo himself joined in a request to delay for six weeks the start of trial following jury selection, even though the District Court proposed beginning trial immediately, and even though Pelullo had recently begun arguing that his rights under the Speedy Trial Act were being violated. *Cf. United States v. Jernigan*, 20 F.3d 621, 622 n.5

---

[32] Any blame for delay in affording the defendants discovery, meanwhile, appears to be attributable to third-party vendors who were overwhelmed by the scale of the discovery demands. For its part, the District Court provided Pelullo and Scarfo access to computer systems inside their detention facility so they could review the discovery and discuss it with their attorneys.

(5th Cir. 1994) (defendant's speedy trial claim "is stripped of all force by the fact that he sought … additional continuances after the complained-of delay" (emphasis omitted)).

The District Court certainly did not abuse its discretion in authorizing the continuance it did.  As in *Lattany*, the continuance was granted before the end of the Speedy Trial Act's seventy-day window; the District Court "contemporaneously and specifically justified the continuance by a finding that it was necessary for [the defendants] to adequately prepare [their] defense," and further justified it by reference to the "numerous charges" in the case; the Court "continually attempt[ed] to accommodate [Pelullo] throughout the pretrial stage"; Pelullo "acquiesced in the motion[] for [a] continuance[]"; and, beyond all dispute, the case was complex. *Lattany*, 982 F.2d at 878, 883; *see also Fields*, 39 F.3d at 444 ("[A]n 'ends of justice' continuance may be granted for the purpose of giving counsel additional time to prepare motions in 'unusual' or 'complex' cases.").  Allowing discovery and pretrial motions to play out and then turning to trial, as the District Court did, was a reasonable approach that conformed with the requirements of the Speedy Trial Act.

Pelullo nevertheless notes that the Act requires a court to schedule a date for trial "at the earliest practicable time[,]" 18 U.S.C. § 3161(a), and objects that the District Court did not set a trial date until a year and a half after the indictment.  But the scheduling of a trial date is a means to an end: the court "shall" set a trial date "*so as to assure a speedy trial*." *Id.* (emphasis added).  All the District Court needed to do was set a date as soon as doing so was "practicable." *Id.*  It ably met those obligations here.  Once the end was reasonably within sight in 2013, the Court scheduled a date for trial.  Given the

reasonableness of the continuance, the District Court did not err in waiting to schedule the trial, and Pelullo has failed to demonstrate a violation of the Speedy Trial Act.[33]

## B. Admission of La Cosa Nostra Evidence and Denial of the Maxwells' Motion for Severance

The Defendants contend that the District Court erred in admitting evidence of Scarfo's and Pelullo's ties to La Cosa Nostra pursuant to Federal Rules of Evidence 403 and 404(b) and that, accordingly, they are entitled to new trials.[34] The Maxwells further contend that the District Court abused its

---

[33] Because the District Court complied with § 3161(a), we need not address whether a violation of that provision automatically requires dismissal or whether a defendant who was not given a trial date "at the earliest practicable time" must establish that he was prejudiced by that delay.

[34] Pelullo and John Maxwell primarily briefed the admission of organized crime evidence, and both specifically adopt each other's arguments. William Maxwell did not separately brief the admission of organized crime evidence, but he specifically adopted the arguments of Pelullo and John, so the issue belongs to all three of those Defendants. While Scarfo did not specifically adopt the other Defendants' arguments and thus forfeited them, *see supra* note 19, we nonetheless refer to the arguments in this section as belonging to "the Defendants" for the sake of simplicity.

William provided only limited briefing on severance, but, again, he specifically joined John's arguments with respect to that issue. Accordingly, we attribute any arguments made by John on severance to William as well.

discretion by denying their motion to sever their trial from that of Scarfo and Pelullo since the evidence of mob ties, even if properly admitted, prejudiced their defenses. We reject each of those contentions.

### 1.	Admission of LCN Evidence[35]

Prior to trial, the government moved for permission to introduce evidence of Scarfo's and Pelullo's association with organized crime, including an explanation of the hierarchy of LCN and the custom of paying superiors within the organization. The government presented two alternative arguments in support of its request: first, the evidence was intrinsic to the charged offenses; and second, even if not intrinsic, the evidence was admissible as evidence of prior bad acts pursuant to Federal Rule of Evidence 404(b). Over the Defendants' objections, the District Court permitted introduction of the LCN evidence as "classic 404(b) evidence."[36] (JAB at 2343.) It reasoned that the evidence was

---

[35] We review decisions to admit evidence for abuse of discretion, and such discretion is construed especially broadly in the context of Rule 403. *United States v. Moreno*, 727 F.3d 255, 262 (3d Cir. 2013) ("In order to justify reversal, a district court's analysis and resulting conclusion must be arbitrary or irrational." (citation omitted)). "However, to the extent the District Court's admission of evidence was based on an interpretation of the Federal Rules of Evidence, the standard of review is plenary." *United States v. Bobb*, 471 F.3d 491, 497 (3d Cir. 2006).

[36] The District Court disagreed with the government's

"relevant because it explain[ed] how and why the takeover occurred" and was "offered … to show motive and control[.]" (JAB at 2343.) The Court also decided the evidence was "sufficiently probative under [Rule] 403 because it … provide[d] an explanation as to why people would do what they [allegedly] did in this case," and that, although the evidence of mob ties may have been prejudicial, that prejudice did not "significantly outweigh[] the relevance of the testimony about the membership in La Cosa Nostra." (JAB at 2343.)

Consistent with that ruling, Agent Kenneth Terracciano testified at trial about the hierarchy of LCN, Scarfo's father's involvement in LCN, the attempted murder of Scarfo in 1989, and Scarfo's subsequent status with the Lucchese family. Terracciano did not testify that Scarfo had committed any crimes on behalf of the Lucchese family and did not even mention Pelullo. The government instead sought to establish Pelullo's allegiance to LCN by introducing evidence of, among other things, his close relationship with Scarfo and Scarfo's father, including during the takeover of FirstPlus, and his efforts to get Scarfo's father released from prison.

Throughout the trial, the District Court repeatedly provided limiting instructions to the jury. Namely, each time LCN or organized crime was mentioned, the Court informed the jury that "[t]here [was] no evidence and the government [did] not allege that any defendants, other than Scarfo and Pelullo, were associates in any organized crime organization."

alternative argument that the evidence of LCN ties was intrinsic to the indicted crimes and hence not subject to Rule 404(b).

56

(JAC at 1750-51; *see also* JAC at 711-13, 5434-35.) The Court made clear it was up to the jurors to decide whether Scarfo or Pelullo "were so associated or whether they made use of, sought the benefit of or benefited from their association with La Cosa Nostra, and whether either of them used those associations to further the unlawful goals of the RICO enterprise alleged in this case." (JAC at 1750-51; *see also* JAC at 711-13.) The jury was also instructed that none of those associations could be considered "as proof that … Scarfo and Pelullo had a bad character or any propensity to commit crime." (JAC at 1751; *see also* JAC at 712-13, 1473.)

Under Federal Rule of Evidence 404(b), evidence of a defendant's prior crimes, wrongs, or other acts "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character" – in other words, it may not be used to show that a person had a propensity for crime. Fed. R. Evid. 404(b)(1). Such evidence is admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). We have explained that 404(b)(2) evidence is admissible "if it is: (1) offered for a non-propensity purpose; (2) relevant to that identified purpose; (3) sufficiently probative under Rule 403 so its probative value is not [substantially] outweighed by any inherent danger of unfair prejudice; and (4) accompanied by a limiting instruction, if requested." *United States v. Garner*, 961 F.3d 264, 273 (3d Cir. 2020) (citation and internal quotation marks omitted). "In a conspiracy case, evidence of other bad acts, subject always to the requirements of Rule 403, can be admitted to explain the background, formation, and development of the illegal relationship." *United States v. Escobarde Jesus*, 187 F.3d 148,

57

169 (1st Cir. 1999); *accord United States v. Reifler*, 446 F.3d 65, 91-92 (2d Cir. 2006) ("Evidence that a defendant had ties to organized crime may be admissible in a variety of circumstances[,]" including to explain "how the illegal relationship between [co-conspirators] developed[.]" (citation omitted)).

The Defendants contend that the District Court abused its discretion by admitting the organized crime evidence. More specifically, they allege that the evidence was not relevant, was not offered for a non-propensity purpose, and was unduly prejudicial. All three arguments lack merit.

First, the District Court correctly deemed the LCN evidence relevant. Federal Rule of Evidence 402 states "[i]rrelevant evidence is not admissible." As the Court noted, the LCN evidence explained "how and why the takeover [of FirstPlus] occurred." (JAB at 2343.) So the evidence was relevant. And proving motive is a proper purpose for evidence under Rule 404(b). Virtually everything in this case traces back to the conspirators' decision to seize control of the company, which was motivated at least in part by Pelullo's and Scarfo's LCN obligations. That is most relevant to Pelullo (and Scarfo), but it is relevant to the Maxwells too. The Maxwells may have boarded the conspiracy for their own reasons, but they still got on. The ties to LCN help explain how and why the railroad was being operated.

In that vein, the evidence shed light on Scarfo's and Pelullo's relationship, explaining why Pelullo was subservient to Scarfo even though Pelullo was the operational leader of the

58

FirstPlus scheme.[37] *See United States v. King*, 627 F.3d 641, 649 (7th Cir. 2010) (affirming admission of gang evidence that "helped establish the relationship among [the co-conspirators and] the rank of those men within the gang," which "was central to the government's theory"). It also explained Scarfo's need to pay off the Lucchese crime family. And, contrary to the Defendants' arguments, it is immaterial whether Scarfo and Pelullo also engaged in the conspiracy for personal reasons – namely, a desire to line their own pockets – in addition to doing so to meet their LCN obligations. "[T]he law recognizes that there may be multiple motives for human behavior[,]" and evidence of other motives does not render irrelevant the evidence of Scarfo's and Pelullo's LCN ties. *See United States v. Technodyne LLC*, 753 F.3d 368, 385 (2d Cir. 2014) (citing *Anderson v. United States*, 417 U.S. 211, 226 (1974) ("A single conspiracy may have several purposes, but if one of them – whether primary or secondary – be the violation of a federal law, the conspiracy is unlawful[.]")).

So, the evidence was offered for, and relevant to, a non-propensity purpose. Even then, it still had to survive Rule 403's balancing test. And it did. The District Court said that

---

[37] To only highlight a few examples indicating Pelullo's subservience to Scarfo, Pelullo ensured that Scarfo received $33,000 per month plus expenses through a sham consulting agreement under which Scarfo did nothing of value, and he fraudulently obtained a mortgage for Scarfo's wife. In addition, evidence indicated that Pelullo was driven by his fear of not being able to pay Scarfo's father. (*See* JAD at 1468 ("[W]hatta we gonna do without that money they're they're [sic] dead. … [M]y uncle is gonna f[***]in' kill me.").)

it was sure there was some prejudice to Pelullo and Scarfo from the introduction of the evidence, but it found that the prejudicial effect did not substantially outweigh the probative value of the organized crime evidence because that evidence helped explain why the Defendants did what they did. (JAB at 2343.)

Pelullo argues that the balancing was "insufficient and substantively improper[,]" but he does not specify what else the Court should have considered or why the Court's reasoning was deficient. (SP Reply Br. at 23-24.) Because the Court "engage[d] in a Rule 403 balancing and articulate[d] on the record a rational explanation," the 403 challenge fails. [38] *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992).

The Maxwells make a related prejudice argument. They contend that, due to the admission of LCN evidence, "Scarfo's

---

[38] Pelullo makes an additional Rule 403 argument on a separate piece of evidence. He says the District Court improperly admitted testimony from FirstPlus secretary David Roberts that, shortly after the FirstPlus takeover, Pelullo told him, William Maxwell, and John Maxwell "that if we ever rat, our wives will be f[***]ed by the N word and our children will be sold off as prostitutes." (JAC at 1848.) The Court determined that the threat was probative in showing that Pelullo wanted to "drive home the point that he was threatening harm and he obviously thought that … the listener [would have understood he] was in grave danger." (JAB at 2402.) The Court concluded that any prejudicial effect from the disgusting phrasing of the threat was outweighed by the relevance of proving Pelullo's state of mind. Because the Court conducted

proverbial blood spilled all over" them, resulting in a "taint [that] could not be washed away or otherwise cle[a]nsed." (JM Opening Br. at 37.) But the District Court, in addition to weighing the evidence under Rule 403, provided clear instructions to the jury that only Scarfo and Pelullo, not any of the other defendants, were associated with LCN and the Lucchese family.

Limiting instructions are an appropriate way to ensure that a jury understands the purpose for which evidence of prior acts may be considered, and such instructions are generally sufficient "to cure any risk of prejudice[.]" *Zafiro v. United States*, 506 U.S. 534, 539 (1993); *see also United States v. Lee*, 612 F.3d 170, 185 (3d Cir. 2010) (upholding a decision to admit evidence under Rule 404(b) in part because the district court gave a limiting instruction). There is particular reason to think that the jury followed those instructions here because some of the Maxwells' codefendants – Adler, McCarthy, and Manno – were acquitted, despite also being associated with the FirstPlus takeover. *See, e.g.*, *United States v. Greenidge*, 495 F.3d 85, 95 (3d Cir. 2007) (noting "the fact that the jury acquitted [a codefendant] is critical proof that the jury was 'able to separate the offenders and the offenses'" (citation omitted)); *United States v. Sandini*, 888 F.2d 300, 307 (3d Cir. 1989) (finding claim of prejudice "without merit" where a codefendant was acquitted of some charges, "a fact indicating that the jury carefully weighed the evidence relating to each

---

an appropriate Rule 403 balancing analysis and reached a rational conclusion, we discern no error in the admission of that evidence. *United States v. Sampson*, 980 F.2d 883, 889 (3d Cir. 1992).

defendant and each charge"); *United States v. Solis*, 299 F.3d 420, 441 (5th Cir. 2002) ("[T]he jury acquitted some of the alleged co-conspirators, supporting an inference that the jury sorted through the evidence … and considered each defendant and each count separately[.]").  We thus see no reason to stray from "the almost invariable assumption of the law that jurors follow their instructions[.]"  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).

## 2. Denial of the Maxwells' Severance Motion[39]

Separately, the Maxwells assert that they are entitled to a new trial because the District Court abused its discretion in denying their motion to sever their trials from that of Scarfo and Pelullo.  They say that the introduction of evidence of Scarfo's and Pelullo's connections to organized crime created spillover prejudice because the Maxwells were not part of the mob but were nonetheless effectively grouped in with it.  Once more, we are unpersuaded.

In assessing the Maxwells' request for severance, the District Court observed that a "fundamental princip[le]" of federal criminal law is the "preference for joint trials of defendants who are indicted together." (D.I. 297 at 17 (internal quotation marks omitted) (quoting *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005)).)  Noting that the preference "is particularly strong in cases involving multiple defendants

---

[39] "[D]enial of severance is committed to the sound discretion of the trial judge[.]"  *United States v. Eufrasio*, 935 F.2d 553, 568 (3d Cir. 1991).

charged under a single conspiracy" (D.I. 297 at 17 (citing *United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996))), the Court held that the Maxwells did not meet the heavy burden of demonstrating the need for severance based on a risk of spillover prejudice.[40]  It also promised to instruct the jury on "the limited admissibility of certain evidence" about Scarfo's and Pelullo's ties to organized crime.  (D.I. 297 at 27.)

"A defendant seeking a new trial due to the denial of a severance motion must show that the joint trial led to 'clear and substantial prejudice resulting in a manifestly unfair trial[,]'" a demanding standard that requires more than "[m]ere allegations of prejudice[.]" *United States v. John-Baptiste*, 747 F.3d 186, 197 (3d Cir. 2014) (first quoting *Urban*, 404 F.3d at 775; and then quoting *United States v. Reicherter*, 647 F.2d 397, 400 (3d Cir. 1981)).  The Maxwells "are 'not entitled to severance merely because they may have a better chance of acquittal in separate trials.'" *Id.* (quoting *Zafiro*, 506 U.S. at 540).  In making the initial determination of whether to grant severance, the "critical issue" before a district court is "not whether the evidence against a co-defendant is more damaging but rather whether the jury will be able to compartmentalize the evidence as it relates to separate defendants in view of its

---

[40] Other defendants – Gary McCarthy, Howard Drossner, David Adler, Donald Manno, William Handley, and John Parisi – sought severance, many of them for the same reasons, and the Court rejected their arguments as well.

volume and limited admissibility." *Id.* (citation and internal quotation marks omitted).

The Maxwells fail to show that any claimed spillover prejudice from the organized crime evidence concerning Scarfo and Pelullo was clear and substantial and, instead, make "mere allegations of prejudice" that are insufficient to clear the high bar for severance. *Id.* (citation omitted). In *United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991), which involved a RICO prosecution of Scarfo's father's criminal enterprise, we rejected the same sort of spillover prejudice argument. We concluded that because "all appellants were charged with the same conspiracy to participate in the same Scarfo enterprise, the public interest in judicial economy favored joinder." *Id.* at 568. The Maxwells' argument based on prejudice from their codefendants' mob ties is even less compelling than that of the *Eufrasio* defendants because, here, the District Court repeatedly gave limiting instructions that "[t]here is no evidence and the government does not allege that any defendants[,] other than Scarfo and Pelullo[,] were associates [in] any organized crime organization." (JAC at 712, 1751.) The Maxwells' only response is that the jury may not have followed these instructions. But, as discussed earlier, we presume that the jury follows instructions, which "often will suffice to cure any risk of prejudice." *Zafiro*, 506 U.S. at 539. There is no reason to believe otherwise in this case. Indeed, the acquittal of other defendants indicates just the contrary. The District Court did not abuse its discretion in concluding that the jury could "compartmentalize the evidence" as it related to the Maxwells, *John-Baptiste*, 747 F.3d at 197

(citation omitted), and, consequently, severance was not warranted.

## V. TRIAL ISSUES

We turn now to the purported errors at the trial. Scarfo objects to being tried alongside his former counsel, while Pelullo argues that his trial counsel had an undisclosed conflict of interest by being under federal investigation during this case. The Defendants also challenge their RICO conspiracy convictions: Scarfo claims that the jury instructions constructively amended the indictment as to that count, and the other three Defendants challenge the jury instructions on and the sufficiency of the evidence supporting one of the predicate acts that formed the basis for their RICO conspiracy convictions. In addition, Pelullo asserts that the instructions on the felon-in-possession conspiracy charge were missing an element required under *Rehaif v. United States*, 139 S. Ct. 2191 (2019). William Maxwell further claims there was insufficient evidence for many of his convictions. Finally, several Defendants advance claims of error relating to the conduct of various jurors. None of those arguments entitle any of the Defendants to reversal of the convictions or a new trial.

### A. Scarfo's Joint Trial with Former Counsel Donald Manno[41]

Scarfo argues that he deserves a new trial because he

---

[41] We address this issue here, as arising out of trial, because Scarfo did not move before the trial to have his case severed from Manno's. Manno did seek severance, but, as

was tried jointly with his codefendant and former attorney, Donald Manno, who proceeded *pro se*. In particular, he contends – for the first time on appeal[42] – that Manno's self-representation "stripped" him (Scarfo) "of a fair and unbiased trial guaranteed by the Sixth Amendment." (NS Opening Br. at 43.) As the government puts it, Scarfo "claims Manno had a conflict of interest that Scarfo refused to waive, so Manno couldn't represent *himself* without violating *Scarfo's* Sixth Amendment right to conflict-free counsel." (Answering Br. at 49.)

---

discussed herein, the argument he made in the District Court was different from the Sixth Amendment theory Scarfo now advances.

We need not decide whether Scarfo would need to establish plain error to succeed on his unpreserved Sixth Amendment claim or whether any violation of his rights was a per se reversible error, since his claim lacks merit under either standard.

[42] Although, as just noted, Scarfo did not raise this issue before the District Court, Manno did seek to sever his trial from Scarfo's. But even though there was a presumption that all defendants joined each other's motions, Manno's request – which articulated a need for severance to protect his own interests – was insufficient to preserve an objection from Scarfo. Indeed, the District Court pointed out as much, denying one of Manno's severance motions partly because "Scarfo has not objected at this point to the proposed testimony, and he would be the one prejudiced by it." (JAB at 842.)

Because Scarfo was represented by independent, conflict-free counsel throughout his trial, he was not deprived of a Sixth Amendment right. If anything, Scarfo's challenge to the fairness of his trial sounds in due process more than in the Sixth Amendment. But Scarfo waived any due process claim he may have had and is not entitled to relief on that basis.

### 1. Background

Among those indicted alongside Scarfo was Manno, who appears to have been one of Scarfo's go-to criminal defense attorneys. According to Manno, he represented Scarfo in several matters, including when Scarfo was seeking habeas relief while imprisoned on state RICO charges related to gambling, when he was charged with possessing a deadly weapon in connection with an altercation at an Atlantic City bar, and when he faced charges of illegal gambling and loan-sharking. As his codefendant in this case, however, Manno did not represent Scarfo. For that task, the District Court appointed counsel.

The Court allowed Manno to represent himself but denied his initial request for severance. Prior to trial, Manno moved once more for severance and moved for permission to introduce evidence of "certain legal services" he had provided to Scarfo. (D.I. 664 at 1-2.) He said he needed the evidence to illustrate his "professional and personal relationship" with Scarfo and Pelullo and to emphasize his role as a criminal defense attorney "as a partial explanation" for some of his conduct. (D.I. 664-1 at 3.) He also argued that the evidence was relevant to show that the approximately $20,000 in fees he received from LANA was compensation for legal services and "totally legitimate and unrelated to [FirstPlus]." (D.I. 664-1 at

4.) Because Manno's defense would depend on addressing his relationship with Scarfo, which centered around Scarfo's criminal activities, Manno said that severance was necessary. He warned that "one of two results" would occur if he and Scarfo were tried together: "Either Scarfo or other defendants or all will be prejudiced by the admission of other convictions and allegations of bad acts[,] or Manno will be denied the ability to fully develop his relationship with Scarfo and others." (D.I. 664-1 at 9.)

Scarfo did not object to those requests, and the District Court granted Manno's motion in part, authorizing him to introduce evidence of his attorney-client relationship, but it refused to sever the trials. Accordingly, at trial, Manno questioned witnesses about and introduced evidence of his prior representations of Scarfo. Although the jury found Scarfo guilty, Manno was ultimately acquitted of all charges.

## 2.    Sixth Amendment

Had Manno represented Scarfo at trial, there would be weight to Scarfo's Sixth Amendment arguments. But Manno did not. Instead (and to repeat), Scarfo was represented by independent, conflict-free counsel. The absence of any issues with Scarfo's own representation is dispositive and means that Scarfo has no Sixth Amendment claim. *Cf. United States v. Voigt*, 89 F.3d 1050, 1078 (3d Cir. 1996) (finding Sixth Amendment caselaw inapplicable to evaluating "the possibility that [a potential trial witness's] prior representation of [certain defendants] during the grand jury investigation might affect [their] ability to receive a fair trial").

The Sixth Amendment "commands, not that a trial be fair, but that … particular guarantee[s] of fairness be provided[.]" *United States v. Gonzalez-Lopez*, 548 U.S. 140, 146 (2006). It does so by defining "the basic elements of a fair trial[,]" "including [through] the Counsel Clause." *Strickland v. Washington*, 466 U.S. 668, 684-85 (1984). That provision entitles a criminal defendant "to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. Scarfo does not argue that the District Court failed to appoint him counsel, or that he was denied "the right to adequate representation by an attorney of reasonable competence [or] the right to the attorney's undivided loyalty free of conflict of interest." *United States v. Moscony*, 927 F.2d 742, 748 (3d Cir. 1991) (citation omitted). Therefore, he suffered no deprivation of his Sixth Amendment rights.

Scarfo musters an extensive array of cases in supposed aid of his argument, but none are on point. In all those cases, the defendant's challenge related to the assistance provided by his *then-current* defense counsel or his inability to select counsel of his choice. *See, e.g.*, *Wheat v. United States*, 486 U.S. 153, 155-57, 164 (1988) (approving district court's "refusal to permit the substitution of counsel" due to defendant's desired counsel's conflicts of interest); *Voigt*, 89 F.3d at 1071-80 (summarizing caselaw governing "denials of the right to counsel" of choice); *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 127 (3d Cir. 1984) (reversing conviction "because trial counsel had an actual conflict of interest"). None stand for the proposition that a defendant's Sixth Amendment right to counsel is violated if his *former* counsel is involved in the proceedings in another capacity. *See United States v. Ramon-Rodriguez*, 492 F.3d 930, 945 (8th Cir. 2007) ("[Defendant] cites no authority, and we have found none, in

69

which [a Sixth Amendment conflicted-counsel issue arises in] a situation involving a defendant's prior attorney in the absence of any alleged conflict involving actual trial counsel."); *English v. United States*, 620 F.2d 150, 151-52 (7th Cir. 1980) (holding that defendant could not raise an ineffective-assistance-of-counsel claim against former attorney who had switched to representing codefendant).

In the absence of any conflicts between Scarfo and the trial counsel he actually had, the effort to use the Sixth Amendment right to conflict-free counsel to condemn Manno's presence in the case "entails the pounding of a square peg into a round hole."[43] *United States v. Poe*, 428 F.3d 1119, 1122-24 (8th Cir. 2005) (finding no conflict of interest from fact that codefendant's counsel previously represented defendant in separate state-court prosecution).

Scarfo nevertheless tries to support his claim by pointing to a conversation the District Court had with government counsel and Manno. In that discussion, the Court "urge[d] [Manno] to seek independent counsel … and not represent [him]self[,]" explaining that he could be "subject … to [an] ethics investigation or prosecution." (Nicodemo Scarfo Appendix ("NSA") at 6.) The Court explained to Manno that

---

[43] Scarfo insists that, at a minimum, the District Court should have conducted an inquiry into the potential conflict, and he claims that its failure to do so was reversible error. Again, though, he relies on caselaw focused on protecting a defendant's Sixth Amendment right to have his *current* counsel be conflict-free. That concern was not in play here, making those cases inapposite.

70

he was in a "very difficult position" due to the "potential risk of revealing client confidences without the permission of [his] client which would … potentially expose[] [him] to ethics problems."[44]  (NSA at 5.)

That conversation avails Scarfo nothing.  The District Court's warnings to Manno confirm that the Court was aware that Manno might be opening *himself* up to potential ethical and professional conflicts by choosing to represent himself. But any issues Manno faced would not, and did not, affect Scarfo's ability to receive conflict-free assistance of counsel from his trial attorney.[45]

---

[44] In passing, Scarfo also attempts to frame that conversation as infringing on his Sixth Amendment right to be present at all critical stages of trial.  The government explains that it asked for the chambers conference because Manno made certain statements in his severance motion that were inconsistent with the government's evidence, and it wanted to give Manno a chance to retract his false statements before they were revealed in open court.  Scarfo makes no showing that his absence from that discussion undermined his rights or harmed his defense at trial, so the conference does not provide a basis for disturbing his convictions.  *Cf. infra* Section V.F.2.

[45] Similarly misplaced is Scarfo's reliance on the New Jersey Rules of Professional Conduct to argue that Manno violated his ethical obligations, an issue that he forfeited in any event by failing to raise it in his opening brief.  *See United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).  That argument is simply beside the point in this Sixth Amendment

Ultimately, any potential legal or ethical issues arising from Scarfo being tried alongside Manno are not cognizable as a violation of the Sixth Amendment right to counsel.

### 3.   Due Process

Setting aside Scarfo's Sixth Amendment argument, the facts he alleges do implicate interesting questions as to his Fifth Amendment due process rights. *See Strickland*, 466 U.S. at 684-85 (noting that "[t]he Constitution guarantees a fair trial through the Due Process Clauses," while the Sixth Amendment only protects particular "elements of a fair trial"); *cf. Voigt*, 89 F.3d at 1071-77 (affirming district court's decision to disqualify defendant's counsel who had conflict of interest with codefendants, in the "interest[] of the proper and fair administration of justice"). Scarfo asserts that, due to the conflict of interest caused by Manno's presence as a codefendant, he could not take the stand – since that would open himself up to cross-examination by Manno – and he was prevented from asserting an advice-of-counsel defense. Those claims raise non-frivolous issues about trial severance, but Scarfo has expressly disclaimed any "challenge [to] the district court's decision to deny Manno's motions seeking to sever his trial from that of his clients." (NS Opening Br. at 19.)

Scarfo's disclaimer is an unequivocal waiver as to severance – the only plausible step the District Court could have taken to eliminate any potential due process issues with

challenge, which requires a showing that Scarfo's actual trial counsel provided ineffective assistance.

72

the joint trial.[46]  In the face of that waiver, we decline to consider an argument Scarfo has not himself articulated.  *See United States v. Sineneng-Smith*, 140 S. Ct. 1575, 1579 (2020) ("[O]ur [adversarial] system is designed around the premise that parties represented by competent counsel know what is best for them, and are responsible for advancing the facts and argument entitling them to relief." (internal quotation marks, citation, and brackets omitted)).  The District Court's denial of severance may well be entirely justifiable, but even if it were not, Scarfo does not advance a due process theory for severance, so we will not "sally forth … looking for wrongs to right."  *Id.* (citations omitted).

---

[46] Scarfo also offers several alternative solutions in lieu of severance, but there is a disconnect between those proposed remedies and Scarfo's complaints.  As mentioned above, Scarfo's theory of unfairness and prejudice is that Manno's mere *presence* as a codefendant at the trial prevented Scarfo from taking the stand and raising an advice-of-counsel defense.  He now suggests that the District Court should have disqualified Manno from representing himself or, at a minimum, appointed standby counsel for Manno.  Scarfo does not explain how those strategies – which would have entailed abridging Manno's Sixth Amendment right to self-representation – would have prevented the harm he says he suffered.

Scarfo also assigns error to the District Court's failure to obtain a conflict waiver from him.  But he undercuts that by saying that even if the Court had done so, "such a waiver would be invalidated" – thus taking his own proposed remedy off the table.  (NS Opening Br. at 99 n.27.)

**B.    Pelullo's    Sixth    Amendment    Ineffective Assistance of Counsel Claim**[47]

Pelullo's longtime attorneys – William Maxwell, Donald Manno, and Gary McCarthy – were all indicted alongside Pelullo, leaving him without counsel.  Therefore, the District Court appointed Troy Archie to represent him under 18 U.S.C. § 3006A.  Given the case's complexity and discovery demands, the Court shortly thereafter appointed J. Michael Farrell as co-counsel.  Pelullo now seeks a new trial or an evidentiary hearing for further factfinding because, he argues, Farrell's performance was rendered deficient by a previously undisclosed conflict of interest.  We are not persuaded and hold that Pelullo did not suffer ineffective assistance of counsel.

**1.    Background**

Pelullo and Farrell had their fair share of disagreements at the outset of Farrell's engagement.  The two apparently did not see eye-to-eye on trial strategy, and Pelullo did not appreciate Farrell's lack of engagement.  Those disputes are unrelated to the conflict-of-interest issue before us, but, within

---

[47] Whether a trial counsel's representation of a defendant was constitutionally inadequate is a mixed question of law and fact.  When reviewing mixed questions, we apply de novo review to applications of law, but review for clear error "case-specific factual issues" like the "weigh[ing of] evidence" and "credibility judgments[.]"  *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Vill. at Lakeridge, LLC*, 138 S. Ct. 960, 967-69 (2018).

a few months of Farrell's appointment, they led to Pelullo's request that Farrell be replaced. Although the Court granted that request, Pelullo soon regretted losing Farrell, and he asked to have him reappointed. Pelullo explained that he had "irreconcilable differences" with the lawyer who had been appointed in Farrell's stead and that replacing Farrell was "an error in … judgment" that arose from his "not clearly understanding [the] situation and how fortunate [he] was to have Mr. F[a]rrell." (D.I. 486.) Pelullo praised Farrell, stating he was "up to speed" and "more than comp[etent] and more than effective[.]" (D.I. 486.) The Court acquiesced to Pelullo's wishes and reappointed Farrell in July 2013.

Farrell represented Pelullo through trial (alongside Archie), employing aggressive litigation tactics. The District Court repeatedly reprimanded Farrell for, among other things, repeated interruptions and argumentativeness. At several points, the Court warned him that, "if [he thought his] goal here [was] to set up an ineffective assistance of a counsel defense[,]" he would be "take[n] … off th[e] case[.]" (*E.g.*, JAC at 318.) After trial, the Court determined that Pelullo required only one attorney at sentencing and terminated Farrell's appointment in November 2014, after which Pelullo requested Farrell's reassignment. He told the Court that, despite their early differences, he and Farrell had formed "a bond" and that "Farrell [was] agreeable to [his] defense strategy[.]" (D.I. 1231; JAE at 463-64.) Pelullo noted that he "d[id] not seek counsel of choice, [but] rather effective counsel." (D.I. 1231.) The Court denied that request in April 2015.

Meanwhile, unbeknownst to Pelullo, Farrell had been dealing with his own legal troubles. In March 2014, about halfway through Pelullo's trial, a subpoena was issued for

Farrell's office manager to testify about Farrell before a grand jury in the United States District Court for the District of Maryland. Farrell, in response, retained Joseph Fioravanti, a former federal prosecutor. Fioravanti tried to discover whether Farrell was either a subject or target of the investigation. Those efforts proved unsuccessful, so Fioravanti advised Farrell not to inform his clients, including Pelullo, because he was not yet known to be a subject or target. Farrell heeded that advice and kept from Pelullo, Archie, and the District Court that some kind of investigation in Maryland was underway. The U.S. Attorney's Office for the District of New Jersey, which was prosecuting the Defendants here, remained similarly unaware of the grand jury investigation in the District of Maryland.

It was not until August 2014, the month after the trial in this case ended, that Fioravanti received a "target letter" informing him that the U.S. Attorney's Office for the District of Maryland was considering filing criminal charges against Farrell. (JAE at 927, 1093, 1102.) In January 2016, more than eighteen months after the guilty verdicts here, an indictment charging Farrell with crimes relating to a large marijuana trafficking ring was unsealed. That charge bore no relation to Pelullo's crimes. *United States v. Farrell*, 921 F.3d 116, 123 (4th Cir. 2019). It was only after Farrell's indictment became public that the prosecutors on Pelullo's case became aware of the charges.

By the time Farrell's indictment was unsealed, Pelullo had already appealed his conviction. Once that indictment came to light, however, Pelullo sought and obtained from us a limited remand for further factfinding on what Pelullo claimed was a conflict of interest with Farrell. On remand, Pelullo filed a Rule 33 motion for a new trial on the ground that the evidence

76

revealed Farrell had provided ineffective assistance of counsel. In his motion, Pelullo claimed that Farrell had labored under a conflict of interest during the trial due to the investigation in Maryland. Despite previously not just accepting but actively promoting Farrell's aggressive trial tactics, Pelullo alleged that Farrell's aggression was caused by the stress of being under investigation himself and that those tactics were damaging.

The District Court held a hearing on the motion, at which Farrell bolstered that line of argument. He confirmed that his "aggressive nature" had been due to the pending investigation and that it "affected [his] ability to represent [Pelullo] in a conflict-free manner[.]" (JAE at 615-16.) He explained that he viewed the prosecution of himself as "a direct threat on the ability of criminal defense attorneys in Maryland – in America to defend their clients" and that "it was inconsistent with the principles of our Republic[.]" (JAE at 579.) It was, he claimed, his personal indignation that fueled his overly aggressive defense of Pelullo.

The District Court denied the new-trial motion. It found Farrell's testimony entirely unreliable, and it determined that the investigation in the District of Maryland did not affect Farrell's performance at trial. The Court explained further that Pelullo may have "at most" had a potential conflict-of-interest claim due to Farrell's failure to disclose the investigation, rather than by virtue of Farrell's aggressive defense. (JAE at 1046.) But, given the overwhelming evidence of Pelullo's guilt and his evident approval of Farrell's tactics, the Court concluded that Pelullo "fail[ed] utterly to demonstrate any prejudice." (JAE at 1046.)

77

## 2. Ineffective Assistance of Counsel Claim

Although we typically do not entertain ineffective-assistance-of-counsel claims on direct appeal, we may do so "when the record is sufficient to allow determination of the issue." *United States v. Thornton*, 327 F.3d 268, 271 (3d Cir. 2003). Because we previously remanded the issue for further factfinding and the District Court conducted an extensive evidentiary hearing, the record is sufficient for us to consider the issue now. There is no clear error in the finding that Farrell's self-deprecatory testimony was unreliable and that his representation of Pelullo was unaffected by the Maryland investigation. *See United States v. Gambino*, 864 F.2d 1064, 1071 n.3 (3d Cir. 1988) (applying clear-error standard to district court's factfinding with respect to "external events and the credibility of the witnesses"). On the record developed in the District Court, we agree that this argument for a new trial fails.

As already discussed, *supra* Section V.A.2, the Sixth Amendment protects a criminal defendant's right to effective assistance of counsel. U.S. Const. amend. VI; *United States v. Cronic*, 466 U.S. 648, 653-57 (1984). That right is "recognized … because of the effect it has on the ability of the accused to receive a fair trial." *Cronic*, 466 U.S. at 658. Pursuant to that right, counsel owes a defendant certain duties, including the "duty to perform competently" and the "duty of loyalty[.]" *Government of Virgin Islands v. Zepp*, 748 F.2d 125, 131-32 (3d Cir. 1984) (citing *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).

Nonetheless, "[a]n error by counsel … does not warrant setting aside the judgment of a criminal proceeding if the error

78

had no effect on the judgment." *Strickland*, 466 U.S. at 691. Accordingly, a criminal defendant pursuing an ineffective assistance claim must show not only that his counsel's performance was deficient, but also that the deficient performance prejudiced his defense. *Id.* at 687. Although a defendant must make both showings to succeed, in certain circumstances prejudice may be presumed. One such circumstance is when counsel breaches the duty of loyalty to his client by maintaining an actual conflict of interest during the representation. *Id.* at 692.

Conflicts arise when counsel's personal interests are "inconsistent, diverse or otherwise discordant with those of his client and … affect[] the exercise of his professional judgment on behalf of his client." *Zepp*, 748 F.2d at 135 (citation and internal quotation marks omitted). When there is "a[n actual] conflict *that affected counsel's performance* – as opposed to a mere theoretical division of loyalties" – the defendant need not make a separate showing of prejudice. *Mickens v. Taylor*, 535 U.S. 162, 171 (2002). A defendant alleging an actual conflict must establish that "trial counsel's interest and the defendant's interest diverge[d] with respect to a material factual or legal issue or to a course of action." *Zepp*, 748 F.2d at 136 (alteration in original) (citation and internal quotation marks omitted).

A criminal investigation of counsel, even for crimes unrelated to those being prosecuted in the defendant's trial, can generate an actual conflict when counsel seeks to curry favor with the attorneys prosecuting his client, thus resulting in counsel "pull[ing] … his punches." *Reyes-Vejerano v. United States*, 276 F.3d 94, 99 (1st Cir. 2002). Conversely, a lack of evidence that counsel pulled his punches may serve as an

indication that he was not "intimidated by a threat of prosecution" in defending his client. *United States v. Montana*, 199 F.3d 947, 949 (7th Cir. 1999). And where a defendant "show[s] only that his lawyer was under investigation and that the lawyer had some awareness of an investigation" during the defendant's trial, but fails to demonstrate that the lawyer's interests diverged from that of the defendant, beyond "the general and unspecified theory that [the attorney] must have wanted to please the government[,]" he has not demonstrated an actual conflict. *Reyes-Vejerano*, 276 F.3d at 99.

That is the case here. Pelullo has presented no evidence that prosecutors in the District of New Jersey knew of the case against Farrell in the District of Maryland or that Farrell thought they did. *Cf. Armienti v. United States*, 234 F.3d 820, 824-25 (2d Cir. 2000) (holding that the defendant presented a "plausible claim" of an actual conflict where his attorney "was being criminally investigated by the same United States Attorney's office that was prosecuting" the defendant, and, during trial, he failed "to conduct further investigation, fail[ed] to vigorously cross-examine the government's witnesses, … fail[ed] to make various objections[,]" was "ill-prepared and distracted[,]" and "misadvised [the defendant] not to talk to the probation department at the time of his sentencing"). There is thus no reason to think that Farrell pulled his punches – that he took it easy on the government to secure the prosecutors' good favor.

In fact, he did quite the opposite, something Pelullo acknowledges and now tries to turn to his advantage. Pelullo contends that Farrell's "rage and a quixotic sense of revenge against an unfair [g]overnment[,]" fueled by the criminal investigation, turned him into "an aggressive madman" driven

"not by Pelullo's best interests but … [instead by] his personal outrage about his own legal problems." (SP Opening Br. at 43-44.) Pelullo offers examples of when Farrell's "rage" supposedly made his representation inadequate, such as his repeated misspeaking on cross and direct examination, presenting a failed *Daubert* challenge, and offering a "catastrophic closing argument" that was a three-day "epic rant, devoid of purpose or focus[.]" (SP Opening Br. at 52-54.) Farrell's personal interest in getting revenge against the government, Pelullo claims, conflicted and interfered with the duty to act in Pelullo's best interests.

Those examples may speak to Farrell's level of competence, but they do not demonstrate any divergence between his interests and those of Pelullo. *Zepp*, 748 F.2d at 136. Farrell's pugnacious approach was fully approved by Pelullo, and Farrell's mistakes were, as the District Court noted, unsurprising in the course of "a very long trial[.]" (JAE at 529.) *See Strickland*, 466 U.S. at 689 (warning against "second-guess[ing defense] counsel's assistance after conviction or adverse sentence" and too readily deeming representation deficient in hindsight); *United States v. Williams*, 631 F.2d 198, 204 (3d Cir. 1980) (holding no ineffective assistance of counsel where defendant concurred in his counsel's trial strategy). In fact, Pelullo sought out Farrell's services precisely because of his aggressive defense style. That he got what he wanted but it didn't produce the desired results does not mean he is free to call it constitutionally deficient advocacy now.

The alleged conflict of interest affecting Farrell's representation is significantly different from fact patterns in which an actual conflict has been found. In *Government of*

81

*Virgin Islands v. Zepp*, 748 F.2d 125, 136 (3d Cir. 1984), we reasoned that defense counsel should have withdrawn because he "could have been indicted for the same charges on which he represented [the defendant] … and … was a witness for the prosecution." Farrell, by contrast, was under investigation for activities unrelated to Pelullo's charges and had no personal stake in the success or failure of Pelullo's defense. Nor does the trial record present a scenario in which the same United States Attorney's Office prosecuted both the defendant and investigated his attorney. In such a situation, there is a clear motive for counsel to "temper[] his defense … in order to curry favor with the prosecution, perhaps fearing that a spirited defense … would prompt the Government to pursue the case against [him] with greater vigor." *United States v. Levy*, 25 F.3d 146, 156 (2d Cir. 1994); *see, e.g.*, *Armienti*, 234 F.3d at 824-25 (ordering an evidentiary hearing on a potential conflict of interest because defense counsel was under investigation by the same United States Attorney's Office prosecuting the defendant); *United States v. McLain*, 823 F.2d 1457, 1463-64 (11th Cir. 1987) (holding that when counsel was under investigation by the same United States Attorney's Office as his client an actual conflict of interest existed, warranting a new trial), *overruled on other grounds as recognized by United States v. Watson*, 866 F.2d 381, 385 (11th Cir. 1989).

Pelullo argues that we should assume that the government attorneys here were aware of the grand jury investigation in the District of Maryland. He asks that we treat the two U.S. Attorneys' offices as "one combined entity[,]" and thus conclude that he was prejudiced. (SP Opening Br. at 77.) We do not accept that premise. *See United States v. Pelullo*, 399 F.3d 197, 218 (3d Cir. 2005) (declining to impute to the prosecution team constructive knowledge of information

held by a federal agency that was not involved in the investigation and prosecution of the case).

Finally, the timeline belies Pelullo's argument that Farrell began his representation of Pelullo "motivated by his own personal anima rather than the best interests of his client." (SP Opening Br. at 45.) As Farrell testified, he was not aware of the investigation's existence until halfway through trial, in either March or April of 2014. Without that knowledge, Farrell could not have begun his representation with the intention Pelullo attributes to him. Farrell's consistently aggressive tactics suggest that his litigation strategy was not affected by his being under investigation but was rather a matter of style. We thus conclude that Farrell's representation of Pelullo did not present an actual conflict.

To the extent that Pelullo and Farrell had a potential conflict of interest, Pelullo needed to show that the potential conflict caused him prejudice. He has failed to do that. *Strickland*, 466 U.S. at 687. There is no reasonable probability he would have been acquitted in the absence of Farrell's services, given the overwhelming evidence of his guilt. *See id.* ("This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.").

In short, Pelullo was not deprived of his Sixth Amendment right to the effective assistance of counsel and so is not entitled to a new trial.[48]

---

[48] Because the District Court fully developed the record and did not err, Pelullo is not entitled to yet another evidentiary

## C. Convictions for RICO Conspiracy Under 18 U.S.C. § 1962(d)

The jury convicted the Defendants of conspiring, in violation of RICO, to "conduct or participate … in" the affairs of an enterprise engaged in interstate commerce "through a pattern of racketeering activity[.]" 18 U.S.C. § 1962(c); *id.* § 1962(d) (making it "unlawful for any person to conspire to violate any of the provisions of subsection … (c)"). RICO lists dozens of federal crimes and incorporates many state crimes that qualify as predicate "racketeering activit[ies.]" *Id.* § 1961(1). To constitute a "pattern[,]" there must be "at least two acts of racketeering activity[.]" *Id.* § 1961(5). Here, that meant, to be guilty of the conspiracy, each Defendant had to have agreed that he or his co-conspirators would perform two or more of the predicate acts listed in § 1961(1). The jury found, in response to special interrogatories, that Pelullo and Scarfo each agreed to the commission of eight such predicate acts, that William Maxwell agreed to the commission of seven, and that John Maxwell agreed to the commission of six. The Defendants raise claims of error related to the RICO conspiracy charge, but none is persuasive.

---

hearing either.

### 1. Constructive Amendment of Indictment[49]

Scarfo complains to us about the verdict form's special interrogatories.[50] According to Scarfo, the District Court violated his Fifth Amendment rights by constructively amending the indictment in the verdict form when it specified

---

[49] We review for abuse of discretion a district court's determination of whether to submit special interrogatories to a jury. *United States v. Console*, 13 F.3d 641, 663 (3d Cir. 1993). While a properly preserved claim of constructive amendment or variance receives plenary review, we review for plain error when it is raised for the first time on appeal. *United States v. Vosburgh*, 602 F.3d 512, 531 (3d Cir. 2010). The test for plain error requires the appellant to show "(1) an 'error'; (2) 'that is plain'; (3) 'that affect[ed] substantial rights'; and (4) that failure to correct the error would 'seriously affect[ ] the fairness, integrity or public reputation of judicial proceedings.'" *United States v. Defreitas*, 29 F.4th 135, 144 (3d Cir. 2022) (alterations in original) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

[50] Pellulo and John Maxwell both specifically adopt Scarfo's argument "as to … shifting of RICO[.]" (SP Opening Br. at 223; JM Opening Br. at 49.) To the extent they intend to refer to Scarfo's constructive amendment argument, their claims fail for the same reason as does Scarfo's – namely, that the verdict form did not expand the potential bases for liability under the RICO charge beyond those listed in the indictment. William Maxwell, meanwhile, does not specifically adopt Scarfo's argument, so he has forfeited it.

a particular group of racketeering activities applicable to each defendant. Separately, he suggests that the special interrogatories made him seem comparatively more culpable than the codefendants for whom fewer predicate acts were listed, prejudicing him in the eyes of the jury and causing juror confusion. He did not raise those issues at trial, so we review for plain error.[51] *United States v. Duka*, 671 F.3d 329, 352 (3d Cir. 2011).

Eleven of the thirteen defendants were charged with engaging in a RICO conspiracy. That count in the indictment

---

[51] Scarfo argues that his constructive amendment claim was preserved when his attorney raised the following concern in the District Court:

> [G]iven that it is a RICO conspiracy charge I think it would be worth reiterating with the jurors that all defendants are charged with the same RICO conspiracy charge because I think it is – I think it was a little bit unclear, given your remarks to them about the verdict form, that they may have concluded that some defendants are charged with different forms of – with different kinds of RICO conspiracy and I think that may generate some confusion.

(JAC at 12498.) The District Court responded that the "verdict form itself" showed that all defendants were charged with the same RICO conspiracy and that the only difference among them was "in the predicate qualifying acts." (JAC at 12498.) Scarfo at no point referenced the indictment nor mentioned constructive amendment or prejudice, so plain-error review is appropriate.

listed eight specific predicate acts, namely, mail fraud, wire fraud, bank fraud, obstruction of justice, extortion, interstate travel in aid of racketeering, money laundering, and securities fraud.

The verdict form asked the jury to first indicate whether it found Scarfo and his alleged co-conspirators guilty or not guilty of RICO conspiracy. Below that, special interrogatories appeared under each defendant's name, asking if the jury "unanimously find[s] that the government proved beyond a reasonable doubt" that the named defendant agreed to commit specified predicate acts. (GSA at 409-15.) The form provided "yes" or "no" spaces for the foreman to check for each predicate act. Some defendants were charged with different and fewer predicate acts than others were. For example, Scarfo's name on the verdict form included all eight potential predicate acts (as it did in the indictment), while some of his co-conspirators had fewer predicate acts listed. The District Court instructed the jury that they needed to unanimously find an answer on the interrogatories regarding acts of racketeering activity but that they should not "answer these interrogatories until after [they] ha[d] reached [their] verdict." (JAC at 12390.)

The Fifth Amendment requires that a defendant be tried only for crimes for which he has been indicted. *See* U.S. Const. amend. V; *Stirone v. United States*, 361 U.S. 212, 217 (1960). Accordingly, a court cannot later amend an indictment – either formally or constructively – to include new charges. *Ex parte Bain*, 121 U.S. 1, 6-9 (1887). A constructive amendment occurs when the court "broaden[s] the possible bases for conviction from th[ose] which appeared in the indictment." *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007)

87

(citation and internal quotation marks omitted). For instance, an indictment is constructively amended if the jury instructions "modify essential terms of the charged offense" such that "the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006).

That did not take place here. The interrogatories required the jury to support their decision by identifying at least two predicate acts for each defendant, after determining whether the defendants were guilty of RICO conspiracy. Those interrogatories did not, as Scarfo argues, turn the predicate acts into elements of the RICO conspiracy. The indictment alleged that each defendant agreed to commit at least two predicate acts and listed all the predicates that later appeared in the interrogatories. If anything, the District Court narrowed, rather than "broaden[ed,] the possible bases for conviction" by instructing jurors to find each predicate act unanimously beyond a reasonable doubt and by removing certain predicate acts for some defendants. *McKee*, 506 F.3d at 229; *cf. United States v. Miller*, 471 U.S. 130, 136 (1985) ("[T]he right to a grand jury is not normally violated by the fact that the indictment alleges more crimes or other means of committing the same crime [than are proven at trial]."). Scarfo, in fact, had the same eight predicate acts listed under his name on the verdict form as were charged in the indictment. For him, then, there was no difference at all between the indictment and the potential bases for conviction listed in the verdict form.

Scarfo also argues that listing more predicates under his name than under his codefendants' names was unfair and caused prejudice and juror confusion. The District Court's

instructions remedied any potential problem, however, by clarifying to the jurors that they first needed to find each defendant guilty or not guilty before turning to the interrogatories as a check on their verdict. *See United States v. Console*, 13 F.3d 641, 663 (3d Cir. 1993) (noting that "an instruction to the jury to answer the [special] interrogatories [regarding RICO predicates] only after it votes to convict" "alleviat[es] the danger of prejudice to the defendant"). Moreover, any disparity between Scarfo and the other defendants was of his own making. There was evidence that he engaged in more criminal wrongdoing than some of his codefendants. Given his own conduct, he cannot now complain that he may have appeared more culpable before the jury than others did. We thus detect no error, much less plain error, in the formulation of the special interrogatories accompanying the RICO conspiracy charge.

### 2. Jury Instructions and Sufficiency of the Evidence

Next, the Defendants challenge the jury instructions and the sufficiency of the evidence pertaining to the RICO conspiracy convictions, but they do so by attacking only one predicate act: extortion under the federal Hobbs Act.[52] Their

---

[52] Pelullo and William Maxwell set forth the challenges to the RICO conspiracy convictions that are addressed in this section. Their arguments were specifically adopted by each other and by John Maxwell, so the claims in this section apply to all three of those Defendants. Though Scarfo did not specifically adopt the other Defendants' arguments and thus forfeited them, *see supra* note 19, we nonetheless refer to the

challenges thus fail for a simple reason: they do not address any of the other predicate acts that support those convictions, and each convicted Defendant had more than two such acts to their discredit, so the elimination of the Hobbs Act predicate makes no difference.[53]  Even if we agreed with their Hobbs Act arguments (which we do not), their convictions for RICO conspiracy are still supported by the other predicate acts found by the jury.  *See United States v. Pungitore*, 910 F.2d 1084, 1107 (3d Cir. 1990) ("Thus, even if we deleted the [extortion] act, we would affirm the convictions" for RICO conspiracy.). Their convictions for RICO conspiracy thus stand.

### D.   Firearm Conspiracy Conviction Following *Rehaif*[54]

Pellulo was charged with a conspiracy, in violation of 18 U.S.C. § 371, having two objects: first, to provide firearms

---

arguments in this subsection as belonging to "the Defendants" for the sake of simplicity.

[53] Scarfo and Pellulo were each found to have agreed to all eight of the listed predicates.  *Supra* p. 81.   William Maxwell was found to have agreed to the commission of mail fraud, wire fraud, obstruction of justice, extortion, interstate travel in aid of racketeering, money laundering, and fraud in the sale of securities.  John Maxwell was found to have agreed to the commission of mail fraud, wire fraud, extortion, interstate travel in aid of racketeering, money laundering, and fraud in the sale of securities.

[54] "[U]npreserved *Rehaif* claims are subject to plain-

to felons (namely, Scarfo and himself), contrary to 18 U.S.C. § 922(d)(1), and, second, to unlawfully possess firearms as a felon, contrary to 18 U.S.C. § 922(g)(1). He objects to his conviction on that count and asserts that the government failed to allege in the indictment and prove at trial, under *Rehaif v. United States*, 139 S. Ct. 2191 (2019), that he knew he was a felon when he possessed the guns. Even if that claim had merit, however, his challenge fails because he has not identified any error in his conviction as to the first object of the conspiracy – namely, to transfer firearms to felons in violation of § 922(d)(1). Because that is an independent and sufficient basis to affirm the guilty verdict on the conspiracy count, we need not, and do not, address whether there was error as to the second object of the conspiracy, the possession of firearms.

In its investigation, the government seized a small arsenal of guns and ammunition from Pelullo's and Scarfo's homes, Pelullo's office, and their yacht. It also collected evidence showing how Pelullo and Scarfo had acquired those weapons: for example, it uncovered Pelullo's and the Maxwell brothers' coordinated efforts to have John Maxwell drive a firearm across the country from Dallas to Scarfo's home in New Jersey. *See infra* Section V.E.1. Since Pelullo and Scarfo had previously been convicted of felonies, neither of them was allowed to have a gun. As noted earlier, *supra* p. 8, Pelullo had convictions for bank fraud, making false statements in an SEC filing, and wire fraud, while Scarfo's criminal record included a guilty plea for conducting an illegal gambling business. The government thus alleged in the indictment that Pelullo

---

error review[.]" *Greer v. United States*, 141 S. Ct. 2090, 2099 (2021).

unlawfully conspired both to violate § 922(d)(1) by providing firearms to Scarfo and himself and to violate § 922(g)(1) by possessing firearms.

Pelullo focuses his arguments on the second object of the conspiracy charge, the § 922(g)(1) violation, but he does not argue that there was insufficient proof that he conspired to transfer firearms to Scarfo in violation of § 922(d)(1). That failure dooms his claim. In a "multiple-object conspiracy" like this one, a guilty verdict will stand so long as there is sufficient evidentiary support for any of the charged objects. *Griffin v. United States*, 502 U.S. 46, 47, 56-57 (1991). We may thus "affirm [Pelullo's] conviction[] as long as we find that there was sufficient evidence with respect to one of the [two] alleged prongs of the conspiracy." *United States v. Gambone*, 314 F.3d 163, 176 (3d Cir. 2003).

Section 922(d)(1) makes it unlawful "to sell or otherwise dispose of any firearm … to any person" while "knowing or having reasonable cause to believe that such person" has been indicted for or convicted of "a crime punishable by imprisonment for a term exceeding one year[.]" That same *mens rea* (or guilty state of mind) – namely, "knowing or having reasonable cause to believe" that the recipient of the firearms is a convicted felon – also applies to cases, like this one, involving a conspiracy to violate § 922(d)(1). That is because the government cannot secure a conspiracy conviction without proving that the defendant had the *mens rea* required for the substantive offense that was the object of the conspiracy. *See United States v. Alston*, 77 F.3d 713, 718 (3d Cir. 1996). The Supreme Court's *Rehaif* decision applied the "presumption in favor of scienter" (that is, a presumption of intent or knowledge of wrongdoing) to read

92

into § 922(g) a requirement that the defendant know his status as a member of a class of persons prohibited from having a firearm, but that has no bearing on § 922(d), which contains an express *mens rea* element. 139 S. Ct. at 2194-96; *see also id.* at 2209 (Alito, J., dissenting) (arguing that the majority read into § 922(g) a *mens rea* element more stringent than the one that Congress explicitly required for § 922(d) charges).

Perhaps it is no surprise that Pelullo does not challenge the § 922(d)(1) object of the conspiracy conviction, since overwhelming trial evidence shows that Pelullo knew or, at a minimum, had powerful cause to believe, that Scarfo was a felon when Pelullo conspired to transfer a firearm to him. Pelullo's counsel explained to the jury, in his opening statement, that "[t]he reason why [Pelullo] helped Mr. Scarfo is because they're both prior felons." (JAC at 100.) Counsel leaned on Scarfo's and Pelullo's prior felonies as part of a narrative of rags to riches turned sour by government overreach, painting them as "two felons who were in business together that had a checkered past" who had turned their lives around to "mak[e] millions of dollars" in "legitimate" business. (JAC at 96.) In his closing argument, Pelullo's counsel again emphasized to the jurors that Pelullo and Scarfo were "two convicted felons" who had supposedly "partner[ed] in good faith to succeed in business legitimately[.]" (JAC at 12805.) Moreover, as more fully described in the next section, *infra* Section V.E.1, the way in which Pelullo endeavored to procure a firearm for Scarfo by secretive means – having John Maxwell buy a gun in Texas and drive it halfway across the country to New Jersey and instructing him to avoid law enforcement officials along the way – demonstrates Pelullo well understood that Scarfo, as a prior felon, was prohibited from having firearms. Because there was sufficient evidentiary support for

the § 922(d)(1) object of the conspiracy count at issue, that in itself is enough to sustain the conviction, regardless of any potential *Rehaif* error associated with the § 922(g)(1) object.[55]

---

[55] Pelullo also asserts that the *Rehaif* error entitles him to "complete dismissal of the indictment" or, at a minimum, vacatur of the RICO conspiracy conviction, since the indictment and the government's case at trial relied heavily on the firearms. (3d Cir. D.I. 322 at 21-24.) But any *Rehaif* error here would not require automatic reversal of his conviction. *Greer*, 141 S. Ct. at 2100. Rather, because Pelullo did not object to the government's mentions of the firearms (or the presence of the guns in the courtroom), he bears the burden, on plain-error review, of showing a "reasonable probability" that he would have been acquitted of the other charges but for the gun evidence. *Id.* at 2096-97. His conclusory claim of "extreme prejudice" due to a "changed … dynamic [at] trial" caused by the guns is insufficient to carry that burden. (3d Cir. D.I. 322 at 25.) It is also unsupported by the record. While the RICO conspiracy portion of the indictment mentioned the firearms, none of the charged racketeering predicate offenses had anything to do with the firearms conspiracy. And the case against Pelullo at trial on the other counts rested on a great deal more evidence than just his involvement with firearms – namely, the extensive testimonial and documentary proof of his leading role in the FirstPlus takeover scheme.

**E.** **Sufficiency of Evidence to Support William Maxwell's Convictions**

    **1.** **Conviction for Conspiracy to Unlawfully Transfer or Possess a Firearm**[56]

William Maxwell disputes the sufficiency of the evidence supporting his conviction for conspiracy to unlawfully transfer a firearm.[57] That count was brought under the general conspiracy statute, 18 U.S.C. § 371, which requires the government to prove "(1) an agreement between two or more persons to achieve an unlawful goal; (2) the defendant intentionally joined the agreement, with knowledge of its objective; and (3) an overt act taken in furtherance of the conspiracy by a co-conspirator." *United States v. Whiteford*, 676 F.3d 348, 357 (3d Cir. 2012). Insofar as William was concerned, the object of the alleged conspiracy was to get guns

---

[56] William Maxwell moved before the District Court for judgment of acquittal on this count. We exercise plenary review over the denial of the motion, although "we view the evidence in the light most favorable to the government, mindful that it is the jury's province (and not ours) to make credibility determinations and to assign weight to the evidence." *United States v. Richardson*, 658 F.3d 333, 337 (3d Cir. 2011).

[57] The same count also charged a conspiracy to unlawfully possess a firearm, but, as in the previous section, it is sufficient for us to concern ourselves with William's efforts to transfer a firearm. *See supra* Section V.D.

into the hands of Scarfo and Pelullo, both of whom were convicted felons.

The evidence supporting that count involved William's brother John delivering a firearm from Dallas, Texas, to Scarfo's home in Egg Harbor Township, New Jersey. The FBI recorded multiple wiretapped phone conversations between John and Pelullo as John made his way to New Jersey. In one call on September 6, 2007, John expressed his suspicion that he was being followed by "a chopper over-head" and "a black and white Suburban [that was] right behind [him] too." (JAD at 6156.) They agreed that John should stop for lunch, presumably to avoid leading the suspected surveillance vehicles to Scarfo's house. Later that day, John and Pelullo spoke again; John said he "talked to Bill [i.e., William Maxwell] and he[, William,] said it could be everything and it could be nothing. He said there's no way of knowing. He said … just take whatever precautions that you [Pelullo] thought were best." (JAD at 6168.) Months later, FBI agents executed a search warrant at Scarfo's house in Egg Harbor Township and uncovered a gun that, according to an ATF report, John Maxwell purchased from a pawn and gun shop in Dallas on September 4, 2007.

William Maxwell claims that the only evidence tying him to the firearm delivery – the call in which John told Pelullo about his conversation with William – was insufficient to bring William within the conspiracy to have the firearm transferred to or possessed by Pelullo or Scarfo. We take that as an argument that the government failed to furnish sufficient evidence of the second element of a conspiracy under 18 U.S.C. § 371: that William intentionally joined an agreement with knowledge of its objective. *Whiteford*, 676 F.3d at 357.

96

But considering that phone call, as we must, in the light most favorable to the jury's verdict, it is enough. *United States v. Richardson*, 658 F.3d 333, 337 (3d Cir. 2011). From John's statement on the phone that he "talked to Bill" about the suspected surveillance vehicles (JAD at 6168), a rational trier of fact could have found that William had knowledge of John's illicit objective to deliver the firearm. *See United States v. Caraballo-Rodriguez*, 726 F.3d 418, 431 (3d Cir. 2013) (en banc) ("[A]lthough the prosecution must prove the defendant's knowledge of the conspiracy's specific objective, that knowledge need not be proven by direct evidence."). And a rational jury could also have found, from John's statement noting William's shared concern about the possibility of surveillance and the advice he gave about the precautions to take (or at least whose precautions to follow), that William was in on the agreement. *See United States v. McKee*, 506 F.3d 225, 241 (3d Cir. 2007) ("A defendant's knowledge and intent may be inferred from conduct that furthered the purpose of the conspiracy."). Although thin, there was thus sufficient evidence as to the second element of the charge – that William intentionally joined the conspiracy, knowing of its objective.[58]

---

[58] The evidence of the first and third elements of a conspiracy was also sufficient, and William does not meaningfully contest those elements. As to the first, the multiple wiretapped phone calls between John and Pelullo as John made his way to New Jersey, plus John's call with William, supported a finding that an agreement existed for John to deliver a firearm to Scarfo's home, where it would be possessed unlawfully by Scarfo or Pelullo. *See United States v. McKee*, 506 F.3d 225, 238 (3d Cir. 2007) (permitting circumstantial proof of agreement "based upon reasonable

## 2. Convictions for Wire Fraud and Conspiracy to Commit Wire Fraud[59]

William Maxwell also disputes the sufficiency of the evidence supporting his guilty verdict on sixteen counts of wire fraud and one count of conspiracy to commit wire fraud. Those counts were predicated on William's involvement in two schemes to defraud FirstPlus, namely by causing the company to pay substantial sums to Pelullo's and Scarfo's sham businesses, and by causing the company to purchase other Pelullo- and Scarfo-owned businesses at vastly inflated prices.

---

inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme"). And as to the third element, John's purchase of the firearm and his cross-country drive to deliver it are certainly overt acts taken in furtherance of the conspiracy. *See id.* at 243 ("[A]n overt act of one conspirator is the act of all[.]").

[59] Because William Maxwell did not move at trial for a judgment of acquittal supporting these convictions, we review for plain error. *See supra* note 49. We look for "a manifest miscarriage of justice[.]" *United States v. Burnett*, 773 F.3d 122, 135 (3d Cir. 2014) (citation omitted). "[T]he record must be devoid of evidence of guilt or the evidence must be so tenuous that a conviction is shocking." *Id.*

Pelullo and John Maxwell purport to adopt William's arguments on this issue, but William's arguments pertain specifically to his particular conduct supporting the convictions, and adoptions "that concern an argument specific to the arguing party will not be regarded[.]" *United States v. Williams*, 974 F.3d 320, 374 n.41 (3d Cir. 2020).

To prove wire fraud, the government needed to show "(1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of interstate wire communications in furtherance of the scheme." *United States v. Andrews*, 681 F.3d 509, 518 (3d Cir. 2012) (citation, internal quotation marks, and alteration omitted). As for the charge of conspiracy to commit wire fraud, once again that required the government to prove "(1) a conspiracy existed; (2) the defendant knew of it; and (3) the defendant knowingly and voluntarily joined it." *United States v. Wheeler*, 16 F.4th 805, 819 (11th Cir. 2021) (citation omitted). William does not focus his attack on the evidence supporting any particular element; he instead claims that he only did "as directed[.]"[60] (WM Opening Br. at 34-36.) But the trial evidence against him belies that attempted evasion.[61]

There was, for example, plenty of evidence to support the jury's finding that William Maxwell participated in the scheme to defraud FirstPlus by causing the company to funnel money to Pelullo and Scarfo. Evidence at trial showed that FirstPlus gave to William, as "Special Counsel," the authority "to retain any and all consulting firms, in [his] sole discretion" and compensated him $100,000 per month plus expenses for his efforts. (JAD at 1653-56.) With that authority, he retained

---

[60] Specifically, he is referring to the jury's verdict with respect to Counts 4 through 16.

[61] William Maxwell tries to resist any such conclusion by pointing to instances in which he provided legitimate legal services for FirstPlus. But evidence of legal conduct does not negate the evidence of other, illegal conduct.

Seven Hills (Pelullo's company) pursuant to a consulting agreement in which Seven Hills was given authority to "run the entire operation of FirstPlus Financial Group and its subsidiaries" in exchange for $100,000 per month plus expenses. (JAC at 3755.) Seven Hills then turned around and retained LANA (Scarfo's company), whereby LANA would receive $33,000 of Seven Hills's $100,000 per month, plus expenses, to perform identical duties as Seven Hills, although it was clear that LANA was not actually going to perform any of those duties, nor was Seven Hills. William was the one who made those payments happen: he received monthly expense reports from Seven Hills and would coordinate and then issue payments for those expenses by wire transfer on behalf of FirstPlus from his attorney trust account.

William also disputes the sufficiency of the evidence of his participation in the purchases of Rutgers and Globalnet.[62] But he fails on that score too. When Pelullo bullied Kenneth Stein into drafting inflated business valuations for Rutgers and Globalnet, it was actually William Maxwell who signed the engagement letter formally hiring Stein, with Pelullo operating behind the scenes. And when Stein was compensated for his services, the payment came via wire transfer from William's law firm account. Moreover, William participated in a discussion that resulted in the inclusion of a false statement in FirstPlus's 10-K regarding its acquisitions of Rutgers and Globalnet from Seven Hills and LANA. When those deals came together, Pelullo had lawyers working on both sides of the transaction. Nevertheless, FirstPlus falsely claimed in its

---

[62] Specifically, he is referring to the jury's verdict with respect to Counts 17 through 19.

10-K that the acquisitions of Rutgers and Globalnet were "arms-length" deals, notwithstanding William's unsupported assertion to the contrary. (JAD at 2771.)

In sum, evidence of William's participation in the wire fraud counts and the wire fraud conspiracy was neither lacking nor so "tenuous" as to render the convictions "shocking." *United States v. Burnett*, 773 F.3d 122, 135 (3d Cir. 2014). In fact, it was quite the opposite. His convictions on the wire-fraud related counts are amply supported by the trial record.

### F.    Juror Issues[63]

### 1.    Background

Toward the end of trial and through jury deliberations, the District Court confronted a number of jury-related issues, ranging from scheduling concerns to allegations of juror misconduct.

---

[63] Scarfo and John Maxwell set forth the challenges to the jury-related issues that are addressed in this section. Scarfo's argument was specifically adopted by John Maxwell and Pelullo – and it effectively includes everything raised by John – so the challenges to these jury-related issues apply to all three of those Defendants. William Maxwell specifically adopted John's arguments, addressed, *infra*, in Sections V.F.2 and V.F.5, but not the remaining arguments raised only by Scarfo, which he has thus forfeited. *See supra* note 19. We nonetheless refer to the arguments in this section as belonging to "the Defendants" for the sake of simplicity.

By mid-June 2014, closing arguments in the case were under way. On the morning of June 16, the Court and parties anticipated that the summation for one of the defendants, David Adler, would continue where it had left off the previous day. Before the jury was brought in, however, the District Court notified the parties that Juror #8 was "distraught," worrying that "her name is known and, therefore, her family's name is known." (JAC at 13557.) The Court expressed its opinion that Juror #8 should be excused because "[s]he says she can no longer be fair and impartial." (JAC at 13557.) The Court also disclosed that it had spoken with Juror #8 about similar concerns "three or four weeks ago[,]" and, at the time, she had expressed a willingness "to try to see [the case] to the end." (JAC at 13557.) But Juror #8's anxiety continued to grow, and the Court decided that, after she voiced her concerns again, it "d[id]n't see any choice but to let her go." (JAC at 13557.) The government agreed with the Court that Juror #8 should be excused. The Defendants' attorneys did as well, though they requested that she be instructed to not tell the other jurors the reason for her being excused. Their request was heeded: the Court confirmed with Juror #8 that she had not expressed her concerns to other jurors, and, when the Court notified the remaining jurors that Juror #8 had been excused and an alternate would take her place, it did not explain why. The Defendants also asked whether a record had been created to document Juror #8's concerns, which the Court confirmed had been done. The trial record includes the transcript of an in camera conversation with Juror #8 earlier that day, in which Juror #8 asked to be excused for the same reasons relayed by the Court to the parties.

The jury started its deliberations two days later, on June 18. Several days later, another juror had to be excused.

102

Juror #12 had a prepaid vacation starting on June 28, and pursuant to the Court's earlier promise to honor all jurors' prepaid vacation plans, Juror #12 was to be excused on June 27, a Friday, if the jury was still deliberating. The Court allowed the parties to choose whether to "go with eleven after [Juror #12] leaves or [to] substitute alternate number one in her place." (JAC at 14000.) On the Tuesday of Juror #12's last week, however, the jury asked the Court – and the Court agreed – to give them Fridays off from deliberations in light of employment hardships, which moved up Juror #12's last day to June 26. The Court then notified the parties of the requested schedule change and the effect it would have on the jury composition and deliberations:

> [I]t's the consensus of the jury they not work Friday at all. Now, obviously that means juror number twelve's last day will be Thursday. … They all understand that if they don't have a verdict when 12 leaves, they're going to get an alternate in there, have to start again next week. …

> So we're not working Friday and you know tomorrow we're ending early. … It's tense in there, which is not unexpected, given the length of this trial and the issues that they have to decide. We put a terrible burden on them with a hundred and seventy questions in the questionnaire and they seem to be working through it. But it's tense and I don't think you're going to have a verdict this week. I could be wrong, but I don't think so. That's just my guess at this point.

(JAC at 14002-03.)

That Thursday, Juror #12's last day, Scarfo's and Adler's attorneys raised concerns about what the jury believed would be the effect of Juror #12's excusal on the jury composition and its deliberations. Specifically, they were concerned that the jury's knowledge of Juror #12's excusal would put pressure on them to reach a verdict before she left – particularly if they knew that, were an alternate to replace her, their deliberations would have to start anew. Although the attorneys conceded that an instruction to start deliberations anew was required once the alternate was seated, *see* Fed. R. Crim. P. 24(c)(3),[64] they wanted to ensure that the instruction wasn't given until the alternate was actually seated, so as not to put pressure on the jury to reach a verdict before the replacement occurred. In fact, the attorneys were concerned that the Court may have already told the jury about starting anew earlier that week, when the jurors had asked not to deliberate on Fridays.

Upon hearing those concerns, the Court said it was "positive [the jurors] know that there will be a substitution" upon Juror #12's excusal (JAC at 14018), but it was unsure whether the jury had been told that seating an alternate would require their deliberations to begin again. The Court acknowledged, however, that it likely had instructed the alternates "that the deliberations would have to start over again because of a new juror" and that "the new juror has a right to

---

[64] Rule 24(c)(3) provides, in relevant part: "If an alternate replaces a juror after deliberations have begun, the court must instruct the jury to begin its deliberations anew."

104

be heard on all the issues in the case." (JAC at 14020.) Scarfo's attorney then raised another concern: the alternates may have relayed that message to the jurors while being transported to and from the courthouse together. The Court agreed that such conversations were possible but that they would have violated the daily instruction to jurors and alternates to not talk about the case. Ultimately, the Defendants noted for the record their objections "to the extent that this jury understands at this point that they will be required, in the event of a substitution for juror number 12, to restart their deliberations." (JAC at 14021.) Nevertheless, they acknowledged there was likely no in-the-moment remedy to their concerns, and the Court did not attempt to fashion one.

Later that same day, the jury passed a note to the Court: "We are unanimous on some counts, but we are not unanimous yet on others. Are we under a time constraint to reach unanimity?" (D.I. 1115 (single and double underlining in original).) The Court proposed to the parties that the jury simply be told it was under no time constraint. The Defendants supported that idea, but the government requested an instruction that the jury was allowed to reach a partial verdict. After some discussions, the Court opted for the shorter answer and told the jury there was no time constraint. It then excused Juror #12 for her vacation and sent the rest of the jury home for the weekend without receiving a verdict. With the jury gone, the parties agreed to have the Court empanel an alternate juror the following week instead of allowing an eleven-juror deliberation.

Before deliberations began the following Monday morning, Juror #7 had an in camera conversation with the Court to voice her "frustration" with deliberations because

105

other jurors were "shutting [her] down" when she disagreed with them.  (NSA at 18.)  Apparently, the other jurors' "minds [were] made up[,]" and they were unwilling to debate certain issues any further.  (NSA at 18, 20.)  She further explained that "two cli[ques]" had arisen among the jury by virtue of the two different vans that transported jurors and alternates to and from the courthouse each day.  (NSA at 18-19.)  She was also offended when the alternate who was set to replace Juror #12 was told by another juror, "[W]elcome to hell."  (NSA at 19.)  Nevertheless, despite her concerns, she assured the Court, when asked, that she could remain fair and impartial as the deliberations continued.

The parties were promptly provided both a transcript of that in camera conversation and an opportunity to react.  Manno asked the Court to remind the jurors, "as a cautionary measure," that they could not discuss the case without all twelve jurors present and that they faced no time constraint on their deliberations.  But the Court thought the reminders were unnecessary: a warning was given each day that the jury was not to discuss the case outside the jury room, and the Court had told the jurors the prior week, in response to their note, that they were under no time constraints.[65]

---

[65] While the parties were on the topic of cliques within the jury, Scarfo's attorney disclosed on the record that, over a month ago, he had seen a juror and an alternate having dinner together at a nearby restaurant but felt that it "was perfectly appropriate, given the fact that friendships develop."  (JAC at 14068-69.)  On appeal, the Defendants flag that disclosure in a footnote and point out that the Court "did not inquire into the nature of the jurors' outside-the-courthouse relationship" (NS

While the parties were all gathered in the courtroom, Scarfo's attorney took the opportunity to move for a mistrial, arguing that the previous week had put pressure on the jury to reach a verdict before Juror #12's excusal that would spill over into further deliberations, forcing the replacement juror to "be subject to the will of those jurors who are already deliberating." (JAC at 14069-72.) The Court denied that motion because the jury had not delivered any verdicts the prior week and the Court, upon empaneling Juror #12's replacement, would instruct the jury to start deliberations over again. The jury then came out, and, as promised, the Court empaneled Juror #12's replacement and instructed the jury to start its deliberations anew.[66]

The Court also distributed twelve clean verdict sheets to the jurors and allowed them to dispose of any previous sheets or notes if they wanted to. That evening, the jurors handed their old verdict sheets to the Court for disposal. Pelullo's attorney later expressed concern that the old verdict sheets had been in the jury room during their Monday deliberations with the replacement juror and therefore may have influenced the

_____

Opening Br. at 121 n.41), but they do not argue that the Court committed reversible error.

[66] Just before the replacement juror was empaneled, Pelullo's attorney objected to the replacement (despite agreeing to it the previous Friday), asking the Court to exercise its discretion to allow the existing jury to continue deliberations with only eleven jurors. The Court overruled the objection.

newly constituted jury. He asked the Court to preserve the old verdict sheets for the parties to examine, but the Court explained that they had already been destroyed.

The following morning, Tuesday, July 1, the Court notified the parties that it had received three more notes from jurors with upcoming vacation plans, the earliest of which did not start until July 8. After raising multiple options for accommodating those plans without losing the jury, the Court and the parties agreed simply to let deliberations play out for the week and to defer any decision until the next week, when the vacations would actually start.[67]

More jury issues arose on Wednesday, July 2. An alternate notified the Court in camera of an incident that occurred the previous afternoon as the jurors were transported back to their cars. In the transport van, the alternate heard three jurors discussing one of the Court's instructions and some facts in the case. The alternate told them that the conversation was inappropriate and that they should stop. The three jurors then whispered for the remainder of the trip, so the alternate could not make out what they were saying.

---

[67] Scarfo's attorney raised another concern the next day, namely that the jury might again feel pressure to reach a verdict before the next juror's vacation, given that they had previously learned after Juror #12's departure that they had to start deliberations anew when jurors were replaced by alternates. He conceded, however, that he could not propose a good solution to his concern, and the Court did not take any action.

The Court relayed that in camera conversation to the parties and gave them an opportunity to research the issue and consider possible remedies. The government proposed simply giving another reminder to the jury that their deliberations must stay in the jury room. The Defendants, on the other hand, wanted to question the alternate and the three jurors on the conversation in the van. They also wanted to question the entire jury on any other conversations outside the jury room that occurred during trial and deliberations, and on whether they formed opinions from those conversations. [68] The Defendants apparently believed that there were bigger problems unfolding in the jury room, claiming that the combination of the conversation in the van and Juror #7's vocal frustrations earlier in the week raised the possibility that the jury was deliberating in separate cliques and not altogether in the jury room. The Court denied the Defendants' requests, concluding that the negative effects of interrupting deliberations would outweigh the potential benefits of further inquiry, particularly where the alleged misconduct was only an intra-jury communication, not an extra-jury influence.

The jury returned its verdict the next day, July 3.

---

[68] Because the Court's conversation with the alternate had not been transcribed, the Defendants also requested that it produce a transcription for all future judge-juror conversations.

### 2. Disclosure of the District Court's First Conversation with Juror #8[69]

As noted earlier, the District Court disclosed to the parties that Juror #8 feared the disclosure of her identity and potential retaliation, which she voiced to the Court outside the presence of the parties. The Court's disclosure came after its second conversation with Juror #8, so the Defendants now fault the Court for failing to disclose Juror #8's concerns after the first conversation, which occurred "three or four weeks" prior. (JAC at 13557.) According to the Defendants, they were "stripped of an opportunity to be heard" when the issue of Juror #8's fear first arose. (NS Opening Br. at 155.) They claim that, had they been given that opportunity, they would have immediately moved to remove her from the jury. Instead, Juror #8 continued to serve an additional three or four weeks, creating what the Defendants describe as an "overwhelming" "likelihood" that the rest of the jury "learned of Juror #8's fear that harm would inevitably come to her or her family upon rendering a verdict[.]" (NS Opening Br. at 156.) The Defendants therefore claim that the Court's initial silence amounted to a violation of Federal Rule of Criminal Procedure 43, the Due Process Clause of the Fifth Amendment, and the Confrontation Clause of the Sixth Amendment, since it effectively prevented them from being contemporaneously

---

[69] We review for harmless error a district court's denial of a criminal defendant's right to be present at every stage of his or her criminal proceeding. *United States v. Toliver*, 330 F.3d 607, 611-12 (3d Cir. 2003).

involved in their trial proceedings. *United States v. Toliver*, 330 F.3d 607, 611 (3d Cir. 2003).

The Defendants are correct that they generally have the "right to be present in the courtroom at every stage of [their] trial." *Illinois v. Allen*, 397 U.S. 337, 338 (1970) (under the Confrontation Clause); *accord United States v. Bertoli*, 40 F.3d 1384, 1397 (3d Cir. 1994) (under the Due Process Clause); Fed. R. Crim. P. 43(a)(2) ("[T]he defendant must be present at … every trial stage[.]"). But that right is not absolute. While we have "stress[ed] the advisability of having counsel present for all interactions between the court and jurors," *United States v. Savage*, 970 F.3d 217, 242 (3d Cir. 2020), "[t]he defense has no constitutional right to be present at every interaction between a judge and a juror[.]" *United States v. Gagnon*, 470 U.S. 522, 526 (1985) (citation and internal quotation marks omitted). To guarantee an absolute right would run counter to the "day-to-day realities of courtroom life" because "[t]here is scarcely a lengthy trial in which one or more jurors do not have occasion to speak to the trial judge about something, whether it relates to a matter of personal comfort or to some aspect of the trial." *Rushen v. Spain*, 464 U.S. 114, 118-19 (1983) (per curiam). Still, "[w]hen an *ex parte* communication [between judge and juror] relates to some aspect of the trial, the trial judge generally should disclose the communication to counsel for all parties." *Id.* at 119.

It may have been less than ideal for the District Court not to notify the parties of the first communication with Juror #8 until after speaking with her again three or four weeks later. The Supreme Court has instructed trial courts to "promptly" notify the parties after a communication from a juror. *Id.* at 117 n.2. And it would have been better for the first

111

communication to have been transcribed, which is "our preference [for] such interactions[.]" *Savage*, 970 F.3d at 242. It was on a relevant topic bearing directly on Juror #8's ability to remain fair and impartial while she heard evidence. *See Rushen*, 464 U.S. at 119 (noting that disclosure is proper when the communication "relates to some aspect of the trial"). Although the Defendants' attorneys did not necessarily need to be present for Juror #8's first communication with the Court, *Gagnon*, 470 U.S. at 526, the better course would have been to consult them after the communication and to give them a chance to participate in the decision-making on how to proceed. *Cf. Toliver*, 330 F.3d at 616 ("[B]y not informing counsel of the jury's note [requesting a specific transcript] before responding, the trial judge foreclosed any opportunity for the defense to argue against submitting the testimony at all, or at least to argue that the transcript should include relevant portions of cross-examination.").

But even if the Court's delay were seen as error, it was harmless. *Id.* at 613. The Defendants' complaint is that the delay gave Juror #8 a chance to express her fears to her fellow jurors and thus infect the entire jury with fearful bias against the Defendants. But they do nothing more than speculate that other jurors learned of Juror #8's fear of retaliation. In fact, the record supports the opposite conclusion: in response to concerns raised by the Defendants' attorneys, the Court "inquire[d] again as to whether or not [Juror #8] made any comments to any of the jurors about the reasons why she can't continue" and confirmed that Juror #8 "ha[d] not made any comments at all to other jurors." (JAC at 13562.) The Defendants' "sheer speculation" to the contrary cannot substantiate their claim that they were harmed by the late

disclosure of the first conversation the Court had with Juror #8. *United States v. Provenzano*, 620 F.2d 985, 997 (3d Cir. 1980).

### 3. Purported Coercion of the Jury by the District Court[70]

The Defendants question the validity of the verdict in light of supposed coercion of the jury. In particular, the Defendants claim that the jury believed it was under time constraints to reach a verdict after deliberations started, largely brought on by the forthcoming departure of certain jurors for their prepaid vacations. According to the Defendants, the jury believed it would have to start deliberations anew each time a juror was excused, so the jurors felt rushed to reach a verdict before more jurors could be excused. Combining that prospect with the fact that the trial had already lasted months longer than originally promised, the Defendants say the jury was coerced by the District Court into reaching its verdict quickly.

It is true that "a trial judge may not coerce a jury to the extent of demanding that they return a verdict." *United States v. Jackson*, 443 F.3d 293, 297 (3d Cir. 2006) (citation and internal quotation marks omitted). "We will find a supplemental charge to be unduly coercive, however, only where the charge caused the jury to be influenced by concerns irrelevant to their task and where the jury reached its

---

[70] "In reviewing jury instructions, we consider the legal standard stated in the instructions de novo, but apply an abuse of discretion standard as to the specific wording of the instructions." *United States v. Boone*, 458 F.3d 321, 326 (3d Cir. 2006).

113

subsequent verdict for reasons other than the evidence presented to it." *United States v. Boone*, 458 F.3d 321, 326 (3d Cir. 2006) (citation, internal quotation marks, and alterations omitted). Thus, undue coercion from a trial court "generally involve[s] substantial and explicit pressure from the court for a verdict or for a particular result." *Id.* at 327.

That is why instructions are permissible when they, for example, merely remind jurors of their oaths or simply explain that disagreement would result in retrial. *Id.* at 326-27; *cf. Jackson*, 443 F.3d at 298 (coercive charge when the court "goes further and unduly emphasizes the consequences, i.e., time, toil, or expense, that will accompany a failure to arrive at a[] unanimous verdict"). Similarly, when it comes to jurors' understanding of the length of deliberations, we have drawn a distinction between impermissible "*affirmative* coercive conduct" by the court – such as reminding the jury of the approaching weekend – and a permissible failure to address a question about an approaching holiday. *United States v. Graham*, 758 F.2d 879, 883-85 (3d Cir. 1985) ("The impending holiday of and by itself is an insufficient additional factor to render the district court's order for further deliberations coercive.").

With respect to the original jury – before Juror #12 was excused – the Defendants cannot complain of any coerced verdict. For one, the record does not clearly support the Defendants' claim that the jury knew it would have to start deliberations anew after Juror #12 was replaced. The Defendants latch onto the District Court's concession that it told alternates that the deliberations would start anew if they replaced a juror, speculating that the alternates relayed that message to the jurors, in direct contravention of the Court's

114

order not to discuss the case outside deliberations.[71]  But we assume that jurors follow instructions.  *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985).

More clear – though still not entirely so – is the District Court's statement to the parties that the jurors "all understand that if they don't have a verdict when [Juror #]12 leaves, they're going to get an alternate in there, have to start again next week."  (JAC at 14002.)  But regardless of the jury's understanding of the consequences of Juror #12's excusal, the fact remains that it did not return a verdict before Juror #12 was replaced by an alternate and the jury was instructed to start over.  The Defendants cannot complain about a coerced verdict when there was no verdict at all at that point.  *See Jackson*, 443 F.3d at 297 (supplemental charges were coercive when they "*caused*" the jury to be influenced by irrelevant concerns and reach a verdict for reasons other than the evidence presented (emphasis added) (citation omitted)).

After Juror #12 was replaced, the jury may well have believed that deliberations would have to start anew again if

---

[71] And because the Defendants simply speculate that alternates told jurors about starting deliberations anew upon a substitution, we disagree with the Defendants that the Court had an obligation to conduct a hearing to determine the existence of improper contact between jurors and alternates.  *See United States v. Console*, 13 F.3d 641, 669 (3d Cir. 1993) (holding that "[t]here is no obligation for the judge to conduct an investigation" if there is no "reason to believe that jurors have been exposed to prejudicial information" (citation and internal quotation marks omitted)).

115

another juror was replaced. Even though other options were available and considered here,[72] the jurors saw what happened after Juror #12 was replaced – the Court instructed them, pursuant to Federal Rule of Criminal Procedure 24(c)(3),[73] to start over – and they could have "assum[ed] that substitution was the only option[.]" (NS Opening Br. at 123.) But that assumption, without more, does not amount to coercion. Other than complying with Rule 24(c)(3), the District Court undertook no "*affirmative* coercive conduct" that would put pressure on the jury to reach a verdict by a certain deadline. *Graham*, 758 F.2d at 885. The Defendants point to no instance in which the Court imposed any "pressure … for a verdict or for a particular result." *Boone*, 458 F.3d at 327. Without any other indicia of coercion, the Defendants effectively invite us to deem a use of Rule 24(c)(3) to be coercive per se, for the message it sends to a newly constituted jury.[74] We decline that invitation.

---

[72] "The Federal Rules of Criminal Procedure currently provide courts three options after excusing a juror for good cause during deliberations: (1) declare a mistrial; (2) proceed with eleven jurors; or (3) seat an alternate." *United States v. James*, 955 F.3d 336, 346 (3d Cir.) (citation, internal quotation marks, and alterations omitted), *cert. denied*, 141 S. Ct. 329 (2020).

[73] *See supra* note 64.

[74] The Defendants emphasize the *lack* of evidence that the jury was *not* coerced by an understanding that deliberations would start anew with another replacement. But the burden of showing error remains with them. *See United States v.*

116

### 4. Purported Coercion of the Substituted Juror by Other Jurors[75]

The Defendants also complain about a different type of juror coercion: pressure from other jurors on the alternate who replaced Juror #12. They claim that the alternate confronted "outward hostility from the deliberating jurors" just prior to being empaneled and that the initial jury had already reached unanimity on certain issues before he joined. (NS Opening Br. at 133-34.) Together, those supposed facts leave the Defendants with "little doubt that the Alternate felt pressure to comply with previously made decisions and acquiesce to the majority's previous determinations as to guilt and innocence." (NS Opening Br. at 138.) And that pressure was allegedly reflected in the timing of the verdict, returned three days after the alternate was empaneled, when contrasted against the seven days that the original jury deliberated. The District Court's decision to empanel the alternate under such coercive conditions was an abuse of discretion, claim the Defendants, and so requires reversal.

Juror coercion can indeed arise not only from trial court instructions but also from other jurors who are forced to start deliberations anew with an alternate. *See Claudio v. Snyder*,

---

*Jackson*, 443 F.3d 293, 297 (3d Cir. 2006) ("[The defendant] must show that the Court's action was 'arbitrary, fanciful or clearly unreasonable.'" (citation omitted)).

[75] "We review for abuse of discretion a district court's decision to dismiss a juror and to impanel an alternate juror." *United States v. Glover*, 681 F.3d 411, 422 (D.C. Cir. 2012).

68 F.3d 1573, 1575-77 (3d Cir. 1995); *e.g.*, *United States v. Lamb*, 529 F.2d 1153, 1156 (9th Cir. 1975) (en banc). When an alternate is empaneled after jury deliberations have commenced, it is not unnatural to worry "that the 11 original regular jurors may have already made up their minds to convict and, together, may coerce the alternate juror into joining in their position." *United States v. Kopituk*, 690 F.2d 1289, 1310 (11th Cir. 1982).

But precautions are available to limit that potentially coercive dynamic. In *Claudio v. Snyder*, we affirmed the denial of habeas relief when, in the petitioner's state-court trial, an alternate replaced a juror after deliberations had commenced. 68 F.3d at 1574, 1577. Although the manner of replacement violated a state procedural rule prohibiting substitutions after the start of deliberations, we followed our sister circuits in holding that, as a federal constitutional matter, such a substitution "does not violate the Constitution, so long as the judge instructs the reconstituted jury to begin its deliberations anew and the defendant is not prejudiced by the substitution." *Id.* at 1575, 1577. We concluded in that case that both requirements were met, noting that the petitioner had not been prejudiced because alternates were chosen in the same manner as regular jurors, the alternates and jurors heard the same evidence and legal instructions, the replacement juror affirmed that she had not been influenced by outside discussions or media reports, and the reconstituted jury deliberated longer than the original jury did. *Id.*

As in *Claudio*, the record reflects no problematic coercion here. Upon empaneling Juror #12's replacement, the Court instructed the new jury to start its deliberations anew, as prescribed by Rule 24(c)(3). And, as in *Claudio*, the alternate

juror was selected in the same manner as the regular jurors, heard the same evidence and instructions,[76] and affirmed that

---

[76] Although the Court instructed the newly constituted jury that all previous instructions (which the alternate heard) remained in effect, the Defendants nonetheless complain that the alternate "was not part of the process in formulating [previous] question[s]" from the jury about answering interrogatories for the RICO predicate acts, and he therefore did not understand the Court's responsive instruction to the same degree as the other eleven. (NS Opening Br. at 135-36.) We disagree. The jury's questions were straightforward: (1) whether they had to answer each interrogatory or could stop after finding two were committed, and (2) whether they should leave an interrogatory blank if they were not unanimous as to that interrogatory. The Court's answer was also clear:

> Of course you must consider all the interrogatories and you must attempt to answer all of them unanimously. All 12 of you have to agree on at least two predicate or qualifying acts as to any individual defendant. If you find the Government has proven beyond a reasonable doubt two or more predicate or qualifying acts, then you can find the Government has proven one of the essential elements of Count one which is the RICO conspiracy as to that defendant. Now all 12 of you have to agree on the same predicate or qualifying act or acts. That is, you can't have six agree on one and six agree on another. All 12 have to agree on each predicate

he had not been influenced by external sources. Although the reconstituted jury here did not deliberate for as long as the original jury, it still deliberated for three days before returning a verdict. That amount of time does not persuade us that the original jurors coerced the alternate into agreeing with the counts on which they were apparently unanimous before Juror #12 was excused. *See United States v. Oscar*, 877 F.3d 1270, 1289 (11th Cir. 2017) (noting that nine-hour deliberations after empaneling alternates "indicat[ed] that the jury did in fact renew its deliberations[,]" even though original jury deliberated "for several days"); *cf. Lamb*, 529 F.2d at 1156 (finding coercion of substitute juror when deliberations of reconstituted jury lasted 29 minutes).[77] And although it may

---

act you found to have been proven.

(JAC at 13989.) We don't see what special background experience was necessary for the alternate to understand what was asked or what was instructed.

[77] The Defendants rely heavily on *United States v. Lamb*, 529 F.2d 1153 (9th Cir. 1975), which is distinguishable not only factually, as noted above, but also legally. The Ninth Circuit was in that case interpreting an old, since-amended version of Rule 24(c) that required the court to discharge all alternate jurors when the jury retired to deliberate. *Id.* at 1155; Fed. R. Crim. P. 24(c) advisory committee's note to 1999 amendment. Further, the Ninth Circuit made explicit that it relied *exclusively* on that old version of Rule 24(c) in reversing the conviction. *See Lamb*, 529 F.2d at 1156 n.7 ("While we have noted the obvious coercive effect suggested by the final deliberative period of only twenty-nine minutes, that is not a factor contributing to our conclusion in this case. The

be true that one juror told the replacement, "[W]elcome to hell" (NSA at 19), it is not at all plain that the comment was intended or received as "outward hostility[,]" as the Defendants claim. (NS Opening Br. at 133.) Tone, facial expressions, and body language all matter mightily in communication, and we have none of those to aid us in understanding whether the comment had an edge or was just a joke. Plus, the lack of any juror issues over the next three days of deliberations convinces us that the alternate was not singled out or coerced into a certain verdict, notwithstanding Juror #7's earlier-voiced frustration with the dynamics in the jury room. Our concern here is coercion specifically aimed at the alternate juror, not general tension in the jury room, and we find no evidence in the record of such coercion. *Oscar*, 877 F.3d at 1289.[78]

---

mandatory provision of Rule 24 having been violated, the period of time during which the substitute juror participated in the deliberations is essentially irrelevant.").

[78] The Defendants also make much of the fact that the original jurors could keep their notes from the first deliberations and did not return their original verdict sheets until the end of their first full day of deliberations with the replacement juror. Although it perhaps would have been "good practice" to confiscate the old notes and verdict sheets before the newly constituted jury commenced deliberations, "we cannot say that it is required[,]" *United States v. Oscar*, 877 F.3d 1270, 1289 n.18 (11th Cir. 2017), or that, as the Defendants claim, "the substituted alternate would have naturally felt pressure to play catch up and concede certain previously made decisions." (NS Opening Br. at 136.)

## 5. District Court's Response to Report of Juror Misconduct[79]

Finally, the Defendants fault the District Court for not inquiring, to the degree they wanted, into an alternate's report of a discussion about the case among three jurors while being transported from the courthouse to their cars. As explained above, the District Court questioned the alternate when he brought the issue up, then questioned the marshal who was driving the transportation van, but the Court declined the Defendants' subsequent request to allow them to interview the alternate, the van driver, and the entire jury for any other communications about the case. As a result, the Defendants tell us, the District Court was unable to evaluate the full extent of misconduct and the prejudice to the Defendants, and we, in turn, are unable to engage in meaningful review of the Court's decision and thus must order a retrial.

Generally, "[j]uror questioning is a permissible tool where juror misconduct is alleged, and we have encouraged its use in such investigations." *Boone*, 458 F.3d at 327. But to mitigate "intrusion into jury deliberations[,]" "a district court should be more cautious in investigating juror misconduct during deliberations than during trial, and should be exceedingly careful to avoid any disclosure of the content of deliberations." *Id.* at 329. Thus, we require "substantial evidence of jury misconduct … during deliberations [before] a district court may, within its sound discretion, investigate the

---

[79] "This Court reviews a trial court's response to allegations of juror misconduct for abuse of discretion." *Boone*, 458 F.3d at 326.

allegations through juror questioning or other appropriate means." *Id.* Further, as we stated in *United States v. Resko*, "there is a clear doctrinal distinction between evidence of improper *intra*-jury communications and *extra*-jury influences[,]" as the latter "pose a far more serious threat to the defendant's right to be tried by an impartial jury." 3 F.3d 684, 690 (3d Cir. 1993). That distinction exists because, with intra-jury communications, "the proper *process* for jury decisionmaking has been violated, but there is no reason to doubt that the jury based its ultimate decision only on evidence formally presented at trial." *Id.*

The Defendants rely heavily on *Resko*, where, after a juror informed a court officer that jurors were discussing the case during recesses and while waiting in the jury room, the court discovered that all twelve jurors had engaged in such discussions. *Id.* at 687-88. Although the misconduct involved merely intra-jury communications, we held that it was an abuse of discretion for the district court to rely solely on a brief questionnaire asking each juror whether they had discussed the case (everyone answered "yes") and, if so, whether they had formed an opinion from those discussions (everyone answered "no"). *Id.* at 691. By stopping there, we held, the district court left unanswered critical questions about the nature and extent of those discussions. *Id.* at 690-91.

But the key difference between *Resko* – "a difficult case" in "which our holding [was] limited," *id.* at 690, 695 – and this case is that, here, the evidence of intra-juror communications was limited to an isolated event among just a few jurors. In *Resko*, the triggering complaint came from a juror who broadly claimed, one week into trial, that jurors discussed the case. *Id.* at 687. The court then learned that all

123

jurors engaged in such discussions. *Id.* at 688. Here, by contrast, an alternate notified the court of one specific discussion among three jurors, which occurred over six months after trial commenced. Given the narrow scope of the alternate's allegations, the Court was within its discretion to question only the alternate and the marshal about the particular incident, but to deny the Defendants' requests to question the entire deliberating jury about all communications dating back to the start of trial. *Cf. Boone*, 458 F.3d at 330 (no abuse of discretion to question only the juror who was allegedly refusing to deliberate). Further distinguishing this case from *Resko*, the alleged misconduct here occurred after deliberations had begun, when the District Court necessarily was more hesitant to intrude. *Boone*, 458 F.3d at 329. It was certainly within its discretion to consider the potential effect of that intrusion and so to conduct a more limited and targeted inquiry into the allegation.

## VI.    SENTENCING ISSUES

Finally, Pelullo and John Maxwell challenge their sentences. First, Pelullo argues that the District Court erred procedurally and substantively in sentencing him to 360 months' imprisonment.[80] Second, Pelullo and John Maxwell claim that holding them jointly and severally liable for the total amount of the forfeiture order was improper under the Supreme Court's decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017). Third, Pelullo challenges the forfeiture of his Bentley automobile and yacht, contending that the government's delay

---

[80] Scarfo adopts one of Pelullo's procedural-error arguments. *See infra* note 84.

124

in seeking forfeiture after it seized those assets violated his statutory and due process rights. While we will vacate the forfeiture piece of John Maxwell's sentence and remand for resentencing, Pelullo has failed to show error on any of his sentencing claims.

## A.    Pelullo's Sentencing Challenges[81]

Pelullo complains of his thirty-year sentence, although his crimes exposed him to a potentially lengthier period of incarceration.[82] When reviewing a sentence, we "first consider whether the district court committed procedural error, such as 'improperly calculating[] the Guidelines range[,]'" and then we assess whether the sentence was substantively reasonable. *United States v. Seibert*, 971 F.3d 396, 399 (3d Cir. 2020) (first alteration in original) (quoting *United States v. Tomko*, 562

---

[81] We review the District Court's factual findings for clear error, its interpretation of the guidelines *de novo*, and its application of the guidelines for abuse of discretion. *United States v. Seibert*, 971 F.3d 396, 399 (3d Cir. 2020); *United States v. Tomko*, 562 F.3d 558, 567-68 (3d Cir. 2009) (en banc).

[82] The guidelines recommended a life sentence, but the District Court could not have set that lengthy a sentence for any one count because the highest maximum sentence for any of Pelullo's convictions was thirty years. U.S.S.G. § 5G1.1(c). In theory, the Court could have set Pelullo's individual sentences on his various counts to run consecutively rather than concurrently, *id.* § 5G1.2(b)-(d), which would have authorized a sentence as high as 445 years.

F.3d 558, 567 (3d Cir. 2009) (en banc)).  Pelullo insists that the District Court committed three "significant procedural errors" in its analysis, and he critiques the substantive reasonableness of his sentence as well.[83]  (SP Opening Br. at 106.)

### 1. Guidelines Sentencing Range Calculation

Pelullo argues that the Court erred in calculating his guidelines range, claiming that it applied the over-$14 million securities fraud loss to punish him for the bank fraud count.[84]

[83] Pelullo adds another objection in his reply brief, alleging that the District Court failed to conduct his sentencing in "the proper order[.]"  (SP Reply Br. at 39-41.)  But he did not raise that issue in his opening brief, so it is forfeited. *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005).

[84] Scarfo specifically adopts Pelullo's argument as to this issue.  *See supra* note 19.  The District Court calculated Scarfo's total offense level following the same grouping approach that it took in sentencing Pelullo and reached a level of 43, the same one that applied to Pelullo.  We thus treat Pelullo's argument as applying to Scarfo as well.  Nonetheless, that argument fails for the reasons discussed herein, so Scarfo, like Pelullo, is not entitled to relief.

Scarfo also attributes error to what he says was the District Court's failure to "consider either of his sentencing memoranda[.]"  (NS Opening Br. at 183 n.61.)  The record reflects that the Court was unable to review, ahead of Scarfo's sentencing hearing, a submission from his counsel that only came in earlier that day.  The Court, however, gave Scarfo's

Those assertions reflect a miscomprehension of the guidelines.

To calculate the guidelines range "[w]hen a defendant has been convicted of more than one count," the sentencing court must assemble closely related counts into what are called "Groups." U.S.S.G. § 3D1.1(a). The court then "[d]etermine[s] the offense level applicable to each Group" and "the combined offense level applicable to all Groups taken together[.]" *Id.* "The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level" and then increasing that offense level based on the number of "Units." U.S.S.G. § 3D1.4. A Unit is a sentencing construct that, according to § 3D1.4 of the guidelines, functions like this: the court "[c]ount[s] as one Unit the Group with the highest offense level" and adds "one additional Unit for each Group that is equally serious or from 1 to 4 levels less serious" than the highest-level Group and "one-half Unit [for] any Group that is 5 to 8 levels less serious[,]" while "any Group that is 9 or more levels less serious than the Group with the highest offense level" does not generate any Units. *Id.* The total number of Units thus informs how many extra levels are added to the offense level of the highest-level Group, based on a formula in § 3D1.4, to arrive at a combined offense level.[85]

_____

counsel an opportunity to raise the issues from that memorandum at the hearing and said that counsel could "put anything you want on the record and if I can respond, I will." (JAF at 6-7.)

[85] Specifically, if the total number of Units is 1, no extra levels are added; if it is 1.5, one level is added; if it is 2, two

127

Here, the District Court split the twenty-four counts of which Pelullo was convicted into five Groups:

| Group | Description | Offense Level |
|---|---|---|
| 1 | Takeover of FirstPlus and accompanying securities fraud | 43[86] |
| 2 | Bank fraud | 23 |
| 3 | Obstruction of justice | 23 |
| 4 | Extortion | 31 |
| 5 | Firearm transfer and possession | 24 |

Although Pelullo focuses on the fact that his Group 2 convictions had a lower offense level than Group 1, the District Court correctly looked for the Group with the *highest* offense level, consistent with the guidelines' instructions, and that was Group 1. *See* U.S.S.G. §§ 3D1.1(a), 3D1.4. Since all the other Groups' offense levels were at least 9 levels below that of Group 1, the number of Units was just one, which did not

---

levels are added; if it is 2.5-3, three levels are added; if it is 3.5-5, four levels are added; and if it exceeds 5, five levels are added. U.S.S.G. § 3D1.4.

[86] While the PSR erroneously calculated Pelullo's Group 1 offense level as 42, the District Court applied the correct level of 43. The sentencing hearing transcript suggests that the Court mistakenly stated (or a transcription error stated) a level of 33, but the Court's calculation of a recommended sentence of life imprisonment reflects that it understood the total offense level to be 43.

require additional level increases. *Id.* § 3D1.4. Accordingly, Pelullo's total offense level was correctly calculated as 43.

Pelullo's claim that the District Court somehow cross-applied the securities-related loss to the bank fraud claim is spurious. The Court appropriately divided the offenses into Groups and took the offense level of the highest-scoring Group – which itself factored in an enhancement for the $14 million loss FirstPlus suffered – as Pelullo's total offense level. That number, "a single offense level that encompasse[d] all the counts of which [Pelullo was] convicted[,]" U.S.S.G. ch.3, pt. D, introductory cmt., was then used to generate a single recommended sentencing range covering all of Pelullo's offenses.[87] There was no error in how the District Court applied the guidelines' provisions governing cases with convictions on multiple counts.

## 2. Loss Amount Enhancement

Next, Pelullo objects to the District Court's calculation of the loss amount. The Court adopted the presentence report's recommendation and found that the securities fraud offense Group – on which the Court based the total offense level –

---

[87] After argument, Pelullo brought to our attention *United States v. Okulaja*, 21 F.4th 338, 347-50 (5th Cir. 2021), which addressed whether relevant conduct for which the defendant was not indicted could be considered in calculating offense levels. Here, though, the District Court did not rely on any conduct that was irrelevant to the Group 1 securities fraud-based offenses that Pelullo was convicted of when determining the total offense level.

resulted in more than $14 million in loss, triggering a 20-level enhancement under U.S.S.G. § 2B1.1(b)(1)(K). Pelullo claims that finding a loss amount of more than $14 million was a factual error, that "he received far less" than $14 million from his participation in the scheme, and that the calculation did not account for the benefits he conferred on FirstPlus. (SP Opening Br. at 113-15, 118-24.) Calculated correctly, Pelullo says, the loss amount would have instead led to only a 16-level enhancement.

In theft cases, of which this case is one variety, a court calculates the offense level by looking to the "loss" to victims, U.S.S.G. § 2B1.1(b)(1), which the government must prove by a preponderance of the evidence. *United States v. Evans*, 155 F.3d 245, 253 (3d Cir. 1998). The court "need only make a reasonable estimate of the loss." U.S.S.G. § 2B1.1 cmt. n.3(C). Here, the District Court chose to calculate the loss by calculating the change in FirstPlus's value caused by the conspirators. FirstPlus started with roughly $10 million in its bank accounts; received $4.4 million in bankruptcy payments over the course of the scheme; and had less than $2,000 left when law enforcement arrived, resulting in a net loss of almost $14.2 million, once a loan Pelullo made to the company is taken into account.[88] The cash outflows included the millions

---

[88] According to the PSR, the total diminution in the value of FirstPlus's accounts was $14,440,798. The discrepancy between that amount and the nearly $14.2 million final loss amount is due, it seems, to a $260,000 loan Pelullo made to the company, for which he received a credit in the loss-amount calculation. The record is not entirely clear as to how the $14.44 million diminution was calculated, but no party has

130

that FirstPlus paid to Seven Hills and LANA for low- or no-value assets, as well as the fraudulent consulting and legal fees it paid to Seven Hills, LANA, and William Maxwell. Those losses were supported by testimony and evidence admitted at trial. Indeed, Pelullo's own expert witness assumed that the $14 million amount was correct – describing it as "a conservative number" for the total amount of money that "walked out the door" – and Pelullo never presented any alternative loss calculations. (JAE at 186, 222.)

Pelullo nevertheless challenges that finding by asserting that the FBI agent who provided evidence of the loss at trial only accounted for roughly $11.2 million withdrawn from FirstPlus's accounts. But any distinction between $11 and $14 million would not help Pelullo, as the guidelines impose a 20-level enhancement for all thefts of between $9.5 and $25 million. U.S.S.G. § 2B1.1(b)(1)(K); *cf. United States v. Isaac*, 655 F.3d 148, 158 (3d Cir. 2011) (holding that error in calculating defendant's criminal history score was harmless because "the same Guideline range would have applied" with the correct number). In any event, because $14 million is a fair estimate of the amount FirstPlus "actually ended up losing[,]" *United States v. Kopp*, 951 F.2d 521, 531 (3d Cir. 1991), *abrogated on other grounds as recognized by United States v. Corrado*, 53 F.3d 620 (3d Cir. 1995), and was backed up by largely uncontested evidence at trial, we cannot say that the District Court clearly erred in selecting that figure.

---

argued that the District Court clearly erred in accepting that amount as the change in value of FirstPlus's accounts over the course of the conspiracy.

131

Pelullo next suggests that he should only have been held liable for the approximately $2.6 million he personally gained from the scheme. That theory, though, is a nonstarter, as the guidelines expressly advise courts to not rely on a defendant's gain, unless unable to calculate the victim's loss. U.S.S.G. § 2B1.1 cmt. n.3(B).

Third, Pelullo contends that he was entitled to credit, and an accompanying reduction in the loss amount, for the services he provided FirstPlus. While a $260,000 loan that Pelullo made to FirstPlus was credited as an offset to the total loss amount, *supra* note 88, he says his loss amount should have been reduced further, down to $8.8 million. He rightly points out that a defendant can have the amount of loss from a theft reduced by the fair market value of any legitimate services he rendered to his victim. *See* U.S.S.G. § 2B1.1 cmt. n.3(E). At trial, Pelullo sought to establish the value of his work through the expert testimony of an accountant who calculated various offsets. The District Court, however, rejected those calculations, which were based on FirstPlus's SEC filings from 2007 and 2008 and on the faulty assumption that FirstPlus was operated as a legitimate business. There was "no question[,]" as the Court saw it, that the fraudulent SEC filings were "phony from day one[,]" and so it refused to "credit [the expert's] testimony … because he relie[d] on phony information." (JAE at 239.) Pelullo offers us no reason to disturb that finding. *See Ramsay v. Nat'l Bd. of Med. Exam'rs*, 968 F.3d 251, 261 (3d Cir. 2020) (findings of fact are only clearly erroneous if they are "completely devoid of minimum evidentiary support displaying some hue of credibility" or they "bear[] no rational relationship to the supportive evidentiary data" (citation omitted)). And since he could not provide "estimates of the value of [his] work" other than those based on the fraudulent

SEC filings, the District Court properly declined to reduce the loss amount. *United States v. Washington*, 715 F.3d 975, 985 (6th Cir. 2013).

Finally, Pelullo also says that his loss amount should have been reduced to account for business expenses he incurred while running the company. A defendant may receive a credit for expenses he incurred while providing "legitimate" services, "even amid [his] fraudulent conduct[.]" *United States v. Blitz*, 151 F.3d 1002, 1012 (9th Cir. 1998) (citation omitted). He may not, however, receive "a credit for money spent perpetuating a fraud." *United States v. Whatley*, 133 F.3d 601, 606 (8th Cir. 1998). That was the case here, as the takeover of FirstPlus "was a complete and utter fraud from day one." (JAE at 240.) The scheme sought to bleed FirstPlus dry but to keep the company going just long enough to collect a few more bankruptcy payments. Any real work Pelullo performed amid those efforts served solely to give the operation a patina of legitimacy so as to keep the scheme running. That was no "service[]" rendered to the company by the conspirators; it was all just "part of the fraudulent scheme." *United States v. Lacerda*, 958 F.3d 196, 215 (3d Cir. 2020); *accord Blitz*, 151 F.3d at 1012. The District Court did not err in refusing to lower the loss amount.

### 3. Victim Number Enhancement

Pelullo also argues that the District Court erred in treating each FirstPlus shareholder as a victim of Pelullo's offenses. Because FirstPlus had 1,254 shareholders when the Defendants' fraudulent scheme took place, Pelullo received a six-level enhancement for offenses "involv[ing] 250 or more victims[.]" U.S.S.G. § 2B1.1(b)(2)(C). He claims, however,

133

that the FirstPlus shareholders were not victims, since the government did not prove that the fraud made them lose money or made the stock price drop. That argument is spectacularly wrong.

A victim is "any person who sustained any part of the actual loss determined under subsection (b)(1)." U.S.S.G. § 2B1.1 cmt. n.1. A person counts as a victim if he "suffer[ed] permanent 'pecuniary harm,'" which is "harm that is monetary or that otherwise is readily measurable in money." *United States v. Smith*, 751 F.3d 107, 118 (3d Cir. 2014) (quoting U.S.S.G. § 2B1.1 cmt. n.3(A)(iii)). FirstPlus's shareholders easily fit that definition. After its subsidiary emerged from bankruptcy, FirstPlus was receiving substantial periodic payments based on those proceedings. When the Defendants took over the company, they diverted and appropriated the funds for themselves, depriving the shareholders "of the waterfall payments that they were entitled to[.]" (JAF at 44.) As the District Court observed, once the fraud was revealed, FirstPlus fell into bankruptcy and its shares were left with "no value whatsoever." (JAF at 45.)

Pelullo quarrels with those findings by parsing the timeline finely. He notes that FirstPlus's stock price was higher when he resigned than when he first joined, and he faults the District Court for failing to compare the stock price before and after the fraud. Neither of those points acknowledges the fundamental effect that the fraudulent scheme had on FirstPlus and its shareholders. The Defendants extracted millions of dollars from a public company, all the while covering up their fraud. All "who bought or held stock when the false information was disseminated by [Pelullo] suffered a loss," *United States v. Peppel*, 707 F.3d 627, 647 (6th Cir. 2013),

134

especially once the scheme rendered FirstPlus "insolven[t]" and forced it into bankruptcy. (JAF at 45.) No creative measurement of the stock price at different times, no willful ignorance of the effect that the misrepresentations had on the stock price, and no attempts to blame the company's downfall on the government's discovery of the fraudulent scheme can rewrite reality. Pelullo fails to identify any errors at all, let alone clear errors, in the District Court's findings of fact.[89]

Finally, Pelullo claims that the shareholders "acquiesce[d]" in the conspirators' misdeeds. (SP Opening Br. at 125.) During the Defendants' tenure, the shareholders let FirstPlus sue to terminate a trust that allocated more than 50% of the waterfall payments to them, and they later voted against issuing dividends. Pelullo says those actions amounted to acquiescence in the fraudulent enterprise he and his co-conspirators ran. But people can't consent to something they don't know is happening. The conspirators kept investors in the dark, hiding Pelullo's and Scarfo's involvement, William Maxwell's hefty fees, and the sham character of the

---

[89] Pelullo objects that the government only called one shareholder to testify at trial. That did not prevent the District Court from also counting as victims the rest of the shareholders who bought or held stock while the scheme was ongoing. Other evidence in the record showed that they suffered loss, as their shares became worthless and they were deprived of their portion of the waterfall payments. *See, e.g.*, *United States v. Naranjo*, 634 F.3d 1198, 1206, 1214 (11th Cir. 2011) (affirming district court's "reli[ance] at sentencing on estimates of the number of victims and amount of losses" based on investigator's testimony).

transactions FirstPlus was forced to enter. The District Court did not err in counting FirstPlus's shareholders as victims. They obviously were.

### 4. Substantive Reasonableness

Finally, Pelullo attacks the substantive reasonableness of his sentence, arguing that the District Court imposed "a 30-year sentence for what amounted to, at most, a $2,921.14 loss to [a] bank."[90] (SP Opening Br. at 109.) That grossly mischaracterizes and minimizes the nature of Pelullo's misconduct. He was found guilty of twenty-four different offenses that harmed more than 1,000 victims and cost a public company many millions of dollars. A thirty-year sentence was eminently reasonable, given the breadth and seriousness of the criminal conduct of which he was convicted. Pelullo's assertion to the contrary has plenty of brass but no merit.

### B. Joint and Several Forfeiture Liability Following *Honeycutt*[91]

### 1. Background

The District Court imposed a $12 million forfeiture order and held the Defendants jointly and severally liable for

---

[90] Pelullo does not explain how he calculated that supposed loss amount.

[91] When an appellant raises an issue for the first time on appeal, we review for plain error. *United States v. Saada*, 212 F.3d 210, 223 (3d Cir. 2000). That holds true even when the

the total amount. While this appeal was pending, the Supreme Court issued its decision in *Honeycutt v. United States*, 137 S. Ct. 1626 (2017), holding that 21 U.S.C. § 853(a)(1), a forfeiture provision similar to the ones relied on by the government here, did not permit the imposition of joint and several liability on a defendant for property that he did not acquire. Pelullo and John Maxwell now argue, for the first time on appeal, that the imposition of joint and several liability was erroneous under *Honeycutt*.[92] They contend that *Honeycutt* precludes the imposition of joint and several liability in a forfeiture judgment. True enough, to a degree, but only John is entitled to relief. While we accept the government's concession that imposing joint and several liability on John was improper, we conclude that Pelullo – as a leader of the conspiracy – cannot show plain error in the District Court's forfeiture order and, as such, remains liable for the full $12 million.

---

issue may have become apparent only with the emergence of new precedent. *See United States v. Nasir*, 982 F.3d 144, 160 (3d Cir. 2020) (en banc), *cert. granted*, *judgment vacated on other grounds*, 142 S. Ct. 56 (2021). "Whether the alleged error is plain is evaluated based on the law at 'the time of appellate review[,]' regardless of whether it was plain at the time of trial." *Id.* (alteration in original) (quoting *Henderson v. United States*, 568 U.S. 266, 269 (2013)). The test for plain error is set forth, *supra*, in note 49.

[92] Although Pelullo separately briefs this issue, he also specifically adopts arguments made by John Maxwell. Because neither Scarfo nor William Maxwell specifically adopt those arguments, they have forfeited them.

The indictment contained notices of forfeiture, alerting the Defendants that the government intended to seek forfeiture at sentencing if it secured their convictions.[93] During the forfeiture phase of the proceedings, the jury returned a special verdict finding that all the sought-after property was subject to

---

[93] The government obtained forfeiture pursuant to 18 U.S.C. §§ 981(a)(1)(C) (permitting civil forfeiture of "[a]ny property … which constitutes or is derived from proceeds traceable to[,]" *inter alia*, a securities fraud conspiracy, wire fraud, or a wire fraud conspiracy), 982(a)(1) (authorizing criminal forfeiture of "any property … involved in" a money laundering conspiracy conviction), and 1963(a)(3) (permitting forfeiture of "any property constituting, or derived from, any proceeds which the person obtained, directly or indirectly, from racketeering activity … in violation of [the RICO statute]"), as well as 28 U.S.C. § 2461(c) (authorizing criminal forfeiture where civil forfeiture is permitted in connection with a criminal offense). Under a number of those provisions, the government was entitled to the specific property forfeited or, where that property had been dissipated, to the value of that property. *See* Sonja Ralston & Michael A. Fazio, *The Post-Honeycutt Landscape of Asset Forfeiture*, DOJ J. Fed. L. & Prac., Sept. 2019, at 33, 60-61 (noting that 21 U.S.C. § 853(p) "provides the court authority to forfeit untainted assets in place of the dissipated tainted assets"); *United States v. Bermudez*, 413 F.3d 304, 306 (2d Cir. 2005) ("Section 982 … incorporates by reference the substitute asset provisions of 21 U.S.C. § 853[,]" with one exception not raised here.); 18 U.S.C. § 1963(m) (permitting substitution where property forfeitable under § 1963(a) has been dissipated).

forfeiture. The District Court then imposed forfeiture money judgments holding all four Defendants – including Pelullo and John Maxwell – jointly and severally liable for $12 million, which it found to be a fair approximation of the "proceeds" of their crimes.[94]

## 2. *Honeycutt* and Its Progeny

Under the law at the time of the District Court proceedings, the imposition of joint and several liability was appropriate, and, sensibly, the Defendants did not object to that

---

[94] Recall that the District Court calculated nearly $14.2 million in loss to the victims of the Defendants' scheme in determining their guidelines ranges. That amount is also reflected in the Court's order that the Defendants pay the victims almost $14.2 million in restitution. *See United States v. Leahy*, 438 F.3d 328, 338 (3d Cir. 2006) (en banc) ("Restitution is … a restorative remedy that compensates victims for economic losses suffered as a result of a defendant's criminal conduct."). The $12 million in forfeiture ordered by the Court does not conflict with the loss calculation because forfeiture is measured by the defendant's ill-gotten gains, not the loss to the victims. *See United States v. Lacerda*, 958 F.3d 196, 218 (3d Cir. 2020) ("[T]he purpose of forfeiture statutes is to separate the criminal from his ill-gotten gains." (citing *Honeycutt v. United States*, 137 S. Ct. 1626, 1631 (2017))). Sentencing ranges generally only take into consideration the latter. *See* U.S.S.G. § 2B1.1 cmt. n.3(B) ("The court shall use the gain that resulted from the offense as an alternative measure of loss only if there is a loss but it reasonably cannot be determined.")

aspect of the forfeiture order. While their appeals were pending, however, the Supreme Court issued its decision in *Honeycutt*. The case involved a hardware store manager who was convicted of conspiring to sell an iodine product from the store's stock, all the while knowing it would be used to manufacture methamphetamine. *Honeycutt*, 137 S. Ct. at 1630. The government conceded that the manager "had no controlling interest in the store and did not stand to benefit personally" from the sale. *Id.* at 1630-31 (internal quotation marks omitted). Still, the government sought forfeiture judgments against both the owner and the manager in an amount equal to the store's total proceeds from the sale of the iodine product. *Id.* at 1631. The forfeiture provision at issue, 21 U.S.C. § 853, permitted liability for "any proceeds the person obtained, directly or indirectly, as the result of" illegal drug distribution. *Id.* at 1632 (quoting 21 U.S.C. § 853(a)(1)). The Supreme Court read that statute as limiting forfeiture "to property the defendant himself actually acquired as the result of the crime" – in other words, "tainted property acquired or used by the defendant[.]" *Id.* at 1632-33, 1635. It reasoned that the word "obtain" in § 853(a) "defines forfeitable property solely in terms of personal possession or use." *Id.* at 1632. Thus, the Supreme Court concluded, because the manager "had no ownership interest in [the] store and did not personally benefit from the [iodine product] sales[,] … § 853 does not require any forfeiture." *Id.* at 1635.

Following *Honeycutt*, we observed in *United States v. Gjeli*, 867 F.3d 418, 427 (3d Cir. 2017), that 18 U.S.C. §§ 981(a)(1) and 1963, two of the provisions relied on here, "are substantially the same as the one under consideration in *Honeycutt*." Thus, the lessons of *Honeycutt* apply "with equal force" to Pelullo's and John Maxwell's forfeiture orders, or at

140

least with respect to those statutes.[95]  *Id.* at 427-28.  Because their arguments are raised for the first time on appeal, however, they must meet the test for plain error.  *See supra* note 49.

### 3.        Post-*Honeycutt*: John Maxwell

We begin with John Maxwell, who was the Chief Executive Officer and a board member of FirstPlus, albeit in title only.  He was installed in those roles by Pelullo and William Maxwell.  No one could fairly describe John Maxwell as a "mastermind" of the conspiracy, *cf. Honeycutt*, 137 S. Ct. at 1633 (describing, as an example of someone who could be held jointly and severally liable, a drug dealer "mastermind" who obtained all the proceeds of a drug distribution scheme), and our analysis can begin and end with the government's concession of plain error and acknowledgement that John's role in the conspiracy was "akin to the manager of the hardware store in *Honeycutt*[.]"  (Answering Br. at 278.)  We understand the government to be agreeing to a remand of John Maxwell's case so that the forfeiture order against him can be modified to allow liability only for the portion of proceeds he actually obtained.  We accept that concession and will remand for further proceedings.[96]  On remand, the District Court should

---

[95] We do not decide today whether *Honeycutt* also applies to 18 U.S.C. § 982(a)(1), the third basis cited for the forfeiture orders.

[96] As noted, *United States v. Gjeli* extended the holding of *Honeycutt* – where the relevant forfeiture provision applied to proceeds "obtained … as the result of" an offense – to 18 U.S.C. § 981(a)(1)(C), which permits forfeiture of proceeds

calculate how much John "himself actually acquired" due to his involvement in the schemes. *Honeycutt*, 137 S. Ct. at 1635.

## 4.     Post-*Honeycutt*: Pelullo

Pelullo argues that, like John Maxwell, he too should not have been held jointly and severally liable. Pelullo's arguments, however, fail under prong two of plain-error review: even assuming *Honeycutt* applies, *see supra* notes 95-96, there was no "clear" or "obvious" error. *Olano*, 507 U.S. at 734. Unlike the defendant in *Honeycutt*, Pelullo was a primary leader and organizer of the FirstPlus scheme, "call[ing] all the shots."[97] (JAD at 1552.) He exercised dominion and control over the entirety of the proceeds reaped

_____

"traceable to" an offense, and 18 U.S.C. § 1963(a)(3), which covers proceeds "obtained … from" unlawful conduct. *United States v. Gjeli*, 867 F.3d 418, 427-28 & n.16 (3d Cir. 2017). Section 982(a)(1), one of the bases for the forfeiture order here, permits forfeiture of "property … involved in" an offense. We need not opine on whether *Honeycutt* prohibits joint and several liability under § 982(a)(1), *see supra* note 95, since the government has conceded error as to John Maxwell. *United States v. Senke*, 986 F.3d 300, 306 (3d Cir. 2021) (accepting the government's concession of plain error and remanding for further proceedings).

[97] Relying on extensive evidence introduced at trial, the government characterizes Pelullo as sitting at the "pinnacle of [the] criminal enterprise and ma[king] all the decisions about disbursing its proceeds, including to himself." (Answering Br. at 274; *see also* Answering Br. at 14-16, 19-20.)

142

from the scheme. He gave definitive commands to employees, directed the disbursement of company funds, and issued instructions to FirstPlus's lawyers, accountants, and other consultants, all of which evidenced his control over the criminal operation.

The Supreme Court in *Honeycutt* emphasized the importance of having an "ownership interest" in or "personal benefit" from the proceeds of a crime. 137 S. Ct. at 1635. It is not plainly wrong to interpret Pelullo's leadership of the FirstPlus looting, coupled with his supervision of the individuals who were distributing the stolen funds, as demonstrating his ownership of or benefit from the proceeds of the criminal enterprise. It follows that it was not plainly wrong to interpret *Honeycutt* as allowing Pelullo to be held jointly and severally liable.

Pelullo contends that he should only be liable for the money that ended up in his pocket. But even after *Honeycutt*, multiple people can "obtain" the same proceeds over the course of a crime where they jointly controlled the enterprise. *See United States v. Cingari*, 952 F.3d 1301, 1306 (11th Cir. 2020) (holding that imposition of joint and several liability on "spouses who jointly operated their fraudulent business" for the full proceeds of their scheme was not plainly erroneous). Thus, as someone who controlled the criminal enterprise, Pelullo can be held jointly and severally liable for funds that he did not walk away with.

That others may have also benefited from the proceeds in question does not mean the District Court plainly erred in holding Pelullo liable for the entire amount. Again, he personally benefited from and exerted control over those funds,

143

which is the type of conduct that the Supreme Court indicated can give rise to forfeiture liability. While we decline to make here any definite statement about who is subject to joint and several liability for the entirety of the proceeds of a criminal scheme under *Honeycutt*, any error in Pelullo's sentence in this regard was not plain, and he is therefore not entitled to relief from the forfeiture order.

## C.  Delay in Forfeiture of Pelullo's Property

During its investigation, the government seized a yacht and a Bentley automobile that it believed Pelullo and Scarfo acquired with the proceeds of their criminal enterprise. It did not seek to formally acquire title to those assets until three years later, when it requested their forfeiture as part of the indictment. Pelullo objects to that delay as violating both the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA") and the Fifth Amendment's Due Process Clause. But he gave up his rights under CAFRA, and the government's delay in initiating a criminal forfeiture proceeding was not so unreasonable as to violate due process, so he is not entitled to relief.

### 1.  Background

In May 2008, FBI officials executed two warrants authorizing them to seize the yacht "Priceless," which was docked in a marina in Miami, and Pelullo's 2007 Bentley automobile, which was also in Miami at the time. The officials obtained those warrants based on affidavits alleging that the yacht and Bentley had been purchased with the proceeds of Scarfo's and Pelullo's unlawful activities at FirstPlus. The FBI then immediately turned the yacht – which it valued at $850,000, the price for which the vessel was purchased – over

144

to the United States Marshals Service. The Marshals Service, in turn, contracted with a private company to maintain the yacht.

A few days later, attorney Mark Cedrone – who briefly represented Pelullo before the District Court – wrote to the government on behalf of PS Charters, a company that Scarfo and Pelullo had set up to conceal their ownership of the yacht. Cedrone "demand[ed] the immediate return of [the yacht] to PS Charters[,]" claiming that the vessel was acquired for legitimate business use and that the seizure "deprived PS Charters of the opportunity to further its … business as planned[.]" (D.I. 662-10 at 2.)

As the government showed at trial, however, that was not true. PS Charters was owned by Seven Hills and LANA and was set up to allow Pelullo and Scarfo to buy the boat for their own personal use, while avoiding detection. Although PS Charters nominally owned the yacht, Pelullo had a financial interest in the ship through Seven Hills, which owned a fifty-fifty interest in PS Charters with LANA. Pelullo controlled Coconut Grove Trust – of which his children were nominally beneficiaries – which owned Seven Hills.

In response to Cedrone's letter, the government informed Cedrone that it was prepared to file a civil action to seek forfeiture of the yacht but that Pelullo would have to submit to civil discovery, including a deposition. Cedrone then changed course and said that, while his client was still "considering judicial action[,]" "it would seem to be in everyone's interests that at least the [yacht] be sold and we can

145

then later fight about the proceeds."[98] (D.I. 700-1 at 4). Pelullo's trial counsel later admitted before the District Court that it was "possibly right" that Cedrone "didn't [want] to submit" Pelullo to depositions and that he "kind of backed off" his request for the return of the yacht.[99] (JAB at 3913-14.)

That was the end of the dialogue between Cedrone and the government until the following year, when the government "called him and advised him that the boat was actually totaled." (JAB at 3914.) "Totaled," as Pelullo's trial counsel put it, was not an exaggeration. While the precise chain of events is unclear, the yacht suffered irreparable damage to its engines when, in July 2009, it sank following maintenance undertaken during the third-party contractor's possession. The government then negotiated a $450,000 insurance payout, which was substituted for the ship during the forfeiture proceedings. *See supra* note 93.

When the government obtained the indictment in 2011, it included five criminal forfeiture allegations against Pelullo and some of the other Defendants, each associated with

---

[98] Cedrone also acknowledged that he was representing PS Charters (this time, along with Seven Hills) "in connection with the Government's seizure of … the Bentley automobile[,]" but he did not express any desire for the return of the car. (D.I. 700-1 at 4.)

[99] Particularly in light of that concession, Pelullo's claim that "the Government did absolutely NOTHING in response" to "Cedrone's requests" is an obvious misstatement of the record. (SP Opening Br. at 212.)

146

specific counts. The allegations all requested the forfeiture of the proceeds of those offenses, which included the yacht and the Bentley, as well as an airplane, jewelry, and the contents of various bank accounts.

After Cedrone's initial dialogue with the government, Pelullo did not press his claim for return of the yacht or pursue any judicial action until more than five years later. In September 2013 – on the eve of trial – Pelullo filed a motion for the return of his property pursuant to Federal Rule of Criminal Procedure 41(g), seeking the Bentley, a 50% interest in the yacht, and certain cash, several computers, and FirstPlus stock. The District Court denied the motion, finding that Cedrone had waived "any rights that [Pelullo] had" to a prompt initiation of a civil forfeiture action by failing to "follow up" after his initial communications with the government.[100] (JAB at 3930.)

The Court completed the criminal forfeiture process after the Defendants were convicted. It held a separate forfeiture proceeding, at the conclusion of which the jury found, beyond a reasonable doubt, that the property referenced in the indictment – including the yacht and the Bentley – was subject to forfeiture.

---

[100] The District Court also found that Pelullo failed to demonstrate an ownership interest in the yacht. The government does not rely on that finding in defending the Court's decision, "[i]n light of the trial evidence regarding Pelullo's control of Seven Hills and the Coconut Grove Trust[.]" (Answering Br. at 249 n.56.)

147

## 2.    CAFRA[101]

Pelullo asserts that he was entitled to the protections of CAFRA, 18 U.S.C. § 983 *et seq.*   That statute governs nonjudicial forfeiture, a process that allows the government to obtain title to seized property without any involvement by the courts, as long as it gives affected parties timely notice and no one comes forward to claim an interest in the property. *Langbord v. U.S. Dep't of Treasury*, 832 F.3d 170, 182 n.4 (3d Cir. 2016) (en banc); *see also* 18 U.S.C. § 983(a)(1)(A)(i), (a)(2)(B); 19 U.S.C. §§ 1607(a), 1609.   If someone does contest the seizure, the government must then promptly initiate a civil or criminal judicial forfeiture proceeding and obtain a court order to allow title to pass to the United States.  18 U.S.C. § 983(a)(3).   Pelullo argues that the government violated CAFRA's deadlines for giving notice of a forfeiture and initiating a forfeiture action.

But that claim comes too late.  Pelullo waived any rights he may have had under CAFRA, just as the District Court said. *See United States v. Desu*, 23 F.4th 224, 231 (3d Cir. 2022) ("Waiver is an 'intentional relinquishment or abandonment of a known right.'" (citation omitted)).   The government represented, and Pelullo does not argue otherwise, that it was prepared to initiate judicial forfeiture proceedings when, through counsel, PS Charters demanded the yacht.  As soon as the prospect of Pelullo facing discovery in a civil forfeiture

---

[101] We review for clear error the District Court's factual determination of waiver.  *See Resol. Tr. Corp. v. Forest Grove, Inc.*, 33 F.3d 284, 285 (3d Cir. 1994); *Bermuda Exp., N.V. v. M/V Litsa (Ex. Laurie U)*, 872 F.2d 554, 562 n.7 (3d Cir. 1989).

action arose, however, PS Charters decided to "back[] off" and to consent to the government not filing any action. (JAB at 3913-14, 3921.) It was not until five years later that Pelullo himself demanded the return of the property. He offers no basis for disturbing the District Court's finding that his actions constituted a waiver of his rights under CAFRA.[102] PS Charters was Pelullo's tool.[103] After employing it to, in effect, ask the government not to initiate civil forfeiture proceedings, Pelullo cannot now complain that the government's failure to file an action violated his rights.[104]

---

[102] Pelullo does not address the legal significance of Cedrone's discussions with the government except to call them, without explanation, "a complete red herring[.]" (SP Reply Br. at 47-48.)

[103] In so recognizing, we are not engaged in an ersatz corporate veil-piercing. Rather, Pelullo admits that PS Charters was his tool by asserting that Cedrone was really acting on his behalf in requesting the return of the yacht. How much PS Charters was also under Scarfo's control is not a question before us.

[104] Pelullo also points to Department of Justice policy statements that set internal deadlines for bringing a judicial forfeiture action. But the government's internal policies, such as its Asset Forfeiture Policy Manual, do not "create enforceable rights for criminal defendants[,]" so Pelullo would not be entitled to relief even if the government failed to abide by its own rules. *United States v. Wilson*, 413 F.3d 382, 389 (3d Cir. 2005).

149

### 3. Due Process[105]

Pelullo also claims that the government's "indefinite" – actually, forty-two-month – "retention of property" between the seizure and the filing of the criminal indictment "trampled upon" his right to due process. (SP Opening Br. at 219.)

When the government seizes property, it cannot hold it forever. Rather, due process requires that it afford a property owner a judicial hearing without "undue delay." *United States v. Eight Thousand Eight Hundred & Fifty Dollars ($8,850) in U.S. Currency*, 461 U.S. 555, 564 (1983). Borrowing from jurisprudence under the Speedy Trial Clause of the Constitution, we take a "flexible approach" in assessing the reasonableness of a delay in filing a forfeiture action, looking to (1) the length of the delay, (2) the reason for it, (3) the timing of the claimant's assertion of his rights, and (4) any prejudice to the claimant caused by the delay. *Id.* at 562, 564 (citing *Barker v. Wingo*, 407 U.S. 514, 530 (1972)). No one factor is dispositive, as they are all merely "guides" in helping us balance the competing interests of the claimant and the government to determine whether "the basic due process requirement of fairness" has been met. *Id.* at 565.

The substantial length of the delay here – almost forty-two months between the seizure of the yacht and Bentley on May 8, 2008, and the grand jury's issuance of the indictment

---

[105] We review the District Court's factual findings for clear error and its analysis of whether Pelullo's due process rights were violated de novo. *Burkett v. Fulcomer*, 951 F.2d 1431, 1437-38 (3d Cir. 1991).

on October 26, 2011 – decisively favors Pelullo, a conclusion the government does not dispute. *See id.* at 565 (deeming delay of eighteen months "quite significant").

On the second factor, Pelullo contends that the government's reason for that delay was "simple [g]overnment failure to take any required action[.]" (SP Opening Br. at 217.) The government responds that the timing of the indictment was not the product of bad faith or frivolous concerns, but rather the complexity of the criminal case and the "substantial tasks facing the prosecutors after the warrants were executed." (Answering Br. at 263.) The government has the better of that argument.

Although the pendency of criminal proceedings "does not automatically toll the time for instituting a forfeiture proceeding[,]" *$8,850*, 461 U.S. at 567, the government may often have good cause to wait to seek forfeiture as part of a criminal prosecution rather than pursuing a separate civil forfeiture proceeding in advance of an indictment. A civil action could "substantially hamper" the prosecution by "serv[ing] to estop later criminal proceedings" or "provid[ing] improper opportunities for the claimant to discover the details of a contemplated or pending criminal prosecution." *Id.* Saving the forfeiture claim for the criminal proceeding may help a claimant too: "[i]n some circumstances, a civil forfeiture proceeding would prejudice the claimant's ability to raise an inconsistent defense in a contemporaneous criminal proceeding." *Id.* Those are serious concerns, and we are hard-pressed to say that the government's reason for choosing the criminal-forfeiture route was an improper one.

151

That is especially true given the complexities of the criminal proceedings here. We have no doubt that it took considerable time for the government to process all the data it seized from various searches, select the appropriate criminal charges for the co-conspirators, and draft the resulting 25-count, 107-page indictment. There is also no indication in the record that the government failed to pursue its investigation with diligence or intentionally delayed in securing an indictment. *See $8,850*, 461 U.S. at 568; *cf. United States v. Velazquez*, 749 F.3d 161, 186 (3d Cir. 2014) (finding that second factor cuts "strongly" in defendant's favor due to government being "strikingly inattentive" in bringing defendant to trial). We thus cannot say that the reasons for the delay are inadequate and favor Pelullo.

Pelullo fares even worse on the third factor – the timing of the claimant's assertion of a right to judicial review of the seizure – since he initially invoked his rights and then changed his mind and backed off the request. As discussed above, Pelullo waived his rights by agreeing through counsel that the government need not immediately initiate judicial forfeiture proceedings. He then did nothing for five years and only filed a motion to get the property back roughly two years after he was indicted. His contention that he "asserted [his right] from the very outset of the seizure" cannot be squared with the record. (SP Opening Br. at 217.)

That inaction weighs heavily against him when considering whether a due process violation occurred. Specifically, a defendant's failure to file a Rule 41(g) motion or, "[l]ess formally," request the return of his seized property "can be taken as some indication that [the defendant] did not desire an early judicial hearing." *$8,850*, 461 U.S. at 569; *cf.*

152

*United States v. Ninety Three Firearms*, 330 F.3d 414, 424-26 (6th Cir. 2003) (finding no due process violation where the claimant's "sole attempt to regain his property consisted of a letter he filed shortly after the seizure").

Finally, as to the fourth factor, Pelullo claims prejudice by arguing that, "because of the [g]overnment's dilatory conduct[,]" he "lost" a number of "key witnesses" – mainly various FirstPlus-affiliated officers and attorneys – who could have aided in his defense but passed away prior to his indictment. (SP Opening Br. at 221.) Pelullo provides a list of those individuals, along with their titles and connections to him or FirstPlus, but he fails to identify what admissible evidence he could have elicited from any of those persons to help his case. His conclusory claims that certain witnesses would have been "key" or "provide[d] information favorable to the defense" on certain issues are insufficient to establish prejudice.[106] (SP Opening Br. at 102-03.) *See United States v. Childs*, 415 F.2d 535, 539 (3d Cir. 1969) (finding no "prejudicial delay whatsoever" from deceased and unavailable witnesses because

---

[106] Pelullo also suggests that the seizure of his assets left him unable to hire his counsel of choice. The Supreme Court, however, has held that neither the Fifth Amendment nor the Sixth Amendment prevents the government from seizing, prior to trial, assets that a defendant "might have wished to use to pay his attorney." *United States v. Monsanto*, 491 U. S. 600, 616 (1989). Moreover, even if we were to agree with Pelullo on his point, the overall balance of the factors – particularly the reason-for-delay and timely-assertion-of-rights factors – would still tilt the balance decisively against him.

defendant did not show how their testimony would have been material to his defense).

In sum, the balancing of factors precludes a determination that Pelullo's due process rights were violated. But our conclusion that Pelullo has not made out a due process violation should not be read as approval of the government's conduct in this case. While the yacht sat in the custody of a third party to whom the Marshals Service had entrusted it, it sank and suffered irreparable damage. At that point, the United States had not formally secured title to the vessel – nor had any forfeiture proceeding even begun. Though the cause of the boat's loss is not clear from the record, the government is left in a very poor light. It ought to go without saying that seized property must be properly cared for. The government may ultimately prevail in forfeiture proceedings and then may dispose of the property in whatever lawful way it deems fit. But there is no guarantee that it will prevail. To ensure that property owners' interests are not wiped out before a hearing, it is critical that the government exercise appropriate diligence to prevent any destruction of not-yet-forfeited property. *Cf. Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 434 (1982) ("[T]he State may not finally destroy a property interest without first giving the putative owner an opportunity to present his claim of entitlement."). It utterly failed in that responsibility in the case of the yacht "Priceless," so the more accurate name of the vessel turned out to be "Half-Priced." That is a consequential breach of duty and should not pass unnoticed.

Despite that, under the relevant framework and the arguments presented to us, we cannot say that the delay in initiating forfeiture proceedings deprived Pelullo of "the basic

154

due process requirement of fairness[.]" *$8,850*, 461 U.S. at 565. As a result, his challenge fails.[107]

## VII.  *BRADY* ISSUES

Finally, Scarfo and Pelullo raise issues relating to the government's disclosure obligations. Scarfo says he should have had a chance to move for a new trial based on "new" evidence from a separate case that he believes was material here, and Pelullo claims that the government withheld evidence that one of its key witnesses at trial was under investigation at the time. Neither argument is persuasive.

---

[107] Pelullo also summarily argues that he is entitled to compensation for the seizures and the return of his assets. He cites virtually no authority for that proposition. The one source he does reference, 28 U.S.C. § 2465(b), is irrelevant; it only applies to civil forfeiture proceedings in which the claimant "substantially prevails[.]" Because Pelullo has not adequately developed the issue for our review, we will not attempt to sua sponte discern any potential legal bases for granting him the relief he seeks. *See Nara v. Frank*, 494 F.3d 1132, 1133 (3d Cir. 2007).

He also claims, again without citing authority, that the Bentley and the firearms found on the yacht should not have been admitted into evidence. He argues they were unlawfully seized, but he does not identify any viable basis for deeming the seizures unlawful or explain why, if the seizures were infirm, any legal violation required exclusion of that evidence.

## A.  Denial of Scarfo's Request to File a Motion for a New Trial Pursuant to Rule 33(b)[108]

Scarfo challenges the District Court's denial of his post-trial request for leave to file a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. His request explained that his proposed motion was based on purported *Brady* violations and new information that only surfaced after trial. The "new information" consisted of certain witness statements taken prior to the trial and pursuant to an unrelated investigation of human-trafficking activity, an investigation that was ultimately prosecuted in the United States District Court for the Eastern District of Pennsylvania (the "*Botsvynyuk* case").[109] *See generally United States v. Churuk*, 797 F. App'x 680, 682 (3d Cir. 2020) (summarizing that prosecution). Scarfo and his codefendants wanted access to those witness statements, memorialized on FBI forms known as 302s, because they might mention Pelullo.[110] And, because of

---

[108] The standard of review associated with this motion is discussed herein.

[109] The government, for its part, first learned about the witness statements when Pelullo's attorney notified the government that he had received the documents from a defense attorney in the *Botsvynyuk* case. Prosecutors then obtained copies of the statements from their counterparts in the Eastern District of Pennsylvania before furnishing them to the District Court here for in camera review.

[110] "The FD-302, commonly referred to simply as a '302', is the form … used by FBI agents to summarize

Pelullo's involvement in the human trafficking, the Defendants thought the documents might in turn show criminal conduct by Cory Leshner – Pelullo's "right hand man" and later a key government witness – and therefore provide helpful impeachment evidence. (D.I. 1237 at 12-13.)

Pelullo thus filed a sealed motion to compel disclosure of the 302s, and Scarfo filed a motion to subpoena the documents pursuant to Federal Rule of Criminal Procedure 17.[111] After reviewing the 302s in camera – and entertaining

---

witnesses' statements and interviews." *United States v. Lacerda*, 958 F.3d 196, 218 n.7 (3d Cir. 2020). Apparently Pelullo was involved with one of the companies that hired the human-trafficking victims in the *Botsvynyuk* case, but the investigation there did not uncover any evidence that Pelullo was complicit in the violations. When trial in that case was approaching, a defense attorney – Mark Cedrone, who had represented Pelullo in earlier stages of this case – may have intended to allege that Pelullo was responsible for employing the victims, so, for purposes of discovery, government attorneys put together a file of all documents containing Pelullo's name. Pelullo's attorney here "had the opportunity to review a portion of the 302 reports [produced by the government] and take notes on relevant details set forth therein" (D.I. 1237 at 5), but the Defendants wanted to have their own copies of the entire file.

[111] As the government points out, a subpoena pursuant to Rule 17 was likely an improper mechanism for obtaining the sought-after information. That rule provides, in relevant part, "The court may direct the witness to produce [books, papers,

157

multiple rounds of briefing plus a hearing – the District Court denied the motions as seeking irrelevant and non-exculpatory information and because the 302s never mentioned Leshner. The Court also made clear that it would not entertain any more motions from the Defendants before sentencing.

Scarfo then requested leave to move for a new trial.[112] The District Court denied the request as "probably untimely" and because the 302s simply did not contain the information claimed by Scarfo. (D.I. 1281.) It is that decision – not the previous decision denying Scarfo's Rule 17 motion to

---

documents, data, or other objects the subpoena designates] in court before trial or before they are to be offered in evidence." Fed. R. Crim. P. 17(c)(1). It is "not intended to provide a means of discovery for criminal cases" but rather "was designed to expedite a trial by providing a time and place *before* trial for the inspection of the subpoenaed materials." *United States v. Amirnazmi*, 645 F.3d 564, 595 (3d Cir. 2011) (citations, internal quotation marks, and alterations omitted).

[112] Scarfo claimed that his motion was

based upon new information that surfaced post-trial, related to the (1) the investigation in *United States v. Botsvynyuk*, (2) the Pelullos, (3) the Leshners, (4) Frank McGonigal, (5) Ken Stein, (6) Gary McCarthy, and (7) Howard Drossner, and all mentioned parties' ties to use of indentured servitude by and through various related cleaning companies.

(D.I. 1280 at 2 (footnotes omitted).)

158

subpoena the 302s – that Scarfo now challenges on appeal.[113] He concedes that he has "struggled to identify applicable precedent related to a court's failure to consider a motion for new trial[,]" but he still believes that the District Court's denial of leave to file the new-trial motion violated his constitutional rights. (NS Opening Br. at 176.)

In many contexts, we have adhered to an abuse-of-discretion standard of review when evaluating a challenge to a district court's denial of a request for leave to take some step in litigation. *See, e.g.*, *Talley v. Wetzel*, 15 F.4th 275, 285 n.6 (3d Cir. 2021) (leave to amend complaint); *Jones v. Zimmerman*, 752 F.2d 76, 78 (3d Cir. 1985) (leave to proceed in forma pauperis); *In re United Corp.*, 283 F.2d 593, 594-96 (3d Cir. 1960) (leave to file untimely statement of objections to an agency decision). The same deference should be afforded to district courts that find it necessary to prohibit further motion practice when issues have been aired and the time has come to move on. *Cf. Pierce v. Underwood*, 487 U.S. 552, 558 n.1 (1988) ("It is especially common for issues involving what can broadly be labeled 'supervision of litigation,' … to be given abuse-of-discretion review."); *United States v. Sheppard*, 17 F.4th 449, 454 (3d Cir. 2021) ("Underlying our review for abuse of discretion are the principles that: 1) a district court may have a better vantage point than we on the Court of Appeals to assess the matter, and 2) courts of appeals apply the abuse-of-discretion standard to fact-bound issues that are ill-suited for appellate rule-making[.]" (citations and internal quotation marks omitted)).

---

[113] The government's arguments on the merits of Scarfo's Rule 17 motion are therefore irrelevant.

Scarfo does not raise any basis for concluding that the District Court abused its discretion in denying his request, nor do we detect any. He does not dispute the District Court's conclusions that a motion for a new trial would likely be untimely and that the 302s did not contain the information he claimed they did. Nor does he dispute that the Court had already entertained "an extraordinary number of written motions" (D.I. 1281 at 1) – including more than a half-dozen after trial. Instead, he simply summarizes his attempts in the District Court to procure the 302s, then concludes that he "seeks remand for consideration of his motion for new trial under Rule 33(b), given the facts set forth herein[.]"[114] (NS Opening Br. at 181.) Because he fails to demonstrate that the District Court's denial of leave was "arbitrary or irrational" or rested upon "a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact[,]" Scarfo has not shown an abuse of discretion. *United States v.*

---

[114] The one case Scarfo does cite, *Ogden v. United States*, 112 F. 523 (3d Cir. 1902), predates the adoption of the Federal Rules of Criminal Procedure, which impose a "rigid" time limit on motions for new trials. *Eberhart v. United States*, 546 U.S. 12, 13 (2005). It is also factually distinguishable: the defendant there moved for a new trial immediately following the verdict based on undisputed evidence of extraneous influences on the jury, while Scarfo joined in three prior new-trial motions and does not dispute that the documents he sought would not have given him the information he wanted. *Ogden*, 112 F. at 524-25.

*Gonzalez*, 905 F.3d 165, 195 (3d Cir. 2018) (citation omitted).[115]

###### B. Pelullo's Motion for Remand Based on *Giglio* Evidence[116]

Unbeknownst to the Defendants or the District Court, Robert O'Neal – the FirstPlus chairman, who flipped and

---

[115] We remain cognizant of the countervailing due process interests in having one's arguments heard in court. One can imagine a scenario in which a party is cut off too soon and is precluded from making an argument essential to its case. Accordingly, we encourage district courts to exercise discretion cautiously in the face of such countervailing interests. Still, wherever the outer bounds of that discretion may be, the District Court was well within them here.

[116] We do not apply a standard of review in the typical sense, since Pelullo could not have raised this issue – which first came to the parties' attention while this appeal was pending – before the District Court. Rather, we look to the burden of proof applicable to *Brady* and *Giglio* claims, as discussed herein.

Pelullo bases his motion on 28 U.S.C. § 2106, which provides that, when reviewing a decision on appeal, we "may remand the cause and … require such further proceedings to be had as may be just under the circumstances." *Wiwa v. Royal Dutch Petroleum Co.*, 392 F.3d 812 (5th Cir. 2004). "Section 2106 grants us broad power when it comes to how best to dispose of a matter under our review." *Id*. at 819. Where a remand to the district court "would be an exercise in futility[,]"

testified for the government at trial – was himself under investigation in an unrelated criminal matter in the Western District of Texas while trial in this case was underway. That investigation culminated in O'Neal's indictment in December 2020, which the government brought to the Defendants' attention a few months later, after it had been unsealed. Pelullo now asks us to remand his case to the District Court so that he can seek an evidentiary hearing and move for a new trial pursuant to Rule 33 based on what he says was the government's failure to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972).[117] We decline to grant such relief.

According to his indictment, O'Neal ran chiropractic clinics in Texas and received millions of dollars in illegal kickbacks from hospitals and other healthcare providers, payments that he disguised as marketing fees and shared with

---

we may "make a complete disposition of the case" ourselves rather than having the District Court consider the matter in the first instance. *Id.*; *Beck v. Reliance Steel Prods. Co.*, 860 F.2d 576, 581 (3d Cir. 1988).

[117] The other Defendants all join in Pelullo's motion. In a second motion filed nearly a year after his original one, Pelullo makes the same arguments but also says we should dismiss the indictment against him with prejudice or order the District Court to do so. He offers no support for that extraordinary demand. Nor could he; the remedy for a *Brady* or *Giglio* violation is a new trial, not dismissal. *Giglio v. United States*, 405 U.S. 150, 153-55 (1972).

certain co-conspirators. [118] The indictment charged that, beginning in 2008 and continuing through 2013, O'Neal conspired with others to defraud the government and to solicit and collect healthcare kickbacks, in violation of 18 U.S.C. § 371. O'Neal was also charged with four counts of violating, and aiding and abetting the violation of, the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b)(2).

When a prosecutor in this case notified the Defendants of the Texas investigation in March 2021, he relayed the message from the O'Neal prosecution team in Texas that O'Neal first became a subject of investigation in 2013 and was not identified as a target until 2017. The Texas prosecutors also reportedly said that "the investigation of O'Neal remained covert" through at least the conclusion of the Defendants' trial in July 2014. (3d Cir. D.I. 345-3 at 3.) O'Neal was ultimately indicted in December 2020 and pled guilty the following August.

The prosecution team here asserts that it "did not learn O'Neal was even being investigated," or that "his prosecution concerned conduct dating back to 2008," until late January 2021. (3d Cir. D.I. 356.) And it did not obtain a copy of the

---

[118] In this context, a "kickback" is a payment made to encourage a healthcare provider to refer a patient to the defendant or to compensate the healthcare provider for doing so. 42 U.S.C. § 1320a-7b(b). Those payments are illegal when the patient's medical care is covered in whole or in part by a federal healthcare program such as Medicare or Medicaid. *Id.*

indictment until early February.[119] It also claims to have confirmed that, before early 2021, none of the "surviving members of the prosecution team" – who include prosecutors, FBI investigators, and a special agent for the Department of Labor – knew that "O'Neal was under investigation for any crimes with which he has now been charged." (3d Cir. D.I. 345-3 at 2-3.)

Pelullo doesn't buy that explanation. He notes that the crimes alleged in O'Neal's indictment "temporally overlap[ped]" with O'Neal's involvement in FirstPlus and his cooperation with the prosecutors in this case (3d Cir. D.I. 345-2 at 12-15), and he asks us to allow him to develop an evidentiary record in the District Court as to what the prosecutors knew about O'Neal at the time of trial. That record, he says, will enable him to move for a new trial based on the government's violation of its duty to turn over all "evidence [that] is material either to guilt or to punishment[,]" *Brady*, 373 U.S. at 87, including evidence "affecting [the] credibility" of its trial witnesses, *Giglio*, 405 U.S. at 153-55. The government's failure to turn over such evidence, if the information were in its actual or constructive possession, could violate his due process rights and require a new trial. *Id.*;

---

[119] The government initially represented that "Pelullo's prosecution team knew nothing about the investigation of O'Neal or the conduct prompting his indictment until shortly before the February 2021 unsealing of that indictment." (3d Cir. D.I. 346 at 2.) It then clarified that the indictment had been unsealed in early January 2021 – which is confirmed by the docket – but nonetheless insisted that it did not know about the investigation until late January.

164

*Dennis v. Sec'y, Pa. Dep't of Corr.*, 834 F.3d 263, 291-92 (3d Cir. 2016) (en banc).

The government responds that any knowledge the Texas prosecutors had about the O'Neal investigation should not be imputed to those in New Jersey and that, accordingly, the information was not in its possession – in any meaningful sense – at the time of trial. In this case, we need not wrestle with the question of imputation of knowledge, because Pelullo's motion for a new trial would fail anyway for two distinct reasons: it would be time-barred and it would not rest on a material nondisclosure.

First, remanding the case would prove fruitless because any motion would be time-barred. Rule 33(b)(1) provides that a motion for a new trial based on newly discovered evidence must be brought within three years of the verdict. *See United States v. O'Malley*, 833 F.3d 810, 813 (7th Cir. 2016) (applying Rule 33(b)(1) to *Brady* and *Giglio* claim); *United States v. Battles*, 745 F.3d 436, 447 (10th Cir. 2014) (same for *Brady* claim). That deadline is an "inflexible" one "meant to bring a definite end to judicial proceedings[.]" *United States v. Higgs*, 504 F.3d 456, 464 (3d Cir. 2007). Pelullo contends that it is unfair to apply that rule here, where it was the government who kept the investigation hidden until more than three years after he was convicted, but that characterization, even if it were accurate, does not allow us to disregard Rule 33's mandatory language. And, as the government points out, refusing to ignore the time limits of Rule 33 does not leave a defendant utterly bereft of the ability to pursue a *Giglio* claim. Once his convictions become final, he may be able to timely seek appropriate relief in the District Court pursuant to 28 U.S.C. § 2255. *See O'Malley*, 833 F.3d at 813 (concluding that "a

165

postjudgment motion based on newly discovered evidence which happens to invoke a constitutional theory" – such as *Giglio* – "can be brought under Rule 33(b)(1) or § 2255").

Second, Pelullo offers us no reason to believe that the nondisclosure of the investigation into O'Neal was material. The government's failure to disclose potential impeachment evidence violates due process, and thus requires a new trial, "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). Put somewhat differently, a *Brady* or *Giglio* claim requires a showing that the undisclosed evidence "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles v. Whitley*, 514 U.S. 419, 435 (1995). The O'Neal evidence does not change the lighting here in any material way. Had the Defendants known in advance that O'Neal was a subject (but not yet a target) of an investigation – and had they used that evidence to undermine O'Neal's credibility on the stand or to persuade the government not to call O'Neal as a witness – that would not have saved them from conviction.

Pelullo and the government disagree as to O'Neal's significance to the prosecution's case-in-chief: Pelullo calls him "the Government's main witness" (3d Cir. D.I. 345-2 at 45), while the government says that his testimony was of a "limited nature" (3d Cir. D.I. 345-3 at 3). It appears to us that O'Neal's testimony about the looting of FirstPlus was one piece of corroboration within a mass of damning evidence. There were nineteen other government witnesses and extensive documentary evidence. *See, e.g.*, *supra* Sections II.G, III.A-B, IV.B, V.C-E. In the face of that overwhelming proof of guilt,

166

the Defendants could not have evaded conviction by pointing out that O'Neal ran a shady chiropractic practice, nor by persuading the government to sideline him at trial. *Cf. Giglio*, 405 U.S. at 151, 154-55 (finding due process violation where government did not reveal impeachment evidence about "the only witness linking petitioner with the crime[,]" on whose testimony "the Government's case depended almost entirely").

Notwithstanding that other evidence, Pelullo insists that O'Neal's testimony was essential to establishing the fraudulent acquisitions of Scarfo's and Pelullo's shell companies and to connecting Pelullo to LCN. He first argues that "the Government's theory that the acquisitions were fraudulent depended directly upon O'Neal's testimony, and specifically the notion that the acquisitions were made without [O'Neal's] knowledge or consent." (3d Cir. D.I. 345-2 at 18.) But Pelullo's counsel already attacked O'Neal's credibility on that claim at trial. He impeached O'Neal with a transcript of a board meeting in which O'Neal discussed the acquisition of Rutgers and authorized William Maxwell to sign off on the sale on his behalf. We seriously doubt that impeaching O'Neal with evidence of his unrelated wrongdoing would have changed his credibility in the eyes of the jury.

As for Pelullo's claim that O'Neal's testimony was necessary to prove Pelullo's mob ties, his own briefing undercuts that assertion. O'Neal testified that he was told by William Maxwell that Pelullo "was a consultant for Mr. Scarfo and his group[,]" which O'Neal took to mean that Pelullo was connected to "[o]rganized crime." (JAC at 2595-96.) Pelullo himself portrays that statement as "cryptic and devoid of actual content[,]" and he likewise describes O'Neal's testimony about his perception of Scarfo as "the Godfather" as unpersuasive

167

and speculative. (3d Cir. D.I. 345-2 at 18-22.) And, as Pelullo points out, O'Neal admitted on cross-examination that his only knowledge of organized crime came from watching movies and news coverage about Italian-American mobsters. More importantly, the proof of Pelullo's mob ties hardly depended on O'Neal's passing impressions. Pelullo's own statements and long history with the Scarfos proved that point.[120]

In short, the evidence of O'Neal's participation in the kickback scheme does not "put the whole case in such a different light as to undermine confidence in the verdict."[121]

---

[120] As already noted, *see supra* Section IV.B.1, the evidence of Pelullo's mob ties outside of what O'Neal had to say was extensive. The government presented expert testimony about Scarfo's and Scarfo's father's records of involvement with LCN. It then connected Pelullo to LCN through evidence of, *inter alia*, his effectively familial relationship with the Scarfos, his efforts to ensure Scarfo profited from FirstPlus without doing any work, and his fear of the consequences of failing to provide financially for Scarfo's father.

[121] Pelullo also uses his motion to address several other issues, including alleged deficiencies in the government's pretrial compliance with its disclosure obligations unrelated to the O'Neal investigation and post-trial discoveries of purported inconsistencies in O'Neal's testimony. He cites little in support of those allegations – some of which appear to duplicate arguments raised in his primary briefing – and offers no reason why those issues could not have been fully argued in his opening brief, so we decline to address them. *See United*

168

*Kyles*, 514 U.S. at 435. Remanding Pelullo's case – and delaying the resolution of his and the other Defendants' appeals – would therefore inevitably fail to secure him a new trial, and so a remand is not in order.

## VIII. CONCLUSION

The Defendants have raised a wide-ranging and extensive list of objections to their convictions and sentences, but none, save one, entitle any of them to relief. We will accordingly affirm the convictions and sentences of Scarfo, Pelullo, and William Maxwell. We will also affirm John Maxwell's conviction, but we will vacate his sentence and remand to the District Court for further proceedings consistent with this opinion. We conclude with a particular commendation to the District Court for its deft and wholly admirable management of this very complicated matter.

---

*States v. Rawlins*, 606 F.3d 73, 82 n.11 (3d Cir. 2010) (refusing to address argument that appellant "fail[ed] to develop"); *United States v. Pelullo*, 399 F.3d 197, 222 (3d Cir. 2005) (requiring that issues be raised in an opening brief to avoid forfeiture).